# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

IN RE: GENERAL MOTORS
CORP. AIR CONDITIONING
MARKETING AND SALES
PRACTICES LITIGATION


ALL CASES

Case No. 18-md-02818

Hon. Matthew F. Leitman


**FIRST AMENDED CONSOLIDATED
MASTER CLASS ACTION
<u>COMPLAINT</u>**


**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................1

II.     JURISDICTION & VENUE ...............................................................7

III.    PARTIES ............................................................................................8

    A.      Plaintiffs .............................................................................. 8

        1.      Plaintiff Rodney Martin .......................................... 8

        2.      Plaintiff Kenneth Gay ........................................... 10

        3.      Plaintiff Carl Williams .......................................... 12

        4.      Plaintiff Clarence Larry ........................................ 16

        5.      Plaintiff Erica Wolfe ............................................. 19

        6.      Plaintiff Andrew C. Hill ........................................ 21

        7.      Plaintiff Richie Ainsworth ..................................... 23

        8.      Plaintiff Jones Won ............................................... 25

        9.      Plaintiff Hayes Ellis .............................................. 29

        10.     Plaintiff Billy Frank .............................................. 31

        11.     Plaintiff John O'Brien ........................................... 34

        12.     Plaintiff Marcus Bell ............................................. 37

        13.     Plaintiffs Aaron and Jan Howard ........................... 39

        14.     Plaintiff Leslie Griffin .......................................... 41

        15.     Plaintiff Edilberto Gomez ...................................... 44

        16.     Plaintiff Corey Steketee ........................................ 46

    B.      Defendants ........................................................................ 49

        1.      General Motors Company ...................................... 49

        2.      General Motors, LLC ............................................ 50

IV.     FACTUAL ALLEGATIONS ...........................................................51

    A.      Automotive Air Conditioning Systems ............................. 51

    B.      The Defect in the Class Vehicles ..................................... 53

    C.      The AC System Defect Poses a Safety Risk to Vehicle Occupants. . 57

    D.      GM's Longstanding Knowledge of the Defect ................. 60

        1.      GM's Knowledge of the AC System Defect Gained from Pre-

## TABLE OF CONTENTS
### (continued)

Page

   Release Design, Manufacture, Engineering, and Testing Data. .................................................................................. 61

  2. GM's Knowledge of the AC System Defect from Technical Service Bulletins ..................................................... 63

  3. GM's Knowledge of the AC System Defect from Repair Data .................................................................................. 65

  4. GM's Knowledge of the AC System Defect Gathered from the Large Number of Replacement AC System Parts Ordered from GM ......................................................................... 66

  5. GM's Knowledge of the AC System Defect Gained from Class Member Complaints Made Directly to GM............................ 67

  6. GM's Knowledge of the AC System Defect from Class Member Complaints Lodged with NHTSA............................. 71

  7. GM's Knowledge of the AC System Defect from Class Member Complaints on Third-Party Websites ........................ 87

 E. GM's "Special Coverage Program" ................................. 101

V. APPLICABLE WARRANTIES ................................................103

VI. GM'S MARKETING AND CONCEALMENT ........................104

VII. FRAUDULENT CONCEALMENT ALLEGATIONS .............107

VIII. TOLLING OF STATUTES OF LIMITATIONS .......................110

Fraudulent Concealment Tolling ........................................................110

Estoppel...............................................................................................111

Discovery Rule.....................................................................................111

X. CHOICE OF LAW ALLEGATIONS .......................................112

XI. CLASS ALLEGATIONS .........................................................114

 A. The Nationwide Class ................................................... 116

 B. The State Classes........................................................... 116

Numerosity..........................................................................................118

Typicality ............................................................................................118

Adequate Representation .....................................................................119

# TABLE OF CONTENTS
## (continued)

**Page**

Predominance of Common Issues..........................................................................119

Superiority...........................................................................................................123

XII.   CAUSES OF ACTION................................................................124

    A.   NATIONWIDE CLASS CLAIMS ..................................... 124

FIRST CAUSE OF ACTION BREACH OF WRITTEN WARRANTY
    UNDER THE MAGNUSON-MOSS WARRANTY ACT .........................124

SECOND CAUSE OF ACTION BREACH OF IMPLIED WARRANTY OF
    MERCHANTABILITY (MICH. COMP. LAWS § 440.2314)...................132

THIRD CAUSE OF ACTION FRAUDULENT CONCEALMENT...................134

FOURTH CAUSE OF ACTION UNJUST ENRICHMENT...............................136

    B.   STATE CLASS CLAIMS .................................................. 137

        1.   ALABAMA ............................................................ 137

FIFTH CAUSE OF ACTION VIOLATION OF ALABAMA'S
    DECEPTIVE TRADE PRACTICES ACT ................................................137

SIXTH CAUSE OF ACTION FRAUD BY CONCEALMENT ..........................141

        2.   ARIZONA.............................................................. 143

SEVENTH CAUSE OF ACTION VIOLATIONS OF THE CONSUMER
    FRAUD ACT (Arizona Rev. Stat. § 44-1521, *et. seq.*)...............................143

EIGHTH CAUSE OF ACTION FRAUD BY CONCEALMENT........................148

        3.   CALIFORNIA ....................................................... 150

NINTH CAUSE OF ACTION VIOLATION OF CALIFORNIA'S
    CONSUMER LEGAL REMEDIES ACT ("CLRA") CAL. CIV.
    CODE § 1750, *et seq.* ..................................................................................150

TENTH CAUSE OF ACTION VIOLATION OF CALIFORNIA'S UNFAIR
    COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, ET
    SEQ.............................................................................................................156

ELEVENTH CAUSE OF ACTION BREACH OF EXPRESS WARRANTY
    PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY
    ACT ..........................................................................................................158

TWELFTH CAUSE OF ACTION BREACH OF EXPRESS WARRANTY.......161

## TABLE OF CONTENTS
## (continued)

**Page**

THIRTEENTH CAUSE OF ACTION BREACH OF IMPLIED
    WARRANTY UNDER SONG-BEVERLY CONSUMER
    WARRANTY ACT ..................................................................165

FOURTEENTH CAUSE OF ACTION BREACH OF IMPLIED
    WARRANTY .......................................................................167

FIFTEENTH CAUSE OF ACTION FRAUD BY CONCEALMENT .................170

        4.      FLORIDA ........................................................ 173

SIXTEENTH CAUSE OF ACTION VIOLATIONS OF THE FLORIDA
    DECEPTIVE AND UNFAIR TRADE PRACTICES ACT FLA.
    STAT. § 501.201, *ET SEQ.* .......................................................173

SEVENTEENTH CAUSE OF ACTION FRAUD BY CONCEALMENT ..........176

EIGHTEENTH CAUSE OF ACTION BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY ................................................178

        5.      GEORGIA......................................................... 180

NINETEENTH CAUSE OF ACTION BREACH OF EXPRESS
    WARRANTY .......................................................................180

TWENTIETH CAUSE OF ACTION BREACH OF IMPLIED
    WARRANTY .......................................................................185

TWENTY-FIRST CAUSE OF ACTION VIOLATIONS OF GEORGIA
    FAIR BUSINESS PRACTICES ACT (Ga. Code Ann. § 10-1-390, et
    seq.).....................................................................................187

TWENTY-SECOND CAUSE OF ACTION VIOLATIONS OF
    GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
    (Ga. Code Ann. § 10-1-370, *et seq.*).............................................192

TWENTY-THIRD CAUSE OF ACTION FRAUD BY CONCEALMENT ........197

        6.      LOUISIANA ..................................................... 201

TWENTY-FOURTH CAUSE OF ACTION VIOLATIONS OF THE
    LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER
    PROTECTION LAW (La. Rev. Stat. § 51:1401, *et seq.*) ...........................201

TWENTY-FIFTH CAUSE OF ACTION BREACH OF IMPLIED
    WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST
    REDHIBITORY DEFECTS (La. Civ. Code Art. 2520, 2524) ...................206

-iv-

# TABLE OF CONTENTS
## (continued)

Page

TWENTY-SIXTH CAUSE OF ACTION VIOLATIONS OF LOUISIANA
PRODUCTS LIABILITY ACT ..................................................................207

      7.     MICHIGAN ........................................................................ 210

TWENTY-SEVENTH CAUSE OF ACTION VIOLATION OF THE
MICHIGAN CONSUMER PROTECTION ACT (Mich. Comp. Laws
§ 445.903, *et. seq.*) ................................................................................210

TWENTY-EIGHTH CAUSE OF ACTION BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (Mich. Comp. Laws
§ 440.2314) ............................................................................................216

TWENTY-NINTH CAUSE OF ACTION FRAUD BY CONCEALMENT ........219

      8.     NEW JERSEY ................................................................... 221

THIRTIETH CAUSE OF ACTION VIOLATION OF NEW JERSEY
CONSUMER FRAUD ACT (N.J. Stat. Ann. § 56:8-1, e*t. seq.*)................221

THIRTY-FIRST CAUSE OF ACTION BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (N.J. Stat. Ann. § 12A:2-
314) ........................................................................................................226

THIRTY-SECOND CAUSE OF ACTION FRAUD BY CONCEALMENT ......228

      9.     NEW YORK ....................................................................... 230

THIRTY-THIRD CAUSE OF ACTION VIOLATION OF NY DECEPTIVE
AND UNFAIR TRADE PRACTICES & FALSE ADVERTISIGN
ACTS (GBL § 349 & 350) ......................................................................230

THIRTY-FOURTH CAUSE OF ACTION DAMAGES FOR VIOLATIONS
OF NY GBL §§ 349 AND 350 .................................................................234

THIRTY-FIFTH CAUSE OF ACTION BREACH OF EXPRESS
WARRANTY ...........................................................................................236

      10.    OKLAHOMA ..................................................................... 237

THIRTY-SIXTH CAUSE OF ACTION VIOLATION OF OKLAHOMA
CONSUMER PROTECTION ACT (Okla. Stat. Tit. 15 § 751, *et. seq.*) ....237

THIRTY-SEVENTH CAUSE OF ACTION BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY (12a Okla. Stat. Ann. § 2-
314) ........................................................................................................243

THIRTY-EIGHTH CAUSE OF ACTION FRAUD BY CONCEALMENT ........245

# TABLE OF CONTENTS
## (continued)

**Page**

11.   TENNESSEE ........................................................................ 247

THIRTY-NINTH CAUSE OF ACTION................................................247

VIOLATION OF TENNESSEE'S CONSUMER PROTECTION ACT
("TCPA") (Tenn. Code Ann. § 47-18-101, *et seq.*) ...................................247

FORTIETH CAUSE OF ACTION FRAUD BY CONCEALMENT ...................252

12.   TEXAS ........................................................................... 255

FORTY-FIRST CAUSE OF ACTION VIOLATIONS OF THE TEXAS
DECEPTIVE TRADE PRACTICES ACT ...............................................255

FORTY-SECOND CAUSE OF ACTION BREACH OF IMPLIED
WARRANTY OF MERCHANTABILITY ...............................................257

13.   WASHINGTON.................................................................. 259

FORTY-THIRD CAUSE OF ACTION VIOLATIONS OF THE
WASHINGTON CONSUMER PROTECTION ACT (Wash. Rev.
Code § 19.86.010, *et seq.*) ...........................................................259

RELIEF REQUESTED..........................................................................262

DEMAND FOR JURY TRIAL ..............................................................264

CERTIFICATE OF SERVICE ...............................................................266

## I.     <u>INTRODUCTION</u>

1.     Plaintiffs Rodney Martin, Kenneth Gay, Carl Williams, Clarence Larry, Erica Wolfe, Andrew C. Hill, Richie Ainsworth, Jones Won, Hayes Ellis, Billy Frank, John O'Brien, Marcus Bell, Aaron and Jan Howard, Leslie Griffin, Edilberto Gomez, and Corey Steketee (collectively, "Plaintiffs"), bring this action for themselves and on behalf of all persons ("Class Members") who purchased or leased certain vehicles equipped with uniform and uniformly defective air conditioning systems designed, manufactured, distributed, warranted and sold/leased by General Motors Company, General Motors LLC, and/or its related subsidiaries or affiliates (collectively, "GM"), as further described below.

2.     The vehicles at issue in this action include the 2015-2017 Cadillac Escalade and Escalade ESV, 2014-2017 Chevrolet Silverado 1500, 2015-2017 Chevrolet Suburban, 2015-2017 Chevrolet Tahoe, 2014-2017 GMC Sierra 1500, and 2015-2017 GMC Yukon (the "Class Vehicles").[1]

3.     These Class Vehicles' air conditioning systems ("AC Systems") have a serious defect that causes the AC Systems to (a) crack and leak refrigerant; (b) lose pressure within the AC System; and (c) fail to properly function to provide cooled air into the Vehicle's passenger cabin (the "AC System Defect").

---

[1] Plaintiffs reserve the right to amend the definition of "Class Vehicles," should further discovery reveal that additional models and model-years are affected by the AC System Defect.

4.     On information and belief, the AC System is substantially the same, from a mechanical engineering standpoint, in all Class Vehicles, in that the AC Systems in all Class Vehicles are made up of substantially the same components and all employ the same general mechanism to deliver cooled air to the passenger cabin.

5.     The AC System in the Class Vehicles is defective because it is insufficiently strong and durable to perform its intended function—providing cooled air into the passenger cabin of the Vehicle—and to withstand the internal pressures and external forces that the System encounters during normal, expected and foreseeable usage and conditions.

6.     The AC System failure can first occur at low mileages, within the Defendants' New Vehicle Express Warranty periods.

7.     Because of the high number of failures, AC System replacement parts are on national backorder and the wait for replacement parts is long—often many months—during which time Plaintiffs and Class Members must suffer without a functioning AC System in their Vehicles.

8.     Even when consumers do receive replacement parts under warranty, GM replaces the parts with equally defective replacement parts, leaving the AC System susceptible to repeated failure.  As a result, GM's warranty service does

not actually remedy the AC System Defect and causes its warranty to fail of its essential purpose.

9.    When the AC System fails outside of the warranty period, consumers are forced to pay between $150 and $2000 out of pocket to repair their AC Systems with the same defective parts, and still are subjected to the same long wait times for backordered parts. The long wait times for backordered GM parts meant many consumers were forced to buy aftermarket replacement parts because there was no timeline for when GM parts would be available.

10.    The AC System Defect inhibits Plaintiffs and Class Members' expected, comfortable, and safe use of their Vehicles, and requires Class Members to go months without functioning AC Systems while waiting for replacement parts, and to pay for equally defective replacement parts that themselves are susceptible to failure.

11.    The AC System Defect also creates a safety risk for Plaintiffs and Class Members because AC System failure subjects the occupants of the Vehicles to unsafely high temperatures and can lead to decreased visibility due to fogging of the windows and an inability to use the AC System to de-fog the windows.

12.    On information and belief, prior to sale or lease of the Vehicles at issue, GM knew of the AC System Defect through sources such as pre-release evaluation and testing; repair data; replacement part sales data; early consumer

-3-

complaints made directly to GM, collected by the National Highway Transportation Safety Administration's Office of Defect Investigation ("NHTSA ODI"), and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from GM dealers; and other internal sources. Yet despite this knowledge, GM failed to disclose and actively concealed the AC System Defect from Class Members and the public, and continued to market and advertise the Class Vehicles as "reliable," "durable," with "functional," "customer-focused" interior AC Systems, which they are not.

13.    GM refused—and continues to refuse—to disclose the Defect to prospective customers, and actively conceals and concealed the Defect from Plaintiffs and Class members prior to and at the time of sale. GM has known of the Defect since well before October 2014, when it first issued a Technical Service Bulletin ("TSB")[2] advising its authorized dealers and service technicians of the

---

[2] TSBs are issued after automobile manufacturers open an investigation into a potential defect, compile their findings, draft a proposed remedy for internal review and then ultimately issue a finalized TSB to dealers. *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014) (observing TSBS are preceded by "an accretion of knowledge by [the manufacturer]." Courts have held that 16 months is a reasonable time period for a manufacturer to investigate and issue a TSB in response to a defect. *Butler v. Porsche Cars N. Am., Inc.*, No. 16-CV-02042-LHK, 2016 WL 4474630, at *5 (N.D. Cal. Aug. 25, 2016) ("The TSB's relevance to the issue of GM's knowledge is even more compelling in the instant case, where only *eight months* elapsed between the date of sale of Plaintiff's car and the release date of the TSB, compared to *Philips*, which had a gap of 16 months between the date of sale and the date of the TSB. It is reasonable to infer that, in order for Defendants to release the TSB addressing the defect only eight

*Footnote continued on next page*

Defect and a simple prophylactic solution it (erroneously) claimed would resolve the Defect: using a bracket to better secure the refrigerant hose to minimize vibration and the likelihood of failure.[3] But GM nevertheless chose to conceal from Class members that the components within the AC System are defective and eventually will require costly repairs, and that the Defect reduced the value of the vehicle at the time of sale and/or will reduce the resale value of Class Vehicles.

14. GM has been plagued with customer complaints concerning premature failure of the AC System in Class Vehicles as a direct result of the Defect, yet has done nothing to protect the significant investment Class members made in these Vehicles. Indeed, although a later TSB instructed authorized service technicians to inspect Class Vehicle AC Systems when performing vehicle maintenance, technicians were authorized to take further measures *only* if the Defect had manifested, thereby ensuring that tens of thousands of Class Vehicles would manifest the Defect, and that owners of Class Vehicles would incur millions of dollars in repair costs. *See* TSB PIE0340, attached as **Exhibit A**.

---

months after the date of sale, Defendants had knowledge of the defect by at least May 2007.").

[3] *See* https://www.repairprocedures.com/service-bulletin/document/2015/cadillac/escalade-esv-2wd/preliminary-information/pit5331/100302829_7527571_2_82_0_3996395.html (last visited Oct. 30, 2017). **(Exhibit S)**

15.     Moreover, when customers whose Vehicles manifested the Defect bring in their Vehicles to GM's authorized technicians for repairs—whether in- or out-of-warranty - GM's authorized dealers routinely inform them that the parts required to repair the Vehicles are on backorder and unavailable. Class members thus are deprived for weeks or even months of a functioning AC System, even during the hot Summer months, or are forced to obtain aftermarket parts from a third party at their own expense, which, according to authorized GM dealers, will prohibit such customers from participating in a recall campaign should GM ever decide to initiate one.

16.     GM has failed to provide an effective in-warranty fix for the Defect within a reasonable time, forced Class Members to wait unreasonable lengths of time for repairs, and/or pay out-of-pocket to replace broken AC System components with equally defective replacement parts, causing its warranty to fail of its essential purpose.

17.     As a result of GM's alleged misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, including that the Class Vehicles contain defective AC Systems, have manifested and/or will manifest, the AC System Defect, and that GM has not provided an effective, no-cost remedy for this Defect within a reasonable amount of time. Furthermore, Plaintiffs and Class Members have incurred, and will continue to incur, out-of-pocket unreimbursed

-6-

costs and expenses relating to the AC System Defect.  As a result of the Defect, the Vehicles were worth less at the time of sale and/or will be worth less at the time of resale.

## II.   JURISDICTION & VENUE

18.    This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiffs and other Class members are citizens of a different state than Defendant.

19.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over GM because it conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

20.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants, as corporate entities, are deemed to reside in any judicial district in which they are subject to personal jurisdiction. Additionally, GM transacts business within this District, and some of the events establishing the claims arose in this District. Additionally, GM requested that the Judicial Panel on Multi-District litigation transfer and centralize the AC System Defect class actions filed by Plaintiffs to this District and the Judicial Panel has done so.

21.     Plaintiffs' venue declaration pursuant to Cal. Civ. Code § 1780(d) are attached hereto as **Exhibit B** and **Exhibit E.**

22.     Pursuant to this Court's direction that new plaintiffs can file directly in the MDL without first filing in the district in which they reside, new plaintiffs file this action as if it had been filed in the judicial district in which they reside.

III.   **PARTIES**

    A.   **Plaintiffs**

        1.   **Plaintiff Rodney Martin**

23.     Plaintiff Rodney Martin ("Plaintiff Martin") is a citizen of the State of Alabama, and currently resides in Camp Hill, Alabama.

24.     On September 24, 2015, Plaintiff Martin purchased a new 2015 Chevrolet Silverado 1500 from McKelvey Chevrolet, an authorized GM dealer in Dadeville, Alabama, for personal, family, and/or household use. His Class Vehicle bears the following VIN: 3GCUKSECXFG476755.

25.     Prior to purchasing his Class Vehicle, Plaintiff Martin test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Martin of the Defect's existence at any time either prior to or following his

purchase, whether at the point of sale or otherwise. Plaintiff Martin relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

26.     In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was equipped with a functioning AC System, and covered by Chevrolet's New Vehicle Limited Warranty. The AC System and New Vehicle Limited Warranty were central to Plaintiff Martin's purchasing decision. Plaintiff Martin relied on Defendants' representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase his vehicle.

27.     In November 2017, with approximately 63,000 miles on the odometer, the AC System in Plaintiff Martin's Class Vehicle failed without warning.

28.     Plaintiff Martin subsequently brought his Class Vehicle to McKelvey Chevrolet, where an authorized GM technician informed him his vehicle had a leak near a condenser mount. Plaintiff Martin inquired as to whether GM had recalled Class Vehicles due to a Defect in the AC System, but McKelvey Chevrolet's informed him GM had not initiated a recall.

29.     Plaintiff Martin waited a week for the necessary parts to arrive, at which point McKelvey Chevrolet replaced the AC condenser, and recharged the AC System with PAG oil and Freon.

30.     Plaintiff Martin paid approximately $695.86 to have his AC System repaired, but does not, and cannot, know whether the repairs cured the Defect in his Class Vehicle.

31.     Plaintiff Martin has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost he incurred to diagnose and repair the Defect, and the diminished value of his Class Vehicle. Had Defendants disclosed the Defect to Plaintiff Martin, he would not have bought his Class Vehicle or would have paid less for it.

### 2.     **Plaintiff Kenneth Gay**

32.     Plaintiff Kenneth Gay ("Plaintiff Gay") is a citizen of the State of Arizona, and currently resides in Surprise, Arizona.

33.     In or around November 2013, Plaintiff Gay purchased a new 2014 Chevrolet Silverado from Sands Chevrolet Surprise, an authorized GM dealer in Surprise, Arizona, for personal, family and/or household use. His Class Vehicle bears the following VIN: 3GCUKSEC2EG189098.

34.     Prior to purchasing his Class Vehicle, Plaintiff Gay test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff

Gay of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff Gay relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

35.    In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was equipped with an AC System, the functionality of which was important to Plaintiff Gay in the hot temperatures of Arizona. The AC System was central to Plaintiff Gay's purchasing decision, and he relied on Defendants' representations regarding its functionality in deciding to purchase his vehicle.

36.    In or around June 2017, with approximately 50,846 miles on the odometer, the AC System in Plaintiff Gay's Class Vehicle failed without warning.

37.    Plaintiff Gay took his Class Vehicle to Sands Chevrolet Surprise, an authorized GM dealer in Surprise, Arizona, to report the AC System failure. An authorized GM technician inspected his vehicle and confirmed that the AC System's condenser was leaking, which allowed refrigerant to leak out of the System and resulted in a failure thereof.

38.    Because replacement condensers were on national backorder and the authorized GM dealer could not confirm when replacement parts would become available, Plaintiff Gay would have had to pay around $1,500 and wait, at minimum, several weeks before his Class Vehicle could be repaired. To avoid

having a vehicle without a working AC System in the Arizona heat while waiting for replacement parts, Plaintiff Gay was forced to have his Vehicle's condenser "repaired".

39.     Upon reinstalling the "repaired" condenser, Sands Chevrolet Surprise tested the AC System, observed refrigerant continue to leak, and determined the repair was ineffective.  Sands Chevrolet Surprise thereafter located a replacement condenser which it installed in Plaintiff Gay's Class Vehicle.

40.     Plaintiff Gay paid around $700.00 to have his AC system repaired, but does not, and cannot, know whether the repairs cured the Defect in his Class Vehicle.

41.     Plaintiff Gay has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost he incurred to diagnose and repair the Defect, and the diminished value of his Class Vehicle. Had Defendants disclosed the Defect to Plaintiff Gay, he would not have bought his Class Vehicle or would have paid less for it.

### 3.     Plaintiff Carl Williams

42.     Plaintiff Carl Williams resides in Thousand Oaks, California.

43.     Plaintiff Williams owns a 2014 Chevrolet Silverado, which he purchased new on or about November 10, 2014 from Paradise Chevrolet in

-12-

Ventura, California.  His Class Vehicle bears the following VIN:

3GCPCSEC9EG529258.

44.     Plaintiff Williams's Class Vehicle was designed, manufactured, sold, distributed, advertised, marketed, and warranted by GM.

45.     Plaintiff Williams purchased his Class Vehicle primarily for his personal, family, and household use.

46.     Prior to purchasing his Class Vehicle, Plaintiff Williams test drove the vehicle, viewed the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features.  Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Williams of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise.  Plaintiff Williams relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

47.     The AC System and New Vehicle Limited Warranty were central to Plaintiff Williams's purchasing decision.  Plaintiff Williams relied on Defendants' representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase his vehicle.

48.     On or around January 30, 2017, Plaintiff Williams noticed a leak of fluid from his Vehicle, which he later learned was refrigerant. Plaintiff Williams took his Vehicle to Silver Star Chevrolet in Thousand Oaks, California, on or

around February 3, 2017 to complain about the leak but the dealership said there was no leak.

49.     On or around February 4, 2017, Plaintiff Williams's Vehicle's AC System failed. At the time, his Vehicle had just around 19,000 miles on it. Plaintiff Williams took his Vehicle back to Silver Star on or around February 13, 2017 to complain about the AC System failure. The dealership found that the AC System had cracked and leaked refrigerant and attempted to repair the AC System. The repair service on Plaintiff Williams's Vehicle was covered by GM under warranty, but this repair service proved ineffective.

50.     On or around June 1, 2017, Plaintiff Williams's Vehicle's AC System failed again. At the time the Vehicle had around 23,912 miles on it. On June 1, Plaintiff Williams again took his Vehicle to Silver Star to complain that the AC System had failed again despite the prior repair attempt. The dealership again found the AC System had cracked and leaked refrigerant. However, because the dealership had run out of the replacement parts, Plaintiff Williams had to wait over a week – with no functioning AC in the summer heat – before his Vehicle could be repaired. Plaintiff Williams's Vehicle was still under warranty and so the second repair service on Plaintiff Williams's Vehicle was covered by GM.

51.     Plaintiff Williams expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know of, or expect,

-14-

that his Vehicle's AC System would leak refrigerant, lose pressure, and fail to function, nor was he aware from any source prior to purchase of the unexpected, backordered, and repeated repairs he would have to make on his Vehicle's AC System simply to have it function. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

52.    Plaintiff Williams regularly saw advertisements for GM vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before he purchased his Class Vehicle in November 2015. Although he does not recall the specifics of the many GM advertisements he saw before he purchased his Class Vehicle, he does recall that state-of-the-art engineering and a comfortable interior were frequent themes across the advertisements he saw. Those advertisements about state-of-the-art engineering and a comfortable interior influenced his decision to purchase his Vehicle. Had those advertisements or any other GM materials disclosed to Plaintiff Williams that the Class Vehicles had defective AC Systems, or that he would have to have repeated repairs to the AC System simply to keep it functioning, he would not have purchased his Class Vehicle, or would have paid less for it.

53.    GM had notice of Plaintiff Williams's claims on or about January 2017, when Plaintiff Williams first took his Vehicle to Silver Star Chevrolet to complain about the refrigerant leak, and February 2017 when Plaintiff Williams

took his Vehicle back to Silver Star to complain that his AC System had failed. GM had further notice of Plaintiff Williams's claims in June 2017, when Plaintiff Williams brought his Vehicle back to Silver Star to complain that the AC System had failed again.

### 4.      Plaintiff Clarence Larry

54.     Plaintiff Clarence Larry ("Plaintiff Larry") is a citizen of the State of California, and currently resides in Modesto, California.

55.     In March 2015, Plaintiff Larry purchased a new 2015 Chevrolet Tahoe from John L. Sullivan Chevrolet ("Sullivan Chevrolet"), an authorized GM dealer in Roseville, California, for personal, family, and/or household use. His Class Vehicle bears the following VIN: 1GNSKCKCSFR112651.

56.     Prior to purchasing his Class Vehicle, Plaintiff Larry test drove the vehicle, viewed advertisements for the vehicle, and spoke with GM sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Larry of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff Larry relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

57.     The AC System and New Vehicle Limited Warranty were central to Plaintiff Larry's purchasing decision. Plaintiff Larry relied on Defendants'

representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase his vehicle.

58.    On or around April 27, 2017, with approximately 69,361 miles on the odometer, the AC System in Plaintiff Larry's Class Vehicle failed without warning.

59.    Plaintiff Larry brought his Class Vehicle to Sullivan Chevrolet, where an authorized GM technician informed him his condenser was leaking despite no evidence of outside damage.

60.    At the time the Defect manifested, Plaintiff Larry's Class Vehicle was covered by a 100,000 mile extended warranty he had purchased from Sullivan Chevrolet, however, the warranty only enables Plaintiff to purchase OEM parts at cost directly from Sullivan Chevrolet.

61.    Sullivan Chevrolet informed Plaintiff Larry that it could not complete the necessary repairs at that time because the condenser used in Class Vehicles was backordered nationwide, GM did not know when the part would become available and he would be added to a waiting list and contacted once replacement parts became available.

62.    Plaintiff Larry thereafter directly contacted GM and advised that he could not safely operate his Class Vehicle without a functioning AC System

because he suffers from high blood pressure.  GM reiterated that it did not know when the condensers needed to repair Class Vehicles would become available.

63.     Because Plaintiff Larry required a functioning AC System to safely operate his Class Vehicle, Plaintiff Larry attempted to procure a replacement condenser through third parties.  Finally, roughly sixty days after his AC System failed, Plaintiff Larry located and purchased a replacement condenser from a third party for approximately $400.

64.     On or around June 19, 2017, Plaintiff Larry brought both his vehicle and the third-party condenser to Sullivan Chevrolet so that GM authorized technicians could repair his AC System.  Chevrolet recharged the AC System with refrigerant, replaced two seals and installed the replacement condenser.

65.     Plaintiff Larry paid Sullivan Chevrolet $700 for the repairs, exclusive of taxes and the approximately $400 he paid to purchase a condenser from a third party.

66.     Plaintiff Larry does not, and cannot, know whether the repairs cured the Defect in his Class Vehicle.

67.     Plaintiff Larry has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost incurred to repair the Defect and the diminished

value of his Class Vehicle. Had Defendants disclosed the Defect to Plaintiff Larry,

he would not have bought his vehicle or would have paid less for it.

### 5.   Plaintiff Erica Wolfe

68.     Plaintiff Erica Wolfe ("Plaintiff Wolfe") is a citizen of the State of

Florida, and currently resides in Wimauma, Florida.

69.     On or about April 30, 2016, Plaintiff Wolfe purchased a certified pre-

owned 2015 Chevrolet Tahoe with approximately 34,000 miles on the odometer

with an extended warranty on the vehicle from Morse Cadillac Brandon, an

authorized GM dealer in Brandon, Florida, for personal, family, and/or household

use. Her Class Vehicle bears the following VIN: 1GNSCBKCXFR259271e.

70.     Prior to purchasing her Class Vehicle, Plaintiff Wolfe test drove the

vehicle, viewed advertisements for the vehicle and the vehicle's window sticker,

and spoke with GM sales representatives concerning the vehicle's features.

Plaintiff also visited GM's website and used the feature to build her own vehicle to

review and compare different option packages, all of which included the AC

System.

71.     In addition to touting many of the Class Vehicle's safety features, the

vehicle's window sticker also stated that the vehicle was equipped with a

functioning AC System, and covered by Chevrolet's New Vehicle Limited

Warranty. The AC System and New Vehicle Limited Warranty were central to

Plaintiff Wolfe's purchasing decision. Plaintiff Wolfe relied on Defendants' representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase her vehicle.

72.     On or about June 5, 2017, with approximately 70,000 miles on the odometer, the AC System in Plaintiff Wolfe's Class Vehicle failed without warning.

73.     On or about June 5, 2017, Plaintiff Wolfe brought her Class Vehicle to Morse Cadillac Brandon, where an authorized GM technician informed her that her vehicle had a leaking condenser.

74.     Plaintiff Wolfe waited sixty days for the necessary parts to arrive, at which point Morse Cadillac Brandon replaced the AC condenser.

75.     Plaintiff Wolfe paid approximately $100 to have her AC System repaired.

76.     One week later, the AC System in her vehicle failed again. She again took her vehicle to Morse Cadillac Brandon, and an authorized GM technician informed her that the AC System had a faulty hose. Morse Cadillac Brandon subsequently replaced the hose.

77.     Plaintiff Wolfe paid approximately $100 to have her AC System repaired a second time, but does not, and cannot, know whether either repair cured the Defect in her Class Vehicle.

-20-

78.     Plaintiff Wolfe has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost incurred to repair the Defect and the diminished value of her vehicle. Had Defendants disclosed the Defect to Plaintiff, she would not have bought her vehicle or would have paid less for it.

### 6.     Plaintiff Andrew C. Hill

79.     Plaintiff Andrew C. Hill ("Plaintiff Hill") is a citizen of the State of Florida, and currently resides in of Myakka City, Florida.

80.     On or about October 3, 2014, Plaintiff Hill purchased a new 2014 Chevrolet Silverado 1500 from Stingray Chevrolet, an authorized GM dealer in Plant City, Florida for personal, family, and/or household use. His Class Vehicle bears the following VIN: 1GCVREC4EZ384875.

81.     Prior to purchasing his Class Vehicle, Plaintiff Hill drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Hill of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff Hill relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

82.    In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was equipped with a functioning AC System, and covered by Chevrolet's New Vehicle Limited Warranty. The AC System and New Vehicle Limited Warranty were central to Plaintiff Hill's purchasing decision. Plaintiff Hill relied on Defendants' representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase his vehicle.

83.    In January of 2018, with approximately 44,000 miles on the odometer, the AC System in Plaintiff Hill's Class Vehicle failed without warning.

84.    Plaintiff Hill subsequently took his Class Vehicle to Cox Chevrolet, an authorized GM dealer in Bradenton, Florida, where an authorized GM technician informed him that his AC System's condenser was leaking. The dealership quoted a cost of $1535.22 to repair the condition with GM parts. Mr. Hill has not yet had his Silverado's air conditioner repaired.

85.    Plaintiff paid approximately $126.39 to have his AC System diagnosed.

86.    Plaintiff Hill has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost he incurred to diagnose and repair the Defect, and the diminished value of his Class Vehicle. Had Defendants disclosed the Defect to

Plaintiff Hill, he would not have bought his Class Vehicle or would have paid less for it.

### 7.   Plaintiff Richie Ainsworth

87.    Plaintiff Richie Ainsworth ("Plaintiff Ainsworth") is a citizen of the State of Louisiana, and currently resides in Slidell, Louisiana.

88.    In September 2015, Plaintiff Ainsworth purchased a used 2014 Chevrolet Silverado 1500 from Mousson Patout Automotive Group, an authorized GM dealer in New Iberia, Louisiana, for personal, family, and/or household use. His Class Vehicle bears the following VIN: 3GCPCSEC2EG168701.

89.    Prior to purchasing his Class Vehicle, Plaintiff Ainsworth test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Ainsworth of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff Ainsworth relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

90.    In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was equipped with a functioning AC System, and covered by Chevrolet's New Vehicle Limited

-23-

Warranty. The AC System and New Vehicle Limited Warranty were central to Plaintiff Ainsworth's purchasing decision. Plaintiff Ainsworth relied on Defendants' representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase his vehicle.

91.     In January 2017, with approximately 49,529 miles on the odometer, the AC System in Plaintiff Ainsworth's Class Vehicle failed without warning.

92.     Plaintiff Ainsworth subsequently brought his Class Vehicle to Automotive Center of Slidell, where a technician told him that the line from the compressor to the condenser was cracked.  The Automotive Center of Slidell replaced the hose connecting the compressor to the condenser, installed a bracket to secure the hose and purportedly remedy the Defect, and recharged the AC System.

93.     Plaintiff Ainsworth paid approximately $453.18 to have his AC System repaired.

94.     In December 2017, with approximately 60,752 miles on the odometer, the AC System in Plaintiff Ainsworth's Class Vehicle again failed without warning.

95.     Plaintiff Ainsworth returned his Class Vehicle to the Automotive Center of Slidell, where a technician told him that his Class Vehicle was leaking refrigerant at the welded seam of the condenser.

96.     The Automotive Center of Slidell recharged the AC System with refrigerant and replaced the condenser.

97.     Plaintiff Ainsworth paid approximately $1,121.34 to have his AC System repaired a second time, but does not, and cannot, know whether the repairs cured the Defect in his Class Vehicle.

98.     Plaintiff Ainsworth has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost he incurred to diagnose and repair the Defect, and the diminished value of his Class Vehicle. Had Defendants disclosed the Defect to Plaintiff Ainsworth, he would not have bought his Class Vehicle or would have paid less for it.

### 8.     Plaintiff Jones Won

99.     Plaintiff Jones Won ("Plaintiff Won") is a citizen of the State of New Jersey, and currently resides in Bergen County, New Jersey.

100.     Plaintiff Won purchased a new 2015 Chevrolet Suburban from Major Chevy, an authorized GM dealer in Long Island City, New York, for business use, on August 31, 2014.

-25-

101.   Plaintiff purchased a second new Chevrolet Suburban from Major Chevy on April 17, 2015.

102.   Plaintiff Won then purchased a third new 2015 Chevrolet Suburban from East Hills Chevrolet of Douglaston, an authorized GM dealer in Douglaston, New York, for business use on September 15, 2016.

103.   Plaintiff Won also purchased a 2016 Cadillac Escalade from Brogan Cadillac, an authorized GM dealer in Totowa, New Jersey, for business use on November 25, 2016.

104.   Prior to purchasing each Class Vehicle, Plaintiff Won test drove the vehicles, viewed advertisements for the vehicles and the vehicles' window sticker, and spoke with GM sales representatives concerning the vehicles' features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Won of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff Won relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicles.

105.   In addition to touting many of the Class Vehicles' safety features, the vehicles' window sticker also stated that the vehicle was equipped with a functioning AC System, and covered by Defendants' New Vehicle Limited Warranty. The AC System and New Vehicle Limited Warranty were central to Plaintiff Won's purchasing decision. Plaintiff Won relied on Defendants'

-26-

representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase his vehicles.

106.  In or around July 2016, the AC System in Plaintiff Won's first Class Vehicle, the 2015 Chevrolet Suburban, failed without warning.

107.  In or around spring of 2017, the AC Systems in Plaintiff Won's remaining Class Vehicles also failed without warning.

108.  Plaintiff Won thereafter brought his Class Vehicles to Happy Auto in Corona, New York and Bobby's Auto Repair in Brooklyn, New York, where technicians informed Plaintiff Won that each of his Class Vehicles had a broken condenser that had allowed refrigerant to escape the AC System.

109.  Plaintiff Won waited approximately two weeks for the necessary parts to arrive, at which point each of his Class Vehicles had their condenser replaced.

110.  Plaintiff Won paid approximately $800.90 to have a condenser replaced in one of his Class Vehicles, and paid similarly large amounts to have the condensers replaced in others.

111.  In July 2017, with approximately 79,000 miles on the odometer, the AC System in Plaintiff Won's first Class Vehicle, a 2015 Chevrolet Suburban, failed again without warning.

112.   In July 2017, with approximately 81,000 miles on the odometer, the AC System in Plaintiff Won's second Class Vehicle, a 2015 Chevrolet Suburban, failed again without warning.

113.   In November 2017, with approximately 76,000 miles on the odometer, the AC System in Plaintiff Won's third Class Vehicle, a 2015 Chevrolet Suburban, failed again without warning.

114.   Plaintiff Won subsequently brought his three Class Vehicles to Happy Auto in Corona, New York and Bobby's Auto Repair in Brooklyn, New York, where technicians informed Plaintiff Won that the condensers in his three Class Vehicles had again failed.

115.   Plaintiff Won waited approximately two weeks for the necessary parts to arrive, at which point his three Class Vehicles had their AC condensers replaced.

116.   Plaintiff Won paid approximately $750.00 to have a condenser replaced in one of his Class Vehicles, and paid similarly large amounts to have the condensers replaced in the other two.

117.   Plaintiff Won does not, and cannot, know whether the repairs cured the Defects in his Class Vehicles.

118.   Plaintiff Won has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost he incurred to diagnose and repair the Defect, and

the diminished value of his Class Vehicles. Had Defendants disclosed the Defect to

Plaintiff Won, he would not have bought his Class Vehicles or would have paid

less for them.

### 9. Plaintiff Hayes Ellis

119.   Plaintiff Hayes Ellis ("Plaintiff Ellis") is a citizen of the State of

Alabama, and currently resides in Killen, Alabama.

120.   On or about March 14, 2014, Plaintiff Ellis purchased a new 2014

GMC Sierra from Milo Gordon Auto Mall, an authorized GM dealer in Lawton,

Oklahoma, for personal, family, and/or household use. His Class Vehicle bears the

following VIN: 3GCUKSECXFG476755.

121.   Prior to purchasing his Class Vehicle, Plaintiff Ellis test drove the

vehicle, viewed advertisements for the vehicle and the vehicle's window sticker,

and spoke with GM sales representatives concerning the vehicle's features. Neither

Defendants nor their agents, dealers, or other representatives informed Plaintiff

Ellis of the Defect's existence at any time either prior to or following his purchase,

whether at the point of sale or otherwise. Plaintiff Ellis relied on Defendants'

misrepresentations and omissions in deciding to purchase his vehicle.

122.   In addition to touting many of the Class Vehicle's safety features, the

vehicle's window sticker also stated that the vehicle was equipped with a

functioning AC System, and covered by GMC's New Vehicle Limited Warranty.

The AC System and New Vehicle Limited Warranty were central to Plaintiff Ellis' purchasing decision. Plaintiff Ellis relied on Defendants' representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase his vehicle.

123.   On or about February 24, 2017, with approximately 79,463 miles on the odometer, the AC System in Plaintiff Ellis' Class Vehicle failed without warning.

124.   On or about March 2, 2017, Plaintiff Ellis brought his Class Vehicle to Ray Miller Buick GMC, an authorized GM dealer in Florence, Alabama, where an authorized GM technician informed him that the compressor-to-condenser line had leaked refrigerant, causing the compressor to fail.

125.   Ray Miller Buick GMC replaced the compressor, installed a new compressor to condenser line and support bracket, and recharged the AC System.

126.   Plaintiff Ellis paid approximately $1,197.30 to have his AC System repaired, as well as $80.00 for refrigerant, but does not, and cannot, know whether the repairs cured the Defect in his Class Vehicle.

127.   Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Ellis of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise.

128.   Plaintiff Ellis has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost he incurred to diagnose and repair the Defect, and the diminished value of his Class Vehicle. Had Defendants disclosed the Defect to Plaintiff Ellis, he would not have bought his Class Vehicle or would have paid less for it.

### 10.   Plaintiff Billy Frank

129.   Plaintiff Billy Frank resides in Nashville, Tennessee.

130.   Plaintiff Frank owns a 2015 Chevrolet Suburban, which he purchased new in or around October 31, 2014, from Jim Keras Chevrolet, in Memphis, Tennessee.  Plaintiff Frank's Class Vehicle was designed, manufactured, distributed, advertised, marketed, warranted, and certified by GM.  His Class Vehicle bears the following VIN: 1GNSCJKC5FR500809.

131.   Plaintiff Frank purchased his Class Vehicle for his personal, family, and household use.

132.   Prior to purchasing his Class Vehicle, Plaintiff Frank test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Frank of the Defect's existence at any time either prior to or following his

purchase, whether at the point of sale or otherwise. Plaintiff Frank relied on

Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

133.   In addition to touting many of the Class Vehicle's safety features, the

vehicle's window sticker also stated that the vehicle was equipped with a

functioning AC System, and covered by Chevrolet's New Vehicle Limited

Warranty. The AC System and New Vehicle Limited Warranty were central to

Plaintiff Frank's purchasing decision. Plaintiff Frank relied on Defendants'

representations regarding the AC System's functionality and the existence of the

New Vehicle Limited Warranty in deciding to purchase his vehicle.

134.   In or around May 2017, Plaintiff Frank's Vehicle's AC System failed.

At the time, the Vehicle had about 63,000 miles on it.

135.   Plaintiff Frank took his Vehicle to Capital Chevrolet in Raleigh, North

Carolina, to report the AC System failure. The dealership diagnosed the problem as

a crack in the AC System that allowed refrigerant to leak out of the System,

causing the failure.

136.   Because the replacement parts were on national backorder, Plaintiff

Frank had to wait approximately three weeks before his Vehicle could be repaired.

To avoid having his family suffer in a hot car while they waited for replacement

parts, Plaintiff Frank purchased cans of refrigerant to try to counter the leaking and

get his AC System to work.

-32-

137.   Plaintiff Frank called GM numerous times to lodge his complaints about the AC System failure, the wait for parts, and the quoted price of the replacement parts and service. The complaint number given to Plaintiff Frank for his claim was 8-2913172791.

138.   Plaintiff Frank paid $1090.58 out of pocket for the repair to the AC System in his Vehicle.

139.   Plaintiff Frank expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know of, or expect, that his Vehicle's AC System would crack, leak refrigerant, lose pressure, and fail to function, nor was he aware from any source prior to purchase of the unexpected, costly, and backordered repairs he would have to make on his Vehicle's AC System simply to have it function. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

140.   Plaintiff Frank regularly saw advertisements for GM vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before he purchased his Class Vehicle. Although he does not recall the specifics of the many GM advertisements he saw before he purchased his Class Vehicle, he does recall that state-of-the-art engineering and a comfortable interior were frequent themes across the advertisements he saw. Those advertisements about state-of-the-art engineering and a comfortable interior

-33-

influenced his decision to purchase his Vehicle. Had those advertisements or any

other GM materials disclosed to Plaintiff Frank that the Class Vehicles had

defective AC Systems, or that he would have to pay for repairs/replacement of the

AC System, he would not have purchased his Class Vehicle, or would have paid

less for it.

## 11.    Plaintiff John O'Brien

141.    Plaintiff John O'Brien resides in Memphis, Tennessee.

142.    Plaintiff O'Brien owns a 2014 GMC Sierra 1500, which he purchased

new in or around November 2013 from Sunrise Buick GMC Covington Pike in

Memphis, Tennessee. Plaintiff O'Brien's Class Vehicle was designed,

manufactured, distributed, advertised, marketed, warranted, and certified by GM.

His Class Vehicle bears the following VIN: 3GTU2VEC6EG265892.

143.    Plaintiff O'Brien purchased his Class Vehicle for his personal, family,

and household use.

144.    Prior to purchasing his Class Vehicle, Plaintiff O'Brien test drove the

vehicle, viewed advertisements for the vehicle and the vehicle's window sticker,

and spoke with GM sales representatives concerning the vehicle's features. Neither

Defendants nor their agents, dealers, or other representatives informed Plaintiff

O'Brien of the Defect's existence at any time either prior to or following his

purchase, whether at the point of sale or otherwise. Plaintiff O'Brien relied on

Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

145.   In addition to touting many of the Class Vehicle's safety features, the

vehicle's window sticker also stated that the vehicle was equipped with a

functioning AC System, and covered by GMC's New Vehicle Limited Warranty.

The AC System and New Vehicle Limited Warranty were central to Plaintiff

O'Brien's purchasing decision. Plaintiff O'Brien relied on Defendants'

representations regarding the AC System's functionality and the existence of the

New Vehicle Limited Warranty in deciding to purchase his vehicle.

146.   In or around October 2017, Plaintiff O'Brien's Vehicle's AC System

failed. At the time, the Vehicle had about 77,000 miles on it.

147.   Plaintiff O'Brien took his Vehicle back to Sunrise to report the AC

System failure. The dealership found there was a leak in the condenser, requiring

the condenser to be replaced and the System re-charged with coolant.

148.   When Plaintiff O'Brien complained about the quoted price for the

repair, the dealership suggested Plaintiff O'Brien contact GM Corporate to

complain. GM Corporate then contacted the dealership directly regarding Plaintiff

O'Brien's vehicle and denied any relief, discount, or warranty coverage for the

repair.

149.   When GM refused to reduce the price of the repair for Plaintiff O'Brien, the dealership itself gave Plaintiff O'Brien a discount because of Plaintiff O'Brien's good relationship with the dealership. Therefore, Mr. O'Brien paid $875.49 out of pocket for the repair to the AC System in his Vehicle.

150.   Plaintiff O'Brien expected his Class Vehicle to be of good and merchantable quality and not defective. He had no reason to know of, or expect, that his Vehicle's AC System would crack, leak refrigerant, lose pressure, and fail to function, nor was he aware from any source prior to purchase of the unexpected, costly, and backordered repairs he would have to make on his Vehicle's AC System simply to have it function. Had he known these facts, he would not have bought his Class Vehicle or would have paid less for it.

151.   Plaintiff O'Brien regularly saw advertisements for GM vehicles on television, in magazines, on billboards, in brochures at the dealership, and on the Internet during the years before he purchased his Class Vehicle. Although he does not recall the specifics of the many GM advertisements he saw before he purchased his Class Vehicle, he does recall that state-of-the-art engineering and a comfortable interior were frequent themes across the advertisements he saw. Those advertisements about state-of-the-art engineering and a comfortable interior influenced his decision to purchase his Vehicle. Had those advertisements or any other GM materials disclosed to Plaintiff O'Brien that the Class Vehicles had

defective AC Systems, or that he would have to pay for repairs/replacement of the AC System, he would not have purchased his Class Vehicle, or would have paid less for it.

### 12.   Plaintiff Marcus Bell

152.   Plaintiff Marcus Bell ("Plaintiff Bell") is a citizen of the state of Texas, and currently resides in Amarillo, Texas.

153.   On or about September 28, 2013, Plaintiff Bell purchased a new 2014 GMC Sierra 1500 from Brown Buick GMC, an authorized GM dealer located in Amarillo, Texas, for personal, family, and/or household use. His Class Vehicle bears the following VIN: 3GTU2VEC7EG209525.

154.   Prior to purchasing his Class Vehicle, Plaintiff Bell test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Bell of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff Bell relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

155.   In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was equipped with a functioning AC System, and covered by GMC's New Vehicle Limited Warranty.

-37-

The AC System and New Vehicle Limited Warranty were central to Plaintiff Bell's purchasing decision. Plaintiff Bell relied on Defendants' representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase his vehicle.

156.   On or about July 30, 2017, with approximately 57,529 miles on the odometer, the AC System in Plaintiff Bell's Class Vehicle failed without warning.

157.   A few days later, on August 2, 2017, Plaintiff Bell attempted to use an A/C recharge kit to revive his Class Vehicle A/C System, but by August 11 the A/C System had again ceased to function.

158.   Shortly thereafter, Plaintiff Bell took his Class Vehicle to a local Meineke where a service representative informed him the AC System's condenser had failed, and that repairs would cost approximately $1,100.  Plaintiff Bell declined.

159.   On or about August 17, 2017, Plaintiff Bell took his Class Vehicle to Shorty's Bear Safety Service, Inc. ("Shorty's"), a local mechanic in Amarillo, Texas, that inspected his Class Vehicle's AC System and confirmed the condenser had cracked and failed. Shorty's recharged the AC System with refrigerant, replaced two seals and installed the replacement condenser.

160.   Plaintiff Bell paid approximately $786.52 for the repairs, but he does not, and cannot, know whether the repairs cured the Defect in his Class Vehicle.

161.   Plaintiff Bell has suffered an ascertainable loss as a result of Defendant's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost incurred to repair the Defect and the diminished value of his Class Vehicle. Had Defendants disclosed the Defect to Plaintiff Bell, he would not have bought his vehicle or would have paid less for it.

### 13.   **Plaintiffs Aaron and Jan Howard**

162.   Plaintiffs Aaron and Jan Howard ("Plaintiffs Howard") citizens of the State of Washington, and currently reside in Everett, Washington.

163.   On or about October 27, 2013 the Plaintiffs Howard purchased a new 2014 Chevrolet Silverado from Sunset Chevrolet, an authorized GM dealer in Sumner, Washington, for personal, family, and/or household use. Their Class Vehicle bears the following VIN: 3GCUKSEC2EG175749.

164.   Prior to purchasing their Class Vehicle, Plaintiffs Howard test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiffs Howard of the Defect's existence at any time either prior to or following their purchase, whether at the point of sale or otherwise. Plaintiffs Howard relied on Defendants' misrepresentations and omissions in deciding to purchase their vehicle.

165.   In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was equipped with a functioning AC System, and covered by Chevrolet's New Vehicle Limited Warranty. The AC System and New Vehicle Limited Warranty were central to Plaintiffs Howard's purchasing decision. Plaintiffs Howard relied on Defendants' representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase their vehicle.

166.   In July 2016, with approximately 37,680 miles on the odometer, the AC System in Plaintiffs Howard's Class Vehicle failed without warning.

167.   On July 11, 2016, Plaintiffs Howard brought their Class Vehicle to Haselwood Chevrolet Buick GMC ("Haselwood"), an authorized GM dealer in Bremerton, Washington, where an authorized GM technician informed Plaintiffs Howard that their Class Vehicle's AC System had failed.

168.   Haselwood recharged the AC System and removed and replaced the low and high side "A/C valves."

169.   Plaintiffs Howard paid approximately $251.08 to have their AC System repaired.

170.   On July 18, 2016, with approximately 37,891 miles on the odometer, the AC System in Plaintiffs Howard's Class Vehicle failed again without warning.

-40-

171.   Plaintiffs Howard subsequently returned their Class Vehicle to Haselwood, where an authorized GM technician informed them that their AC System had failed due to a leak in the condenser.

172.   Plaintiffs Howard waited eleven days, at which point Haselwood replaced the condenser and re-charged the air conditioning system.

173.   Plaintiffs Howard paid approximately $412.08 for the repairs, but do not, and cannot, know whether the repairs cured the Defect in their Class Vehicle.

174.   Plaintiffs Howard have suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost they incurred to diagnose and repair the Defect, and the diminished value of their Class Vehicle. Had Defendants disclosed the Defect to Plaintiffs Howard, they would not have bought their Class Vehicle or would have paid less for it.

### 14.    <u>Plaintiff Leslie Griffin</u>

175.   Plaintiff Leslie Griffin ("Plaintiff Griffin") is a citizen of the State of Georgia, and currently resides in Douglasville, Georgia.

176.   On May 23, 2016, Plaintiff Griffin purchased a certified pre-owned 2015 Chevrolet Suburban with approximately 43,053 miles on the odometer from Bellamy Automotive Group, Inc., an authorized GM dealer in McDonough,

Georgia, for personal, family, and/or household use. Her Class Vehicle bears the following VIN: 1GNSCJKC3FR608863.

177.   Prior to purchasing her Class Vehicle, Plaintiff Griffin test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Specifically, Plaintiff Griffin recalls viewing advertisements touting her vehicle's high safety ratings. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Griffin of the Defect's existence at any time either prior to or following her purchase, whether at the point of sale or otherwise. Plaintiff Griffin relied on Defendants' misrepresentations and omissions in deciding to purchase her vehicle.

178.   In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was equipped with an AC System, the functionality of which she tested during her test drive. The AC System was central to Plaintiff Griffin's purchasing decision, and she relied on Defendants' representations regarding its functionality in deciding to purchase her vehicle.

179.   In October 2017, with approximately 92,800 miles on the odometer, the AC System in Plaintiff Griffin's Class Vehicle failed without warning.

-42-

180.   On December 4, 2017, Plaintiff Griffin brought her Class Vehicle to John Thornton Chevrolet, an authorized GM dealer in Lithia Springs, Georgia, at which time an authorized GM technician informed her that the AC System had failed due to a leak in the condenser, and that the condenser needed to be replaced.

181.   On or around December 5, 2018, Plaintiff Griffin had John Thornton Chevrolet replace the condenser and recharge her Class Vehicle's AC System with PCKT refrigerant.

182.   Plaintiff Griffin paid approximately $847.70 to have her AC System repaired, but she does not, and cannot, know whether the repairs cured the Defect in her Class Vehicle.

183.   On December 13, 2017, Plaintiff Griffin contacted GM customer service to request warranty and/or goodwill coverage for the repairs necessitated by the Defect. A GM representative informed her that GM would review her request and update her once it reached a decision. Plaintiff Griffin followed up by phone on January 2, 2018, at which time GM informed her that it would not provide coverage for the Defect.

184.   Plaintiff Griffin has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including, but not limited to, to the out of pocket cost she incurred to diagnose and repair the Defect, and the diminished value of her Class Vehicle. Had Defendants disclosed the

Defect to Plaintiff Griffin, she would not have bought her vehicle or would have paid less for it.

## 15.   Plaintiff Edilberto Gomez

185.   Plaintiff Edilberto Gomez ("Plaintiff Gomez") is a citizen of the state of Florida, and currently resides in Hialeah, Florida.

186.   On or about January 4, 2016, Plaintiff Gomez purchased a new 2015 Chevrolet Silverado from Miami Lakes AutoMall, an authorized GM dealer in Miami Lakes, Florida, for personal, family, and/or household use. His Class Vehicle bears the following VIN: 3GCPCREC8FG506449.

187.   Prior to purchasing his Class Vehicle, Plaintiff Gomez test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Specifically, Plaintiff Gomez recalls watching commercials for his Class Vehicle, and researching the vehicle through various third-party websites. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Gomez of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff Gomez relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

188.   In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was equipped with an AC

System, the functionality of which he tested during his test drive. The AC System was central to Plaintiff Gomez's purchasing decision, and he relied on Defendants' representations regarding its functionality in deciding to purchase his vehicle.

189.   On or about March 14, 2018, with approximately 55,754 miles on the odometer, the AC System in Plaintiff Gomez's Class Vehicle failed without warning.

190.   On March 14, 2018, Plaintiff Gomez took his Class Vehicle to Miami Lakes AutoMall, where an authorized GM technician inspected his vehicle and confirmed the AC System has failed due to a leak in the condenser.

191.   That same day, Plaintiff Gomez contacted GM Customer Service to determine whether GM had issued a recall due to widespread reports of a pervasive defect in the AC System, and whether it would cover the cost of repairs necessitated by the Defect. GM informed him it had not issued a recall and would not provide coverage for the repairs.

192.   After determining that he could not delay repairs indefinitely during the sweltering summer heat, on or about March 14, 2018, Plaintiff Gomez had Miami Lakes AutoMall replace the condenser and recharge his Class Vehicle's AC System with refrigerant.

193.   Miami Lakes AutoMall charged Plaintiff Gomez $1433.64 for the repairs, but he does not, and cannot, know whether the repairs cured the Defect in his Class Vehicle.

194.   Plaintiff Gomez has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost incurred to repair the Defect and the diminished value of his Class Vehicle. Had Defendants disclosed the Defect to Plaintiff Gomez, he would not have bought his vehicle or would have paid less for it.

### 16.   Plaintiff Corey Steketee

195.   Plaintiff Corey Steketee ("Plaintiff Steketee") is a citizen of the State of Michigan, and currently resides in Belding, Michigan.

196.   On or about July 31, 2013, Plaintiff Steketee purchased a new 2014 GMC Sierra from Todd Wenzel Buick GMC, an authorized GMC dealer in Grand Rapids, Michigan, for personal, family, and/or household use.  His Class Vehicle bears the following VIN: 3GTU2UEC9EG168745.

197.   Local GM dealer Todd Wenzel told Plaintiff Steketee that the new 2014 GMC Sierra design was "bulletproof."

198.   Plaintiff Steketee decided not to purchase an extended warranty for his Class Vehicle because local GM dealer Todd Wenzel told Plaintiff Steketee

that GM did extensive research on the body and engine design and that the Class Vehicle was very well put together.

199.   Prior to purchasing his Class Vehicle, Plaintiff Steketee test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Neither Defendants nor their agents, dealers, or other representatives informed Plaintiff Steketee of the Defect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise.  Plaintiff Steketee relied on Defendants' misrepresentations and omissions in deciding to purchase his vehicle.

200.   In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also stated that the vehicle was equipped with a functioning AC System, and covered by GMC's New Vehicle Limited Warranty. The AC System and New Vehicle Limited Warranty were central to Plaintiff Steketee's purchasing decision. Plaintiff Steketee relied on Defendants' representations regarding the AC System's functionality and the existence of the New Vehicle Limited Warranty in deciding to purchase his vehicle.

201.   In or about July 2015, the AC System in Plaintiff Steketee's Class Vehicle failed without warning.  Plaintiff Steketee purchased approximately five cans of refrigerant, at an out-of-pocket expense of roughly $20 each, and continued to refill the refrigerant in his AC System until the end of the summer.

-47-

202.   When the weather turned warm again the following year, Plaintiff Steketee subsequently brought his Class Vehicle to his dealership for repair.  The service techs found the system had lost refrigerant and replaced the condenser and recharged the system on June 2, 2016, at an out of pocket cost to Mr. Steketee of approximately $865.00. Plaintiff Steketee asked the GM service techs if they knew of a defect in the AC System. They told him that they did not.

203.   The June 2 repair did not remedy the AC System Defect in Plaintiff Steketee's Class Vehicle. In early April 2018, the AC System in Plaintiff Steketee's Class Vehicle failed again without warning.

204.   On May 3, 2018, Plaintiff Steketee subsequently brought his Class Vehicle back to Todd Wenzel Buick GMC, where an authorized GM technician informed him the problem was with the compressor.  Plaintiff Steketee asked again if the dealership was aware of a defect in the AC System.  The dealership stated it was not.  The dealership quoted him $870.00 to attempt to repair the compressor. Plaintiff Steketee felt that he did not want to continue paying for repairs on his vehicle so he contacted GM Customer Service to request they cover the repair cost. After calling GM Customer Service multiple times, Plaintiff Steketee was told that GM would not pay for the repair.

-48-

205.  Plaintiff Steketee paid approximately $965.00—and may have to pay another $870.00—to have his AC System repaired, but does not, and cannot, know whether the repairs cured the Defect in his Class Vehicle.

206.  Plaintiff Steketee has suffered an ascertainable loss as a result of GM's omissions and/or misrepresentations associated with the Defect, including but not limited to the out of pocket cost he incurred to diagnose and repair the Defect, and the diminished value of his Class Vehicle. Had Defendants disclosed the Defect to Plaintiff Steketee, he would not have bought his Class Vehicle or would have paid less for it.

### B.  **Defendants**

#### 1.  **General Motors Company**

207.  Defendant General Motors Company is a Delaware corporation, which has its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

208.  General Motors Company is the sole member and owner of General Motors Holdings LLC.

209.  General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

210.  General Motors Holdings LLC is the sole member and owner of General Motors, LCC.

## 2. General Motors, LLC

211.  General Motors, LLC is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. General Motors, LLC was incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

212.  Defendants are jointly referred to herein as "Defendants" or "GM".

213.  There exists, and at all times herein mentioned, a unity of ownership between Defendants such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.  Adherence to the fiction of the separate existence of Defendants, would, under the circumstances set forth in this Complaint, sanction fraud or promote injustice.

214.  At all times relevant herein, Defendants (themselves and through their related entities) engaged in the business of designing, manufacturing, marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, throughout the United States.

## IV.   FACTUAL ALLEGATIONS

### A.   Automotive Air Conditioning Systems

215.   Since the 1970s, all passenger vehicles sold in the United States—including GM trucks—have come equipped with air conditioning systems as a standard item in order to cool cars (and their occupants) in hot weather.

216.   The AC System in the Class Vehicles is a pressurized, self-contained system composed of three main components: the compressor, the condenser, and the evaporator, which are connected by hoses and lines to each other. A generalized diagram of the type of air conditioning system found in the Class Vehicles is below in **Figure 1**, with component parts labeled and refrigerant flow path and temperature indicated by colored arrows.



**Figure 1**

-51-

217.   A chemical refrigerant flows through the AC System, alternating between a liquid and a gas depending on the pressure it is subjected to in the various components it flows through during its continuous cycle through the System.

218.   Automotive AC systems, including the AC Systems in Class Vehicles, are "closed loop" systems that circulate a gaseous refrigerant to cool vehicle cabins.  When operating as intended, AC systems should not consume refrigerant or allow it to escape the system.  Thus, a vehicle's AC system will cease to produce cold air only if a system component ceases to function properly, or if the system develops a leak that allows the refrigerant to escape.

219.   The compressor is responsible for compressing the refrigerant gas. Compression causes the refrigerant to get very hot. The hot, compressed refrigerant gas is then sent through the condenser.

220.   Because the hose connecting the compressor and condenser—the "refrigerant hose"—is a high pressure side hose, it experiences approximately 350 psi of pressure during system operation, in addition to vibration and jostling during normal vehicle operation.  If the hose cracks, refrigerant may leak, impairing the system's functionality.

221.   If the compressor successfully forces refrigerant into the refrigerant hose, the pressurized refrigerant ultimately reaches the condenser. The condenser

is a series of coils that outside air passes over to remove the heat from the

compressed refrigerant gas. This causes the refrigerant gas to cool and condense

into a cold liquid. The cold liquid refrigerant then passes through the receiver-

drier, a canister containing desiccant to absorb moisture, and then through an

expansion valve to change it from a high-pressure liquid to a low-pressure liquid

mist before entering the evaporator.

222.   The evaporator is an array of tubes that the refrigerant liquid mist

flows through, chilling the tubes. As the low-pressure liquid refrigerant mist flows

through the evaporator, a blower motor pushes air across the cold tubes of the

evaporator to deliver cooled air into the passenger compartment of the automobile.

223.   The AC System is entirely sealed off and must remain so in order to

maintain the pressures necessary to allow the System to function properly and

produce cooled air for the passenger cabin.

### B.   The Defect in the Class Vehicles

224.   Since 2013, GM has manufactured, distributed, marketed, sold and

warranted various models of trucks and SUVs built on a single vehicle platform,

referred to internally as GMT K2XX vehicles.  GMT K2XX vehicles include the

following make and model vehicles, referred to hereafter as "Class Vehicles":

2015-17 Cadillac Escalade models; 2014-17 Chevrolet Silverado 1500 models;

2015-17 Chevrolet Suburban models; 2015-17 Chevrolet Tahoe models; 2014-17

GMC Sierra 1500 models; and 2015-17 GMC Yukon models.  On information and belief, the AC Systems in all Class Vehicles are identical in terms of both their design and constituent components.

225.   AC Systems in Class Vehicles are (or should be) designed to function for periods and mileages substantially in excess of those specified in GM's warranties. Customers justifiably expect to enjoy the use of an automobile air conditioning system for significantly longer than the limited times and mileages identified in GM's warranties.

226.   On information and belief, the AC System is not sufficiently strong and durable to withstand the internal pressures and external forces the System can be expected to encounter under normal use and conditions. This insufficiency leads to System parts cracking, which allows refrigerant to leak out of the System and causes the System to lose pressure, which results in failure of the AC System to produce cool air.

227.   GM knew or should have known that having insufficiently strong and durable AC System components could lead to cracking, refrigerant leaks, lost pressurization, and AC System failure under normal and foreseeable use and conditions.

228.   The AC System failure can first occur at low mileages, within the warranty period.

-54-

229.   Because of the high number of failures, AC System replacement parts are on national backorder and the wait for replacement parts is long – often many months – during which time Plaintiffs and Class Members must suffer without a functioning AC System in their Vehicles.

230.   Moreover, GM's replacement of faulty AC System components with equally defective replacement parts leaves the AC System susceptible to repeated failure and thus does not effectively remedy the AC System Defect.

231.   When GM refuses to cover the cost to repair the AC System, consumers are forced to pay between $150 and $2000 out of pocket, yet the repair is done with the same defective GM parts, and consumers still are subjected to the same long wait times for backordered parts.

232.   GM's proposed "fixes" for the AC System have proven inadequate. Because GM discontinued the refrigerant hose originally installed in Class Vehicles[4] due to the hose's purported inability to withstand the pressures to which it is exposed, GM required Class members whose AC Systems failed to purchase a redesigned hose supposedly manufactured to specifications sufficient to avoid cracking during ordinary and intended use.  GM also required its customers to install a line bracket to restrain the hose. These repairs were ineffective, however,

---

[4] *See* https://www.gmpartsdirect.co/oem-parts/gm-f-hose-22777831 (last visited Oct. 30, 2017).  **(Exhibit T)**

-55-

because other AC System components, such as the condenser, also crack and spring leaks.

233.   GM then began to offer a redesigned condenser, but that redesigned part is subject to a months-long backorder due to the Defect's pervasiveness, requiring Class members to go without a functioning AC System for many months.

234.   Lastly, if Class Vehicles begin to hemorrhage refrigerant due to a leak caused by the Defect, the compressor may seize when refrigerant ceases to pass through it.  As a result, the compressor used in all Class Vehicles, much like the condenser, is on a months-long backorder, forcing Class members whose compressors have seized to forego air conditioning for extended periods of time.

235.   Due to the fact that the parts affected by the Defect are internal, mechanical components, and the failure manifests suddenly and without warning, Plaintiffs and Class members have no warning that the Defect has manifested until it causes a complete failure of the AC System.

236.   The Defect is covered by GM's New Vehicle Limited Warranties, which cover in all Class Vehicles all repairs required as a result of defects in material or workmanship for three-years or 36,000 miles (whichever comes first), or, in the case of Cadillac Escalade and Escalade ESV vehicles, four-years or 50,000 miles.  But the majority of Class Vehicles manifest the Defect only after any applicable GM warranties have expired—and often at time periods and

mileages *just* outside the warranty period—and GM charges anywhere from $200 to $2500 to return the AC System to working order.

237.   But even where Class members tender their Vehicles for repair within the warranty period, GM has often made only temporary repairs. Many Class members report receiving warranty coverage when the Defect first manifests, only to later discover the repairs were not an effective remedy and that they would be required to pay out-of-pocket for subsequent repairs. This causes GM's warranty to fail of its essential purpose.

238.   GM could have disclosed the Defect to customers in advertising or at the point of sale or lease, but instead elected to conceal the Defect and force its customers to bear the costs of repairing the damage caused by a Defect of which GM has been aware since prior to placing Class Vehicles into the stream of commerce.

### C.   <u>The AC System Defect Poses a Safety Risk to Vehicle Occupants.</u>

239.   The AC System Defect poses a safety risk to Vehicle occupants because a Vehicle with a non-functioning AC System subjects occupants to unsafely high temperatures, and can create a visibility issue if windows fog up and cool air from the AC System is not available to de-fog the windows.

240.   Numerous GM owners and absent Class Members have told NHTSA, and GM directly, that the AC System Defect poses a safety risk, as illustrated by the following examples:[5]

> "I was informed that the [2015 Chevrolet Tahoe] air condenser is a faulty part and is not working on my vehicle. Also, GM has knowledge of this issue, for it is a known issue with Chevrolet Tahoe. The part to fix this problem is on back order, and there are no parts in production, for they have not come up with a remedy to replace the faulty part. Therefore, I do not have air conditioning within my vehicle. Thus, **causing a safety issue, for it is 90 degrees where I live, and I have infant twins** that are transported with my vehicle." http://www.carproblemzoo.com/chevrolet/tahoe/air-conditioner-problems.php (posted May 2017) **(Exhibit F)**

> "I have been waiting to get my [2014 GMC Sierra 1500 Sierra 15500 Denali 6.2L] air conditioner fixed now for months and I keep getting told there are no Condensers available. I have talked with service writers at GM dealership's well as other Sierra owners and they all have the same problem for the most part. This needs to be put on a recall list or I have decided to file a class action lawsuit in this matter regarding all Sierra owners across the country. I, as well as I am sure other people, have **serious breathing issues in hot weather** and need my truck fixed promptly..." http://www.carcomplaints.com/GMC/Sierra_1500/2014/AC_heater/AC_not_working.shtml (posted May 2016) **(Exhibit G)**

> "I have been a GMC Customer since 1976 and have purchased a total of six new trucks over the years. … SO when I laid down over 50K I expected it to be something I could feel good about driving & never expected it to be a death trap that would be best used as a boat anchor for the cargo ships carrying imported vehicles. This [2014 GMC Sierra 1500 LX 5.3L] Model Year is **unsafe** and should not have been

---

[5] For these and other customer complaints quoted in this Complaint, quotes are left as written, except that those originally in all-caps have been changed to sentence case. Due to the sheer number of typographical and grammatical errors, [sic] notation has not been used. Any emphasis has been added, unless otherwise noted.

made available until it had been properly tested and **GMC should be more focused on the safety of the Customer** .... At just over 36k miles 36500 my A/C suddenly started blowing hot air. I had just had it serviced by the dealership and not sure what caused the problem. … This is something that GMC should be covering. … I called GMC and began the formal complaint process and was pretty much blown off and haven't heard anything back from them. **With the amount of money I paid for this truck I should be safe and comfortable and have something of value**. I feel like I have been taken for my money and want what I paid for…"
http://www.carcomplaints.com/GMC/Sierra_1500/2014/AC_heater/AC_not_working.shtml (posted September 2016) **(Exhibit H)**

"I need my [2015 Chevrolet Tahoe LT 3.2L V6] air fixed bad. It's entirely **too hot to be riding around with no cooling system** and defrost. I've only had vehicle for 1yr."
http://www.carcomplaints.com/Chevrolet/Tahoe/2015/AC_heater/ac_stopped_working.shtml (posted June 2017) **(Exhibit I)**

"GM condenser issue. GM has a known issue with 2014-2016 [Chevrolet Tahoe] models using a defective condenser. They have a new part# that is on national backorder and are unwilling to do anything for their customers waiting for the part. I was driving down the freeway, kids in tow, on a rainy muggy day ... **My windshield began to fog and with no condenser to run the AC I was unable to [de-fog] my windows**. Unable to see a thing I had to pull over, on the freeway, carefully, and find a child's coat in the very back to wipe down the windows to [create] visibility. **This is a safety issue** and clearly negligence on GM's part and they would be held liable if/when **this creates a serious accident**."
NHTSA ODI 10994971 (incident date June 13, 2017)

 "I'm a frustrated customer with a 2015 Chevy Suburban looking for some assistance with the air condenser on my vehicle. I have gone almost 2.5 months without a/c and I am incredibly disappointed to be have been going so long without something as basic as a/c. I have 3 small children and it's incredibly uncomfortable in the vehicle now that it's summer temperatures… On an unexpectedly cool day like today with outdoor temps at 67 the driver side foot area is 98 degrees because of hot air blowing which I assume comes from the engine. I shut off all the vents and fans and it still blows. On days when it's

warmer that floor temp is more like 114-118 degrees and it's causing pain and burning sensation to my feet. I've contacted my dealership and they offered me to end my lease early and get into a new suburban. I've been so disappointed with the way this has been handled. I have never been so unsatisfied as customer for such a long period of time. I feel like I should be reimbursed for the two visits for diagnostics on the vehicle to find out why the a/c wasn't working and the rental car I needed. I also feel like I shouldn't have to be paying my lease payments for a faulty vehicle for the last few months that it hasn't been functioning properly. Lastly, I would like the option of ending my lease early without penalty to get into a more comfortable vehicle of my choice. I've contacted GM customer service only to be told there's nothing they can do unless GM decides that this should be a recall. Frankly, this is a problem amongst many vehicles in the GM line. This is frustrating and is really **becoming a safety issue as temperatures rise. I am genuinely concerned for my family's safety** and I am **frustrated with the overall lack of urgency on this issue**."

NHTSA ODI 11001813 (incident date March 23, 2017).

### D.    GM's Longstanding Knowledge of the Defect

241.    On information and belief, GM learned of the AC System Defect at least as early as 2012, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; early consumer complaints made directly to GM, collected by NHTSA ODI, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from GM dealers; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

-60-

## 1. GM's Knowledge of the AC System Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data.

242. During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, GM necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicle's AC Systems, particularly the basic engineering principles behind the construction and function of the Systems and the expected conditions and uses the Systems would encounter in ordinary customer service.

243. An adequate pre-release analysis of the design, engineering, and manufacture of the AC Systems in the Class Vehicles would have revealed to GM that the AC Systems were defective and susceptible to cracking, leaking refrigerant, and failing to provide cool air into the passenger cabin.

244. Moreover, GM conducts significant durability testing on all of its vehicles, including Class Vehicles. GM asserts that during durability testing at its Milford Proving Grounds "the team drives a test vehicle up to 25,000 miles, though it is in such extreme conditions that it represents 100,000 miles of customer use."[6]

---

[6]
http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Oct/1024-milford.html (last visited Oct. 30, 2017). (**Exhibit U**)

245.  Indeed, GM is known for its "notoriously rigorous durability tests. In just 18 months, engineers are able to replicate the kind of wear and tear a car would undergo in its entire lifetime, ensuring it will hold up over time once it reaches customer hands."[7]

246.  GM also claims it is "always pushing ourselves to test even the smallest part of a vehicle to ensure that the entire product from the engine down to the screws and bolts are tough enough to handle the driving our customers need."[8]

247.  The 2014 Chevrolet Silverado, for example, completed more than 12.5 million miles of testing before General Motors put the vehicle on sale. GM says its fleet of Silverado test vehicles completed more than 4 million miles of combined durability testing and 8.2 million miles of real world driving before being sent into production in Silao, Mexico, Fort Wayne Ind. and Flint, Mich. The testing was done in the scorching deserts of Arizona, the frozen grounds of Kapuskasing, Ontario, and of course GM's own test facility.[9]  As a result, GM

---

[7] *See* http://gmauthority.com/blog/2014/10/general-motors-celebrates-90-years-of-vehicle-testing-and-abuse-at-its-milford-proving-grounds/ (last visited Oct. 30, 2017). **(Exhibit V)**

[8] *Id.*; *see also* http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/Oct/1024-milford.html (last visited Oct. 30, 2017). **(Exhibit W)**

[9] http://gmauthority.com/blog/2013/10/2014-silverados-benefit-from-12-5-million-miles-of-durability-testing/ (last visited Oct. 30, 2017).  **(Exhibit X)**

knew or should have known that the AC System in Class Vehicles is defective and prone to premature failure.

### 2. GM's Knowledge of the AC System Defect from Technical Service Bulletins

248. TSBs are bulletins that vehicle manufacturers issue to alert authorized service technicians to pervasive issues affecting particular models and model years of vehicles and, in many cases, recommended procedures for repairing those vehicles. Significantly, GM has issued two TSBs related to the Defect, plausibly suggesting that it learned of the Defect well before it began to sell and lease Class Vehicles.

249. On October 6, 2014, GM issued bulletin #PIT5331 covering 2015 Escalades, Suburbans, Tahoes, and Yukons, and 2014-2015 Silverados and Sierras.[10] The bulletin concerned cracks in the AC System components that allow refrigerant/refrigerant to leak out, resulting in a "very low/empty refrigerant level" and the AC System "blowing warm" air instead of producing cold air. This bulletin instructed service technicians to replace the compressor-to-condenser line and install a line bracket in the AC System.

---

[10] *See* https://www.repairprocedures.com/service-bulletin/document/2015/cadillac/escalade-esv-2wd/preliminary-information/pit5331/100302829_7527571_2_82_0_3996395.html (last visited August 18, 2017). **(Exhibit Y)**

250.    Although the TSB is not available on the NHTSA website—despite GM being required by law to make *all* TSBs publicly available—TSB PIT5331 was highlighted at a 2014 meeting of the Cadillac National Service Managers Council, the notes of which were published on the internet.  *See* 2014 Cadillac National Service Managers Council Meeting Notes, p. 23, attached as **Exhibit C**. Under the subheading of "Escalade," the subject notes expressly acknowledge TSB PIT5331, and advise that there is an air conditioning leak "from [the] Compressor to condenser high side line." *Id*.

251.    TSB PIT5331 also identified the temporary "fix" GM employed for some time: the installation of a bracket to better secure the refrigerant hose to minimize vibration and the likelihood of failure.

252.    GM then issued TSB PIE0340 on May 29, 2015, in which it detailed "A/C Inoperative or Poor Performance on Recent Built Vehicles" for all models of the 2015 Cadillac Escalade, 2015 Chevrolet Silverado 1500, 2015 Chevrolet Suburban, 2015 Chevrolet Tahoe, 2015 GMC Sierra 1500, and 2015 GMC Yukon. *See* **Exhibit A**.  TSB PIE0340 also acknowledges that GM's authorized dealers may discover the Defect "during Pre-Delivery Inspection" of Class Vehicles, further demonstrating that GM knew of the Defect prior to selling or leasing Class Vehicles to Plaintiffs and Class members.

253.   On information and belief, TSBs and similar bulletins are issued only after significant investigation into the issue by GM. Given that the first of these TSBs was issued in fall 2014, it is evident that GM knew about the AC System failures as early as 2012 and was investigating them prior to issuing the first TSB addressing the Defect in 2014.

### 3.   GM's Knowledge of the AC System Defect from Repair Data

254.   GM also knew or should have known about the AC System Defect because of the large number of claims for AC System repairs and part replacements made during the Class Vehicles' warranty periods.

255.   Consumers complain that the AC System Defect often causes AC System failures at low mileages, within the warranty period.

256.   On information and belief, GM, like all vehicle manufacturers, communicates with its authorized service technicians in order to identify pervasive vehicle defects, and root causes and potential repairs.  GM collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data, in order to determine whether a defect exists and should be covered under warranty or through a goodwill program.

-65-

257.   GM also reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles.  GM dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide GM with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the defective component in case GM later decides to audit the dealership or otherwise verify the warranty repair.  For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to GM because GM will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.  Due to GM's efforts to monitor defect trends and the sheer number of repairs and warranty/goodwill requests made in connection with the Defect, GM knew or should have known of the Defect.

**4.    GM's Knowledge of the AC System Defect Gathered from the Large Number of Replacement AC System Parts Ordered from GM**

258.   Upon information and belief, GM also knew or should have known about the AC System Defect because of the higher than expected number of replacement AC System parts ordered from GM, which should have alerted GM that this was a Defect affecting a wide range of its Vehicles.

-66-

259.   Upon information and belief, GM service centers use GM replacement parts that they order directly from GM. Furthermore, independent vehicle repair shops that service Class Vehicles also order OEM parts directly from GM. Therefore GM would have detailed and accurate data regarding the number and frequency of replacement part orders. The ongoing high sales of replacement AC System parts – indeed so much so that the parts were (and continue to be) on national backorder – was certainly known to GM, and should have alerted GM that its AC Systems were defective and causing Class Vehicles' AC Systems to fail.

**5.     GM's Knowledge of the AC System Defect Gained from Class Member Complaints Made Directly to GM**

260.   GM also knew or should have known about the AC System Defect because numerous consumer complaints regarding failures of the AC System were made directly to GM. The large number of complaints, and the consistency of their descriptions of the AC System failures in the Class Vehicles, should have alerted or actually alerted GM to this serious Defect affecting a wide range of its Vehicles.

261.   The full universe of complaints made directly to GM about the AC System Defect is information presently in the exclusive custody and control of GM and is not yet available to Plaintiffs prior to discovery. On information and belief, however, many Class Vehicle owners complained directly to GM dealerships about the AC System failures their Vehicles experienced. For example, some instances of

these direct-to-GM complaints were posted on online on GM's own website

forums, and responded to by GM customer service:

> "We bought our 2014 Chevy Z71 LTZ 4 Door 1/2 ton truck last June
> when they first came out. … now that we've had it just over a year,
> putting some miles on it (almost 34,000), and the warranty is about
> over with, the AC has gone out on us. The AC is just blowing hot air.
> Had been working fine up until this afternoon. The controls all work,
> the vents change as they should, just no cool air. … We are going to
> take it to a dealer for repair but our experience with these dealers so
> far has not been a good one.... No loaner car and a week wait to find
> the problem is a bit frustrating for someone who just spent $40,000 on
> their product."
> https://chevroletforum.com/forum/2014-gmtk2xx-110/2014-silverado-
> ac-problems-already-67170/ (posted August 4, 2014) **(Exhibit J)**

An official GM representative from Chevrolet Customer Care responded to the

post on August 6, 2014.

> "I bought a 2014 Silverado about 5 months ago. For the most part I
> have really enjoyed it. On Wednesday I noticed the air conditioning
> was not working. It was only blowing hot air. I immediately took it to
> the dealer in Murray Utah who diagnosed the problem as a faulty
> compressor. He said they could fix it under warranty but they didn't
> have the parts and would have to order them in from Denver. He told
> me to bring the vehicle back on Thursday. I came back on Thursday
> only to be told that they had missed the order deadline the day before
> so no parts. He told me to come back Friday. In the meantime it is 90
> degrees outside and the black interior of the truck is scalding hot. I
> went back Friday (yesterday) to be told that the compressor had come
> in but a valve they need had not come in. He told me to come back
> Saturday (today). I am told that the parts are now all here and it will
> take 4 hours to fix. I told him that I was surprised to have a
> compressor go out on such a new vehicle and I asked him if he was
> seeing a lot of these compressor problems and he said it was the
> second this week." https://chevroletforum.com/forum/2014-gmtk2xx-
> 110/2014-silverado-ac-problems-already-67170/ (posted September

27, 2014) **(Exhibit K)**

"Well I just had another bad experience with the AC [in 2015 Tahoe LTZ]. …It was set on auto 74 degrees and 90 degrees outside. It would blow cool air for about a minute from the front vents at full fan speed, then the fan speed would back down to low with warm air and then switch to full fan speed and the air would blow cool air from the vents at your feet with just a trickle of warm air coming from the front vents then it would start the process all over again. This continued for about 30 minutes during my drive to the Dealer and about 30 more minutes with the service adviser in the vehicle. No cold air at anytime during that hour. Diagnosis: operating as designed. Are you kidding me." http://www.tahoeyukonforum.com/threads/a-c-not-working.61544/page-4 (posted October 29, 2014) **(Exhibit L)**

An official GM representative from Chevrolet Customer Care responded to the posts on this thread as well.

262.   Other instances of these direct-to-GM complaints are described in Class Vehicle owners' complaints logged with NHTSA ODI and posted on online vehicle owner forums:

"At 48,000 miles, the [2015 Chevrolet Suburban] AC condenser has cracked, and the dealer has told us this is a manufacturer's problem. The replacement part is on national backorder, and we have waited 5 weeks for the replacement part to come in. Neither the dealer nor GM can tell us when the replacement part will arrive. **I have filed a complaint with GM**, and the case no. is 8-3029151511." NHTSA ODI 10995213 (incident date May 2, 2017)

"I have been a GMC loyal owner for many years. We purchased the extended warranty. The problem is the [GMC Sierra 1500 V8] ac quit working and only blows hot air. I live in Orlando FL where it is 95+ degrees daily plus humidity. My ac has not been working for at least 3 weeks! I took it to the shop and they kept it for a couple of days and had me pick it up saying the part had to be ordered. That problem I am

told is that **many other GMC owners are having issue** and the part is back ordered. It actually has to be made and they can give me no idea when the part will be available. Meanwhile I am told that there are some 2000+ other owners waiting as well. This is not acceptable! Meanwhile payments are still being made for a vehicle that I paid $43,000 for because I work hard everyday and at the very least deserve to drive to work in comfort paying that amount of money. I live in an area where the traffic is awful and drive in bumper to bumper on I4. That is maddening with[out] an a/c. So windows are down and I get to inhale the exhaust from all the other vehicles on the road. Meanwhile the only calls I get from GMC is to purchase a new vehicle from them. The only incentive they offer is a $1000.00 off loyalty certificate. Really? Who in their right mind would buy another vehicle from them when **they have no solution and no concern**. I want to find a way to let unsuspecting new buyers know how much GMC cares when you have a problem and that is not at all! I called the dealership again today because I have heard nothing from them in a week and a half. The same exact response was given to me again. **The part is ordered. It has not been made and there is no time line when you might get your AC working again**. Thank GMC" http://www.carcomplaints.com/GMC/Sierra_1500/2014/AC_heater/A C_not_working.shtml (posted April 2017; updated June 2017) **(Exhibit M)**

 "Same issue as all the rest: 1.) [2015 Chevrolet Tahoe LT] A/C stops working 2.) Mechanic replaces [refrigerant] but can't find a leak in the lines 3.) A/C is blowing hot air again after 3 days; [refrigerant] completely gone 4.) Mechanic runs dye through lines to find the leak, replaces [refrigerant] again 5.) A/C is blowing hot air again after 2 days; [refrigerant] completely gone 6.) Mechanic notes a Technical Service Bulletin (TSB) and **widespread complaints of issue**...suggests browbeating Chevy dealer over the issue, given how new the truck is. 7.) **Issue raised with Chevy dealer...no response**… Probably the last GM vehicle I will ever purchase." http://www.carcomplaints.com/Chevrolet/Tahoe/2015/AC_heater/ac_ stopped_working.shtml (posted May 2017) **(Exhibit N)**

263.   As the above sampling of complaints shows, Class Members have been vocal in complaining directly to GM about the AC System Defect, and the number and consistency of their complaints should have alerted GM about the AC System Defect.

### 6.   GM's Knowledge of the AC System Defect from Class Member Complaints Lodged with NHTSA

264.   In addition to complaints made directly to GM, many Class Vehicle owners and lessees lodged complaints about the AC System Defect with NHTSA ODI.

265.   Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

266.   Thus automakers should (and do) monitor NHTSA databases for consumer complaints regarding their automobiles as part of the automakers' ongoing obligation to identify potential defects in their vehicles, such as failures of AC Systems to emit cold air as intended.

267.   From its monitoring of the NHTSA databases, GM knew or should have known of the many complaints about AC System Defect logged by NHTSA

ODI, and the content, consistency, and large number of those complaints alerted,

or should have alerted, GM to the AC System Defect.

268.   A sampling of the publicly available complaints lodged with NHTSA

ODI, includes some of those quoted above, as well as the following:

"The [caller] owns a 2015 Cadillac Escalade ESV. While driving in the rain, the air conditioner condenser fractured and the air conditioner failed to work. The **failure caused the windows to fog up and impaired the driver's visibility**. The vehicle was taken to the dealer … who stated that the part was unavailable. The **failure recurred**. The **manufacturer was made aware of the failure and stated that it was a known issue.** The manufacturer provided the contact a rental vehicle for three days. The vehicle was repaired after seven weeks when the part was located. The cause of the failure and repair part were not provided. The failure mileage was approximately 7,500." NHTSA ODI # 11005298 (incident date March 23, 2017)

"The [2015 GMC Yukon] air conditioner condenser failed. The part is on backorder and I have no air conditioning for an undetermined amount of time. No eta on the part and **they will replace the part with the same faulty model**. No loaner car, no air-conditioning." NHTSA ODI # 11006147 (incident date July 8, 2017)

"[2015 GMC Yukon] air conditioner condenser failed. Replacement part is on national back order we have been waiting **5 weeks so far and no update from GM**." NHTSA ODI # 10991649 (incident date April 10, 2017)

"[2015 Cadillac Escalade] air conditioning stopped working in May 2017. Called the dealership and they told me that there was a high number of cars coming back with the same problem-asked me to come in so they could assess. Came in-20 minutes later-they informed me that my issue was the same. Condenser was out. Part was back ordered. **I've now waited for 8 weeks and the part is still back ordered and GM is refusing to give us an ETA when its available**. Driving with no AC during the summer in high temps and on the freeways has now aggravated my daughter's allergies and she is now

on medication. Can't seem to get any answer from gm and it's not just me." NHTSA ODI # 11010423 (incident date May 30, 2017)

"[2015 Chevrolet suburban] air conditioning condenser is faulty vehicle is covered bumper to bumper under warranty and no replacement is available. No rental car offered, no date of repair is available. **Driving with no air conditioning in the heat is miserable.**" NHTSA ODI # 11002905 (incident date June 5, 2017)

"There was a not any big event that caused it. [2015 Chevrolet suburban] air conditioning was blowing cold air on Monday June 26, 2017; on Tuesday June 27, 2017 it was warm air even after driving around for 6 minutes. Immediately took it to the dealer we purchased it from: Priority Chevrolet. The condenser had stopped working. Couldn't hold [refrigerant] because there was a hole in it. ... ?!?!?! Not sure of the cause. My car is barely 2 years old! I have four young children in the middle of summer initially we were told 1-2 month wait!? **Apparently this isn't the first condenser they have had to replace.** Tells me something isn't right with Chevrolet." NHTSA ODI # 11001975 (incident date June 27, 2017)

"National a/c condenser backorder: today marks 21 days without an a/c condenser on my car [2015 Chevrolet suburban]. I have a small child (15 months old) and GM has no idea when an a/c condenser will be available. I am the 6th person at my local dealership to need one, the 3rd one at a local automotive garage. **GM says they have not heard of this issue** but a small google search will show there is a very large issue across the nation, hence the national backorder on the part. I have tried calling various Chevrolet dealership trying to locate this part." NHTSA ODI # 10992401 (incident date May 10, 2017)

*Vehicle*: 2016 GMC Yukon Denali XL
*Date Complaint Filed*: 06/7/17
*Date of Incident*: 06/01/17
*Component(s)*: Unknown or other
*NHTSA ID Number*: 10993747
*Consumer Location*:  Staten Island, NY
*Summary*:  MY 2016 GMC YUKON XL DENALI'S AIR

CONDITIONER STARTED BLOWING HOT AIR AFTER APPROX. 30,000 MILES. THE DEALERSHIP INFORMED ME THAT I NEED A NEW AIR CONDITIONER CONDENSER AND THAT THE PART IS ON NATIONAL BACK ORDER. BASED ON MY ONLINE RESEARCH, THIS SEEMS TO BE A VERY COMMON ISSUE WITH GMC, CHEVY AND CADILLAC SUV'S/TRUCKS, SO WANTED TO MAKE SURE THAT MY COMPLAINT WAS ALSO LOGGED WITH THE MANY OTHERS.

*Vehicle*: 2016 Chevrolet
*Date Complaint Filed*: 08/28/17
*Date of Incident*: 08/27/17
*Component(s)*:  Engine, Fuel/propulsion system
*NHTSA ID Number*: 11020045
*Consumer Location*:  Catlettsburg, KY
*Summary*:  WHILE DRIVING IN THE SUMMER, MY WIFE INFORMED ME THAT THE VEHICLE HAD STALLED AND ALMOST DIED--SHORTLY AFTER, THE AC WAS NOT WORKING. I LEFT WORK AND CAME TO HER-- FOUND THAT THE COMPRESSOR BELT HAD SHREDDED OFF. TOOK THE VEHICLE TO DEALER AND THEY REPLACED COMPRESSOR. A MONTH LATER, MY WIFE WAS DRIVING HOME ON THE INTERSTATE AND THE VEHICLE STARTED STALLING AND JERKING. THE CHECK ENGINE LIGHT STARTED BLINKING AND TRACTION CONTROL LIGHT ALSO ILLUMINATED. I TRAILERED THE VEHICLE TO OUR HOME A FEW MILES AWAY. I DID NOTICE THE LONG BOLT HOLDING THE NEW COMPRESSOR WAS LOOSE (1/4" SPACE BETWEEN BOLT HEAD AND WASHER).  THE BOLT WAS TIGHTENED, BUT DID NOT APPEAR TO BE A CONTRIBUTING FACTOR WHEN IDLING, THE ENGINE JERKS SO HARD THAT THE ENTIRE CAR SHAKES-THE ENGINE NEARLY DIES. FOR SOME TIME, THE VEHICLE HAS PRODUCED AN UNUSUAL PURRING/CLICKING NOISE WHILE NAVIGATING THRU A PARKING LOT OR SOMETHING AT SLOW SPEEDS-- SOUNDS LIKE IN THE TRANSMISSION OR TORQUE CONVERTER? THE VEHICLE IS BEING TOWED TO THE DEALERSHIP NOW FOR THEIR DIAGNOSIS.

*Vehicle*: 2016 GMC Sierra 1500
*Date Complaint Filed*: 07/14/17

-74-

*Date of Incident*: 0710/17
*Component(s)*: Unknown or other
*NHTSA ID Number*: 11005270
*Consumer Location*: Westborough, MA
*Vehicle Identification No.* (VIN) (if known): 3GTU2NEC0GG...
*Summary*: I HAVE A 2016 GMC SIERRA 1500 5.3L. I'VE BROUGHT
THE TRUCK DOWN TO THE DEALER 4 TIMES NOW BECAUSE
THE AC DOESN'T BLOW COLD AIR. THE AC STOPPED WORKING
AGAIN THIS WEEK WITH THE TRUCK ONLY HAVING 2,800
MILES ON IT. I CALLED GMC DIRECTLY (NOT THE DEALER)
BECAUSE I DON'T WANT TO BRING THE TRUCK DOWN TO THE
DEALER FOR THE 5TH TIME FOR THE SAME ISSUE. IT'S 85+
DEGREES NOW WHERE I LIVE AND DRIVING WITHOUT AC IS
UNBEARABLE, ESPECIALLY WHEN IN TRAFFIC. GM SENT ME
AN E-MAIL INFORMING ME THE AC CONDENSER IS FAULTY BY
DESIGN AND A 'REDESIGN' HAS BEEN CREATED. THE PART IS
ON "NATIONAL BACK ORDER" WITH NO ETA. THEY SAID IT
COULD BE 4-6 WEEKS WHICH MEANS DRIVING MY TRUCK
WITHOUT AC IS VERY UNCOMFORTABLE AND NOT AN OPTION
WITH CHILDREN IN THE TRUCK WHO CAN'T WITHSTAND THE
HEAT. I'M READING ON VARIOUS FORUMS THAT PEOPLE HAVE
BEEN WAITING SINCE MARCH (4 MONTHS) FOR THE NEW
CONDENSER TO COME IN.


*Vehicle:* 2015 GMC Yukon
*Date Complaint Filed:* 08/11/17
*Date of Incident:* 08/11/17
*Component(s):* Engine
*NHTSA ID Number:* 11014598
*Consumer Location:* Kingston, TN
*Summary*: 2015 GMC YUKON - REPLACED THE BAD CONDENSER!
VERY COSTLY, PART WAS ON BACKORDER FOR 2 MONTHS SO
OBVIOUSLY THERE ARE A LARGE AMOUNT OF OTHERS
HAVING THE SAME ISSUES. THIS IS CONSIDERED SAFETY
ISSUES DUE TO THE HEAT IN THE SOUTH AND WE PAID $65,000
FOR A VEHICLE WHICH 2 YEARS LATER NOW HAS A BAD
CONDENSER - AN ADDITIONAL $1,000. I'M DONE WITH GMC. I
FEEL LIKE WE HAVE BEEN TREATED POORLY AND THIS PART

SHOULD BE RECALLED IMMEDIATELY. YOU ARE A BILLION DOLLAR INDUSTRY, IF YOU WANT TO KEEP PEOPLE COMING BACK YOU MAKE IT RIGHT WITH YOUR CUSTOMERS. I WANT TO BE REIMBURSED FOR MY ENTIRE BILL I'M ABOUT TO PAY. I AM SO DISAPPOINTED, I HAVE ALWAYS ALWAYS BEEN A GMC/CHEVROLET PERSON BUT THIS HAS TRULY MADE ME SICK TO KNOW THAT MY FAMILY FORKED OUT $1,000 FOR YOUR MISTAKE! COME ON IT'S A $65,000 VEHICLE...VERY VERY VERY ANGRY. PLEASE FEEL FREE TO CONTACT ME REGARDING OUR BILL AND HOW YOU WILL ATTEMPT TO PROVIDE AMAZING CUSTOMER SERVICE TO MAKE THIS RIGHT. [XXX] INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6).

*Vehicle*: 2015 Chevrolet Suburban
*Date Complaint Filed*: 07/03/17
*Date of Incident*: 06/05/17
*Component(s)*: Unknown or other
*NHTSA ID Number*: 11002905
*Consumer Location*: Torrance, CA
*Summary*: AIR CONDITIONING CONDENSER IS FAULTY VEHICLE IS COVERED BUMPER TO BUMPER UNDER WARRANTY AND NO REPLACEMENT IS AVAILABLE. NO RENTAL CAR OFFERED, NO DATE OF REPAIR IS AVAILABLE. DRIVING WITH NO AIR CONDITIONING IN THE HEAT IS MISERABLE.

*Vehicle*: 2015 GMC Yukon
*Date Complaint Filed*: 07/06/17
*Date of Incident*: 07/05/17
*Component(s)*: Unknown or other
*NHTSA ID Number*: 11003474
*Consumer Location*: Conway, SC
*Summary*: AC QUIT WORKING & DEALER SAID IT'S A BAD CONDENSER, WHICH PART IS UNAVAILABLE DUE TO NATIONAL BACK ORDER. CAN'T TELL ME WHEN THEY CAN GET PART TO FIX. OBVIOUSLY THIS IS A MAJOR DEFECT ON GM BEHALF & THEY'RE DOING NOTHING ABOUT IT. NOT EVEN A RECALL!

*Vehicle*: 2015 GMC Yukon
*Date Complaint Filed*: 05/26/17

*Date of Incident*: 05/03/17
*Component(s)*: Unknown or other
*NHTSA ID Number*: 10991747
*Consumer Location*: San Antonio, TX
*Summary*: MY A/C STARTED BLOWING HOT AIR A FEW WEEKS AGO. I TOOK IT IN TO MY GMC SERVICE DEPARTMENT, AND THEY ADVISED ME IT WAS THE CONDENSER THAT NEEDS TO BE REPLACED, HOWEVER THAT PART IS ON BACK ORDER INDEFINITELY. I HAVE SINCE SPOKE WITH SEVERAL PEOPLE WITH VEHICLES LIKE MINE WHO HAVE ALSO HAD THIS SAME RESULT WITH THEIR A/C CONDENSER. I WOULD LIKE THIS MATTER REVIEWED AS AN OFFICIAL RECALL.

*Vehicle*: 2015 Chevrolet Suburban
*Date Complaint Filed*: 08/30/17
*Date of Incident*: 08/28/17
*Component(s)*: Unknown or other
*NHTSA ID Number*: 11020523
*Consumer Location*: Virginia Beach, VA
Summary: THE AIR CONDITIONER STOPPED BLOWING COLD AIR AND UPON REVIEW BY THE DEALER THE CONDENSER NEEDS TO BE REPLACED. HOW DOES A VEHICLE THAT IS ONLY 2 YRS OLD AND NEVER BEEN IN AN ACCIDENT HAVE A HOLE IN THE CONDENSER? THIS IS RIDICULOUS AND IS VERY DANGEROUS DURING PERIODS OF EXTREME HEAT. I PURCHASED A NEWER VEHICLE TO AVOID ISSUES AND REPAIRS SUCH AS THIS. THE AC DOES NOT WORK WHETHER THE CAR IS IN MOTION OR STATIONARY.

*Vehicle*: 2015 Chevrolet Suburban
*Date Complaint Filed*: 06/28/17
*Date of Incident*: 06/27/17
*Component(s)*: Engine
*NHTSA ID Number*: 11001975
*Consumer Location*: Virginia Beach, VA
*Summary*: THERE WAS A NOT ANY BIG EVENT THAT CAUSED IT. AIR CONDITIONING WAS BLOWING COLD AIR ON MONDAY JUNE 26, 2017; ON TUESDAY JUNE 27, 2017 IT WAS WARM AIR EVEN AFTER DRIVING AROUND FOR 5 MINUTES. IMMEDIATELY

TOOK IT TO THE DEALER WE PURCHASED IT FROM: PRIORITY
CHEVROLET. THE CONDENSER HAD STOPPED WORKING.
COULDN'T HOLD FREON BECAUSE THERE WAS A HOLE IN
IT....?!?!?! NOT SURE OF THE CAUSE. MY CAR IS BARELY 2
YEARS OLD! I HAVE FOUR YOUNG CHILDREN IN THE MIDDLE
OF SUMMER. INITIALLY WE WERE TOLD 1-2 MONTH WAIT!?
APPARENTLY THIS ISN'T THE FIRST CONDENSER THEY HAVE
HAD TO REPLACE. TELLS ME SOMETHING ISN'T ISN'T RIGHT
WITH CHEVROLET.

*Vehicle*: 2015 Chevrolet Suburban
*Date Complaint Filed*:  06/01/17
*Date of Incident*: 04/16/17
*Component(s)*:  Visibility
*NHTSA ID Number*:  10992758
*Consumer Location*:  Minnetonka, MN
*Summary*:  THE CONTACT OWNS A 2015 CHEVROLET
SURBURBAN. WHILE THE VEHICLE WAS STATIONARY, THE AIR
CONDITIONING SYSTEM FAILED. THE VEHICLE WAS
DIAGNOSED AS HAVING A FAULTY CONDENSOR. THE DEALER
WAS CONTACTED AT SUBURBAN CHEVROLET IN EDEN PRARIE,
MINNESOTA, BUT THE PART WAS UNAVAILABLE FOR THE
REPAIR. THE MANUFACTURER WAS MADE AWARE OF THE
FAILURE AND THE CALL WAS FORWARDED TO NHTSA. THE
FAILURE MILEAGE WAS 56,000.

*Vehicle*: 2015 Chevrolet Suburban
*Date Complaint Filed*: 05/11/17
*Date of Incident*: 05/11/17
*Component(s)*:  Visibility
*NHTSA ID Number*:  10984918
*Consumer Location*:   North Plainfield, NJ
*Summary*:  THE CONTACT OWNS A 2015 CHEVROLET SUBURBAN.
THE CONTACT STATED THAT THE AIR CONDITIONING
SPORADICALLY FAILED TO FUNCTION. THE FAILURE
RECURRED MULTIPLE TIMES. THE VEHICLE WAS TAKEN TO
THE DEALER WHERE IT WAS DIAGNOSED THAT THE AIR
CONDITIONER CONDENSER FAILED DUE TO A FREON LEAK
AND NEEDED TO BE REPLACED. THE VEHICLE WAS NOT
REPAIRED. THE MANUFACTURER WAS UNABLE TO ASSIST AND

REFERRED THE CONTACT TO NHTSA. THE APPROXIMATE
FAILURE MILEAGE WAS 35,000. UPDATED 07/13/17*LJ UPDATED
10/13/2017*JS

*Vehicle*: 2015 Chevrolet Suburban
*Date Complaint Filed*: 07/24/16
*Date of Incident*: 07/04/16
*Component(s)*:   Electrical System, Engine, Service Brakes
*NHTSA ID Number*:   10888039
*Consumer Location*:  Lorton, VA
*Summary*:   A/C NO COLD AIR. I WENT TO DEALERSHIP AND
THEY TESTED AND SAID THERE'S HUGE HOLE. APPARENTLY
THEY ONLY SAID SMALL LEAK. THEY REPLACED WITH NEW
CONDENSER. I WAS FORCED TO PAY NEARLY 1,400. ALSO
RESURFACE FRONT DISC BRAKE. THIS IS BRAND NEW VEHICLE
AND OVER 20 VEHICLES I KNOW HAVE SAME ISSUES. THERE
SHOULD BE RECALL ON THIS VEHICLE. I WENT TO DEALER
AND THEY SAID DEAL WITH GM. I WENT TO GM THEY WON'T
RESOLVE MY ISSUES.

*Vehicle*: 2015 Chevrolet Suburban
*Date Complaint Filed*: 03/30/16
*Date of Incident*: 03/24/16
*Component(s)*:   Equipment
*NHTSA ID Number*:   10852507
*Consumer Location*:  Flushing, NY
*Summary*:  THE CONTACT OWNS A 2015 CHEVROLET SUBURBAN.
THE CONTACT STARTED THE VEHICLE AND ACTIVATED THE
AIR CONDITIONER; HOWEVER, HOT AIR CIRCULATED
THROUGH THE AIR VENTS. THE VEHICLE WAS TAKEN TO THE
DEALER WHERE IT WAS DIAGNOSED THAT THE AIR
CONDITIONER CONDENSER NEEDED TO BE REPLACED DUE TO
A LEAK. THE VEHICLE WAS REPAIRED. THE MANUFACTURER
WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE
MILEAGE WAS 60,000.

*Vehicle*: 2015 Cadillac Escalade
*Date Complaint Filed*: 07/24/17
*Date of Incident*: 05/30/17
*Component(s)*: Unknown or other
*NHTSA ID Number*:   11010423

-79-

*Consumer Location*:  Redmond, WA
*Summary*:   AIR CONDITIONING STOPPED WORKING IN MAY 2017.
CALLED THE DEALERSHIP AND THEY TOLD ME THAT THERE
WAS A HIGH NUMBER OF CARS COMING BACK WITH THE SAME
PROBLEM- ASKED ME TO COME IN SO THEY COULD ASSESS.
CAME IN- 20 MINUTES LATER- THEY INFORMED ME THAT MY
ISSUE WAS THE SAME. CONDENSER WAS OUT. PART WAS BACK
ORDERED. I'VE NOW WAITED FOR 8 WEEKS AND THE PART IS
STILL BACK ORDERED AND GM IS REFUSING TO GIVE US AN
ETA WHEN ITS AVAILABLE. DRIVING WITH NO AC DURING THE
SUMMER IN HIGH TEMPS AND ON THE FREEWAYS HAS NOW
AGGRAVATED MY DAUGHTERS ALLERGIES AND SHE IS NOW
ON MEDICATION. CAN'T SEEM TO GET ANY ANSWER FROM GM
AND ITS NOT JUST ME.

*Vehicle*: 2015 Cadillac Escalade ESV
*Date Complaint Filed*: 11/16/15
*Date of Incident*: 09/07/15
*Component(s)*: Electrical System
*NHTSA ID Number*: 10790680
*Consumer Location*:  Boca Raton, FL
*Summary*:  THE AIR CONDITIONING ACTIVATED, THE HEAT
INDEPENDENTLY TURNED ALL THE WAY UP IN THE REAR OF
THE VEHICLE WITHOUT WARNING. THE HEAT CAUSED ONE OF
THE OCCUPANTS TO PASS OUT. THE VEHICLE WAS TAKEN TO
THE DEALER WHERE IT WAS DIAGNOSED THAT THERE WAS AN
ELECTRICAL FAILURE AND THAT THE COMPUTER HAD TO BE
REPROGRAMMED. THE VEHICLE WAS REPAIRED. THE
MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE
FAILURE MILEAGE WAS 6,000.

*Vehicle*: 2015 Chevrolet Tahoe
*Date Complaint Filed*:  05/31/17
*Date of Incident*:  04/17/17
*Component(s)*:   Power train
*NHTSA ID Number*:   10992449
*Consumer Location*:  Brooklyn, NY
*Summary*:  MY 2015 CHEVY TAHOE A/C IS NOT WORKING. THE
CONDENSER PART IS ON BACK ORDER FOR 6 MONTHS OR
MORE FROM THE GM FACTORY PLANT. MEANWHILE, I CAN'T

DRIVE THE CAR BECAUSE I HAVE BREATHING PROBLEMS. GM TOLD ME ALL THERE TAHOES HAVE THIS PROBLEM AND THEY DO NOT HAVE THE PART AVAILABLE YET.

*Vehicle*: 2015 Chevrolet Tahoe
*Date Complaint Filed*: 06/06/17
*Date of Incident*: 05/21/17
*Component(s)*: Unknown or other
*NHTSA ID Number*: 10993526
*Consumer Location*: Bellingham, WA
*Summary*: I OWN A 2015 TAHOE AND LIVE IN THE PACIFIC NW (AC USED THREE MONTHS OUT THE YEAR, MAYBE). EIGHT MONTHS AGO (END OF LAST YEAR WARM SEASON) THE AC STOPPED WORKING, OF COURSE IT IS OUT OF WARRANTY PAID OVER $850 AT LOCAL CHEVY DEALER TO PUT IN NEW CONDENSER. GO TO USE AC FOR FIRST TIME THIS SEASON AND IT STOPS WORKING, SAME THING. TAKE IT TO SAME DEALER AND I AM TOLD THAT NOW THE COMPRESSOR IS LEAKING AT A TUNE OF $960!! THIS IS ABSOLUTELY CRAZINESS, THE AC IS A NEW VEHICLE SHOULD NOT BE GOING BAD. NO ACCIDENTS OR ANY REASON THIS IS HAPPENING. I BOUGHT CHEVY BELIEVING I WAS BUYING QUALITY. I HAVE KIDS IN SPORTS AND DRIVE A LOT SO IT IS IMPORTANT TO BE SAFE AND COMFORTABLE. I AM A SINGLE MOM AND I HAVE NEVER HAD TROUBLE LIKE THIS WITH A NEW CAR. CHECKING WITH THREE DIFFERENT DEALERS/AUTOMOTIVE AC REPAIR COMPANIES I WAS TOLD BY ALL THREE THAT THIS SHOULD NOT BE OCCURRING IN MY VERY NEW AND EXPENSIVE VEHICLE AND THAT IT IS LIKELY THE CONDENSER WAS NOT BAD IN THE FIRST PLACE AND WAS THE COMPRESSOR ALL ALONG AND ONCE REFILLED WITH FREON IT WORKED FOR A BIT BUT NOW LEAKED OUT AGAIN AND I AM ASKED TO PAY THE LABOR ALL OVER AGAIN. VERY VERY UNHAPPY CUSTOMER AND FEELING LIKE CHEVY IS NOT A GOOD PRODUCT, NEVER ANY ISSUES LIKE THIS WITH HONDA OR TOYOTA I HAVE OWNED- NORMAL STUFF AND IF ACCIDENT OR MECHANICAL STUFF, BRAKES, YES ALL THAT HAPPENS, BUT AC IN A NEWER VEHICLE-2 XS IN LESS THAN 1 YEAR, NO! #TAKENFORARIDEBYCHEVY #FAULTYPRODUCT #CHEVYDISSPOINTING.

*Vehicle*: 2015 Chevrolet Tahoe
*Date Complaint Filed*: 05/11/17
*Date of Incident*: 04/11/17
*Component(s)*: Unknown or other
*NHTSA ID Number*: 10984928
*Consumer Location*: Simpsonville, SC
*Summary*: THE AC CONDENSER HAS A LEAK AND THERE IS NO
OPTION FOR A REPLACEMENT CONDENSER AS THEY ARE ON
NATIONAL BACKORDER WITH NO ETA AND COULD TAKE UP
TO 120 DAYS TO GET A REPLACEMENT PART. SO GM EXPECTS
MY FAMILY OF 5 WHICH INCLUDES 3 KIDS UNDER THE AGE OF
8 TO DRIVE A VEHICLE FOR AN ENTIRE SUMMER IN SOUTH
CAROLINA WITH NO AC.

*Vehicle*: 2015 Chevrolet Tahoe
*Date Complaint Filed*: 12/20/16
*Date of Incident*: 12/13/16
*Component(s)*: Engine
*NHTSA ID Number*: 10936404
*Consumer Location*: Richmond, TX
*Summary*: CONDENSER WENT OUT. I HAVE A LITTLE OVER
39,000 MILES ON THIS VEHICLE AND JUST HAD TO PUT IT IN
THE SHOP FOR THE CONDENSER TO BE REPLACED. I
CONTACTED 2 DIFFERENT DEALERSHIPS AND BOTH HAVE
TOLD ME THEY HAVE HAD TO REPLACE SEVERAL DEFECTIVE
CONDENSERS. TO ME, THIS SAYS THAT GM IS AWARE OF THE
ISSUE YET IS MAKING NO ATTEMPT TO RECALL THE
DEFECTIVE PART. I AM ATTACHING A PHOTO TO SHOW THE
LEAK IS AT A SAUDER LINE AND NOT DUE TO EXTERNAL
DAMAGE. HAD A ROCK OR OTHER FOREIGN OBJECT HIT THE
CONDENSER MY INSURANCE WOULD HAVE PAID FOR THIS
SINCE IT WOULD BE CONSIDERED COMPREHENSIVE BUT THE
TECH AT THE DEALERSHIP TOLD ME THAT IT WAS NOT DUE TO
EXTERNAL DAMAGE, IT WAS DEFECTIVE. THE DARK SPOT AT
THE BOTTOM OF THE PHOTO IS WHERE THE LEAK WAS & IT
WAS COMING FROM THAT SEAM/SAUDER LINE.

*Vehicle*: 2015 Chevrolet Silverado 1500
*Date Complaint Filed*: 08/21/17
*Date of Incident*: 08/18/17

*Component(s)*: Engine and Engine Cooling
*NHTSA ID Number*: 11018709
*Consumer Location*: Houston, TX
*Summary*: THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. WHILE DRIVING HIGHWAY SPEEDS WITH THE AIR CONDITIONER ACTIVATED, A BELT FRACTURED AND CAUSED HEAT TO ENTER THE VEHICLE. THE AIR CONDITIONING COMPRESSOR PREMATURELY FAILED. THE VEHICLE WAS NOT DIAGNOSED BY A DEALER OR AN INDEPENDENT MECHANIC. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE CONTACT WAS WAITING FOR A RESPONSE TO DETERMINE IF A DEALER WOULD BE ABLE TO DIAGNOSE THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 40,000.

*Vehicle*: 2014 GMC Sierra 1500
*Date Complaint Filed*: 09/14/17
*Date of Incident*: 08/14/17
*Component(s)*: Unknown or other
NHTSA ID Number: 11023396
Consumer Location: Honolulu, HI
Summary: A/C CONDENSER HAS CRACK IN WELD ON RIGHT UPPER WELD AS DESCRIBED BY MANY OTHERS ON FORUMS FOR GMC AND CHEVY 2014-2017 TRUCKS. DATE BELOW IS JUST AN ESTIMATE AS WHEN THE ACTUAL DATE IS UNKNOWN. THE DATE IS WHEN AIR STARTED BLOWING WARM.

*Vehicle*: 2014 GMC Sierra 1500
*Date Complaint Filed*: 08/27/17
*Date of Incident*: 07/25/16
*Component(s)*: Unknown or other
*NHTSA ID Number*: 11019965
*Consumer Location*: Brighton, MI
*Summary*: AIR CONDITIONING SYSTEM WENT OUT. DEALERSHIP FOUND THAT THE LINE SET BETWEEN THE CONDENSER AND COMPRESSOR FAILED. DEALERSHIP STATED IT NEEDS A BRACKET TO FIX OR THIS WILL KEEP HAPPENING. APPROX. $700 TO FIX AND NOT COVERED UNDER VEHICLE WARRANTY.

*Vehicle:* 2014 GMC Sierra 1500
*Date Complaint Filed*: 08/11/17
*Date of Incident*: 05/01/17

-83-

*Component(s)*: Unknown or other
*NHTSA ID Number*: 11014686
*Consumer Location*: Cataula, GA
*Summary*: AIR CONDITIONING HOSE BETWEEN CONDENSER AND COMPRESSOR FAILED. NEEDS A BRACKET TO HOLD IT. GM KNOWS ABOUT THIS BUT HAS NOT CALLED FOR RECALL. THEY CHARGE 700.00 TO FIX. VIRTUALLY ALL 2014 CHEVY AND GM TRUCKS ARE AFFECTED. I AM VERY DISAPPOINTED WITH GM. TRUCK HAD ONLY 60K MILES.

*Summary*: Vehicle: 2014 GMC Sierra 1500
*Date Complaint Filed*: 05/11/17
*Date of Incident*: 04/15/17
*Component(s)*: Visibility
*NHTSA ID Number*: 10984972
*Consumer Location*: Bowling Green, KY
*Summary*: THE CONTACT OWNS A 2014 GMC SIERRA 1500. WHEN THE AIR CONDITIONER WAS ACTIVATED, HOT AIR EMITTED FROM THE VENTS WITHOUT WARNING. THE CONTACT MENTIONED THAT THE HEATER WORKED FINE. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE ENTIRE CONDENSER NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE MANUFACTURER STATED THAT THEY WOULD MAKE A NOTE OF THE FAILURE. THE FAILURE MILEAGE WAS 55,000. THE VIN WAS NOT AVAILABLE.

*Vehicle*: 2014 GMC Sierra 1500
*Date Complaint Filed*: 05/11/17
*Date of Incident*: 04/14/17
*Component(s)*: Visibility
*NHTSA ID Number*: 10984911
*Consumer Location*: West Monroe, LA
*Summary*: THE CONTACT OWNS A 2014 GMC SIERRA 1500. THE CONTACT STATED THAT THE AIR CONDITIONER CONDENSER LEAKED FREON AND FAILED TO BLOW COOL AIR. THE CONTACT CALLED THE MANUFACTURER AND WAS INFORMED THAT THEY WOULD EXPEDITE A CONDENSERAND SEND IT TO THE DEALER. THE DEALER INFORMED THE CONTACT THAT WHEN THE MANUFACTURER SENDS THE CONDENSER, IT

-84-

WOULD GO TO THE NEXT AVAILABLE CUSTOMER IN LINE AND THE CONDENSER PART WOULD TAKE SIX WEEKS TO BECOME AVAILABLE. THE VEHICLE WAS NOT SERVICED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 55,000.

*Vehicle*: 2014 Chevrolet Silverado 1500
*Date Complaint Filed*: 08/15/17
*Date of Incident*: 08/15/17
*Component(s)*: Engine
*NHTSA ID Number*: 11015350
*Consumer Location*: Deridder, LA
*Summary*: THE CONTACT OWNS A 2014 CHEVROLET SILVERADO 1500. THE CONTACT STATED THAT THE AIR CONDITIONING UNIT WAS DISTRIBUTING HOT AIR. THE CONTACT CALLED A LOCAL DEALER (BILLY NAVARRE CHEVROLET CADILLAC LOCATED AT 1510 E COLLEGE ST LAKE CHARLES, LA 70607, 227-377-0601) TO MAKE AN APPOINTMENT. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE CONTACT CALLED THE MANUFACTURER AND WAS OFFERED A $100.00 VOUCHER TOWARD REPAIRS. THE MANUFACTURER PROVIDED CASE NUMBER: 8-3140285548. THE FAILURE MILEAGE WAS 37,000.

*Vehicle*: 2014 Chevrolet Silverado 1500
*Date Complaint Filed*: 10/17/17
*Date of Incident*: 10/01/16
*Component(s)*: Engine
*NHTSA ID Number*: 11034165
*Consumer Location*: Santa Ana, CA
*Summary*: THE CONTACT OWNS A 2014 CHEVROLET SILVERADO 1500. THE CONTACT STATED THAT THE AIR CONDITIONING UNIT FAILED TO OPERATE AND WAS BLOWING OUT HEAT. THE CONTACT WAS CONCERNED FOR HIS SAFETY DUE TO THE HUMIDITY AND CLIMATE WHERE HE LIVES. THE VEHICLE WAS TAKEN TO GUARANTY CHEVROLET (711 17TH ST, SANTA ANA, CA 92701) WHERE IT WAS DIAGNOSED THAT ONE OF THE AIR CONDITION HOLES WAS DAMAGED AND NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED; HOWEVER, THE FAILURE RECURRED ONE YEAR LATER. THE VEHICLE WAS TAKEN BACK TO GUARANTY CHEVROLET (711 17TH ST, SANTA

-85-

ANA, CA 92701), BUT A DIAGNOSTIC TEST WAS NOT PERFORMED DUE TO THE PRICE. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND INFORMED THE CONTACT THAT THERE WAS NO RECALL. THE APPROXIMATE FAILURE MILEAGE WAS 46,000. THE VIN WAS NOT PROVIDED.

*Vehicle*: 2014 Chevrolet Silverado 1500
*Date Complaint Filed*: 07/11/17
*Date of Incident*: 03/11/17
*Component(s)*: Electrical System
*NHTSA ID Number*: 11004261
*Consumer Location*: Lafayette, IN
*Summary*: THE CONTACT OWNS A 2014 CHEVROLET SILVERADO 1500. WHILE DRIVING AT ANY SPEED, THE AIR CONDITIONING CONDENSER DID NOT WORK WITHOUT WARNING. THE MANUFACTURER AND DEALER WERE CONTACTED (DEFOUWU CHEVROLET IN LAFAYETTE, INDIANA) AND STATED THAT THERE WERE NO RECALLS OR PARTS AVAILABLE. THE VEHICLE WAS NOT REPAIRED. THE VIN WAS NOT PROVIDED. THE FAILURE MILEAGE WAS APPROXIMATELY 72,000.

*Vehicle*: 2014 Chevrolet Silverado 1500
*Date Complaint Filed*: 06/13/17
*Date of Incident*: 06/13/17
*Component(s)*: Visibility
*NHTSA ID Number*: 10994631
*Consumer Location*: Unknown
*Summary*: THE CONTACT OWNS A 2014 CHEVROLET SILVERADO 1500. WHILE DRIVING OR WHILE THE VEHICLE WAS PARKED, THE AIR CONDITIONING UNIT WAS INOPERABLE. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC WHO DIAGNOSED THAT THERE WAS A LEAK IN THE COMPRESSOR AND HOSE. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE CONTACT CALLED NASH CHEVROLET AT (770) 822-6678 AND WAS INFORMED THAT HE WOULD HAVE TO PAY FOR THE REPAIRS. THE FAILURE MILEAGE WAS 67,859.

*Vehicle*: 2014 Chevrolet Silverado 1500
*Date Complaint Filed*: 09/29/14

*Date of Incident*:  07/30/14
*Component(s)*:  Electrical System, Steering
*NHTSA ID Number*:  10639896
*Consumer Location*:  Sherwood, AR
*Summary*:  THE CONTACT OWNS A 2014 CHEVROLET SILVERADO 1500. WHILE DRIVING APPROXIMATELY 30 MPH, THE STABILITY TRAC, STEERING ASSIST WAS REDUCED, SERVICE POWER STEERING, SERVICE FOUR WHEEL DRIVE, AND SERVICE BRAKE ASSIST WARNING INDICATORS ILLUMINATED ON THE INSTRUMENT PANEL. IN ADDITION, THE AIR CONDITIONING STOPPED WORKING AND THE ENGINE REVVED. THE CONTACT ALSO STATED THAT THE POWER STEERING SEIZED. THE DEALER RESET THE COMPUTER, BUT THE FAILURES PERSISTED. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 2,969.

269.   As the above sampling of complaints makes clear, consumers have been vocal in complaining to NHTSA ODI about the AC System Defect and GM was, or should have been, aware of and monitoring those complaints, and thus should have known about the AC System Defect.

### 7.   GM's Knowledge of the AC System Defect from Class Member Complaints on Third-Party Websites

270.   In addition to complaints made directly to GM and collected by NHTSA ODI, many Class Vehicle owners and lessees posted complaints about the AC System Defect on public online vehicle owner forums.

271.   Other examples of these types of postings are below:

"2014 Sierra SLT … I was heading out this morning to take the youngest daughter to move into her apartment where she is going to

school. 3 hrs away. All is fine then about 1 1/2 hrs into our journey noticed the air was not as cold as it had been from the A/C. Well, nothing I did helped to get it cooler, just getting hotter. Blowing just fine. …We had to lower the windows. Getting to be about 95 outside and more miserable by the mile. And traffic was moving slowly. By the time we made it to our destination it was a 100 or hotter outside. This started happening at mileage 11950. … temp outside at one point showed 111 per my nifty pickup thermometer. Anyway it was just miserable. This all started about 1030 this morning and had to leave the windows down all day that we were in the pickup. Finally made it home tonight about 9pm with outside temp of 94.The **AC is dead in the water with almost a year on her and a little less than 12k miles**. I have never had a vehicle lose the AC before and I have had MANY new vehicles."
http://www.gm-trucks.com/forums/topic/163791-well-have-a-problemno-ac33/ (posted August 17, 2014) **(Exhibit O)**

"Bought a 2014 GMC Sierra SLE Crew Cab from Tulley GMC in Nashua about a month ago. I also bought the extended warranty, thank GOD!!!! A couple weeks ago, started noticing the AC wasn't blowing icy cold air. Took it to the service department and the problem is the AC condenser. They said it is covered under my warranty but the part is 'back ordered'. I've been reading some comments online about other people with this same issue. I'm getting a little nervous because I'm seeing **people that have been waiting months and still no AC condensers available**. I have a pregnant girlfriend at home and if I need to drive us somewhere, I need AC at least for her. The dealer did give me a loaner and say that I can stay in it for as long as it takes but I'm pissed because I just bought the truck and I'm paying $500 a month to drive around in a Terrain while my truck sits in their back parking lot. Anyone have any luck with a dealer actually getting their hands on a AC condenser?"
http://www.carcomplaints.com/GMC/Sierra_1500/2014/AC_heater/AC_not_working.shtml (posted June 2017) **(Exhibit P)**

"Purchased 2015 Chevy Tahoe LTZ new, 3 years ago. Air conditioning not working and told it needs a condenser. **Part is on back order with no delivery date available due to the high number of 2015 Tahoes that are waiting for this part**. Went online to see if anyone else is having this problem with the same make/model/year

-88-

and the number is astonishing. This was a brand new model and first year offered from Chevy so there is obviously a manufacturing issue. Car warranty is expired and **was told part would be over $2000**!" http://www.carproblemzoo.com/chevrolet/tahoe/air-conditioner-problems.php (posted March 2017) **(Exhibit Q)**

"2014 GMC Sierra [1500], had to replace the AC Condenser (3 yr. old truck), cost $1000. **2 weeks after it was replaced the AC quit working again**. Brought it back in, had to have a High Side Line Hose replaced, $300 more dollars to fix. No recall on an issue that seems to be a common problem with these trucks. Disgusting." http://www.carcomplaints.com/GMC/Sierra_1500/2014/AC_heater/AC_not_working.shtml (posted June 2017) **(Exhibit R)**

272.    As shown by this small sampling of complaints from vehicle owner forums consumers have been vocal in complaining about the AC System Defect and the AC failure it causes. A multi-billion dollar automaker like GM undoubtedly had and has a marketing department that tracks such sites and should reasonably have been aware of the AC System Defect in the Class Vehicles.

273.    Indeed, as demonstrated by the posting below, GM routinely monitors third-party websites on which its customers discuss defects affecting their GM vehicles—including the Defect—and responds to its customers:



The AC is dead in the water with almost a year on her and a little less than 12k miles. I have never had a vehicle lose the AC before and I have had MANY new vehicles. No way to talk with anyone so will have to try to get something done on Monday. Wish me luck. And did I mentioned it was miserable.

In simpler terms it just down right sucked....[11]

[GM Responds]

Hello fly53usmc,

Sorry you are having concerns with the A/C in your 2014 Sierra. I'm glad fellow forum members are chiming in to assist you with feedback and advice. If you decide to take your vehicle to your dealership, I'd be glad to assist you. I can be reached via private message to further discuss your situation and I am always happy to assist anyway that I

---

[11] http://www.gm-trucks.com/forums/topic/163791-well-have-a-problemno-ac/by
"fly53usmc, Central Texas" on August 16, 2014 (last visited Oct. 30, 2017).
**(Exhibit Z)**

can!

Regards,
Andraya
GM Customer Care[12]

***

The AC is just blowing hot air. Had been working fine up until this
afternoon. The controls all work, the vents change as they should, just
no cool air.

Has anyone else had this issue?

We are going to take it to a dealer for repair but our experience with
these dealers so far has not been a good one. I understand that cars
break but it would be nice for the dealers to at least ACT like they
want to help... No loaner car and a week wait to find the problem is a
bit frustrating for someone who just spent $40,000 on their product.[13]

[GM Responds]

Hi Magnes,

We certainly understand how this must be frustrating and apologize if
you've had a difficult time working with the dealership in the past.
You're well within warranty, so it shouldn't be any problems with
getting your air conditioning fixed. If you need any assistance while
working with the dealership we're more than happy to reach out to
them. Private message us your VIN, contact information and
dealership name if we can be of assistance.

Amber N.
Chevrolet Customer Care[14]

---

[12] http://www.gm-trucks.com/forums/topic/163791-well-have-a-problemno-
ac/?page=2 by "Verified GM Representatives" on August 17, 2014 (last visited
Oct. 30, 2017). **(Exhibit AA)**
[13] *See* https://chevroletforum.com/forum/2014-gmtk2xx-110/2014-silverado-ac-
problems-already-67170/ by "Magnes" on August 4, 2014 (last visited Oct. 30,
2017). **(Exhibit BB)**
[14] *Id.* by "Official GM Rep" on August 6, 2014.

*Footnote continued on next page*

\*\*\*

same issue this morning a/c is blowing HOT air. what was the problem with yours ?[15]

[GM Responds]

Hi Jacobmo,

We are here if any extra help is needed with your concern. Please send us a private message with your full contact information, VIN, current mileage and dealership name if you would like for us to look further into this for you. We will be glad to help!

Kristen A.
Chevrolet Customer Care[16]

\*\*\*

Our AC just went out as well 8,396 miles wow ,do you guys know of a quick fix? It's a holiday weekend and Oklahoma is hot! our dash rattles and our seat flexes with strange noises as well dealer did not even attempt to fix the other two issues hope they provide better service with the AC...[17]

[GM Responds]

Hi Brandon,

Sorry you are also having problems with your A/C. I can understand what an inconvenience this must before you dealing with the Oklahoma heat! I see you are experiencing additional concerns with dash rattles and strange noises from your seat. I'm sorry if your dealership was unable to resolve these concerns for you. I'd be glad to reach out to your dealership on your behalf. If you'd like my assistance, please reach out to me via PM here on the site!

Andraya

---

[15] *Id.* by "Jacobmo"

[16] *Id.* by "Official GM Rep" on August 27, 2014.

[17] *Id.* by "brandonsw79" on August 31, 2014.

*Footnote continued on next page*

Chevrolet Customer Care[18]

\*\*\*

I bought a 2014 Silverado about 5 months ago. For the most part I have really enjoyed it. On Wednesday I noticed the air conditioning was not working. It was only blowing hot air. I immediately took it to the dealer in Murray Utah who diagnosed the problem as a faulty compressor. He said they could fix it under warranty but they didn't have the parts and would have to order them in from Denver. He told me to bring the vehicle back on Thursday. I came back on Thursday only to be told that they had missed the order deadline the day before so no parts. He told me to come back Friday. In the meantime it is 90 degrees outside and the black interior of the truck is scalding hot. I went back Friday (yesterday) to be told that the compressor had come in but a valve they need had not come in. He told me to come back Saturday (today). I am told that the parts are now all here and it will take 4 hours to fix. I told him that I was surprised to have a compressor go out on such a new vehicle and I asked him if he was seeing a lot of these compressor problems and he said it was the second this week. He said it was too early to tell if this is a trend.[19]

\*\*\*

I took in my 2014 Silverado two weeks ago since the A/C wasn't working. They said the condenser went out and replaced it. Guess what happened again? A/C doesn't work today. Chevy you made a crappy part and design on the A/C. I am so disappointed with the dealer, the experience and the A/C in this truck. Give me a break![20]

\*\*\*

2015 Tahoe – a/c condenser is cracked. Nationwide back order for part and no idea when I might get my truck back. In the meantime, the loaner they have available is a Camaro. Sounds nice, and I'm thankful

---

[18] *Id.* by "Official GM Rep" on August 31, 2014.
[19] https://chevroletforum.com/forum/2014-gmtk2xx-110/2014-silverado-ac-problems-already-67170/page2/ by "OldmanGreg" on September 27, 2014 (last visited Oct. 30, 2017). **(Exhibit CC)**
[20] *Id.* by "koko22" on March 6, 2015.

*Footnote continued on next page*

to have something to drive in the interim, but with a family of 5 and a husband who is 6'9", it definitely is not practical or comfortable.[21]

\*\*\*

Purchased new model Chevy Tahoe 3 years ago and A/C not working. I live in the northeast and only use the AC 6 months/year. Was told the part is on back-order for at least 10 weeks – due to the number of 2015 Chevy Tahoes with this same issue that need the part. This is obviously a company wide issue that needs to be addressed since 2015 was the brand new model for the Tahoe. Was told the part will be over $2000 (on a 3 year old car!!!). Hoping my dealer goes to bat for me w/ GM and I get reimbursed for the part. But even with that I will have to wait until the summer to get the part and will have NO A/C. This is my 3rd and last GM car for sure.[22]

\*\*\*

I've owned this vehicle for 4 months and it's the biggest POS I've ever purchased!! It's in the shop constantly with different things going on. I've HAD IT!! I want this car replaced!!!!!! DO NOT waste your hard earned money on this POS SUV!!!.[23]

\*\*\*

I have had several issues with my 2015 Tahoe, but the AC not working is awful. I paid over $50,000 for this truck, I should not have major repairs like this one.[24]

\*\*\*

I live in Texas. Coming home from a family camping trip the AC stopped working! It was miserable! Summer heat with 5 boys in the

---

[21] *See* http://www.carcomplaints.com/Chevrolet/Tahoe/2015/AC_heater/ac_stopped_working.shtml, by "emwrlw, Wimauma, US" on June 2, 2017 (last visited Oct. 30, 2017).  **(Exhibit DD)**

[22] *Id*. by "Mj C., St Davids, US" on March 22, 2017.

[23] *Id*. by "Shannon E., Sour Lake, TX, USA" on May 20, 2015.

[24] *Id*. by "Becky G., Mulvane, KS, USA" on June 22, 2015.

*Footnote continued on next page*

car, for four hours![25]

\*\*\*

Purchased 2015 chevy Tahoe ltz new, 3 years ago. Air conditioning not working and told it needs a condenser. Part is on back order with no delivery date available due to the high number of 2015 Tahoes that are waiting for this part. Went online to see if anyone else is having this problem with the same make/model/year and the number is astonishing. This was a brand new model and first year offered from chevy so there is obviously a manufacturing issue. Car warranty is expired and was told part would be over $2000![26]

\*\*\*

My AC conditions developed a pin hole leak along the seam/braze. The AC Delco condenser lasted just long enough to get me through the warranty period. I thought it was the AC to condenser line, but not the case, despite my truck not coming with the bracket that GM started adding to later models (thanks beta testers). The stealership quoted $1k to fix it…not happening. Has anyone DIY'd a condenser replacement? Does the drier need to be replaced as well? Any recommendations on alternative condenser brands? Don't want to replace it with an equally inferior condenser.[27]

\*\*\*

A/C compressor popped yesterday. 2014 Sierra with only 56,000 miles on her. Truck bogged down and almost died while backing out of a parking spot. Looked under the hood and saw the wheel on the compressor was looking sketchy and noticed a white residue that somehow got sprayed around the engine compartment. Took it to the dealer and the service rep said he could pull some strings at GMC and get it replaced for $200. Said they have the part in stock, but I'm not

---

[25] *Id*. by "Carmen V., Pearland, TX, US" on July 19, 2014.

[26] *See* http://www.carproblemzoo.com/chevrolet/tahoe/air-conditioner-problems.php, failure date of 03/22/2017 (last visited Oct. 30, 2017).  **(Exhibit EE)**

[27] *See* http://www.gm-trucks.com/forums/topic/191974-ac-condenser-replacement/, by "Enthusiast" on September 17, 2016 at 03:34 PM. **(Exhibit FF)**

*Footnote continued on next page*

feeling too optimistic after reading all the other complaints.[28]

\*\*\*

This is the first issue of three concerning the cooling system I have experienced. I understand GM is aware of the faulty design as this issue is widespread on this model. GM has since created a bracket to prevent the hose from failing however, no recall has been executed.[29]

\*\*\*

Dealer mentioned that this is a common problem, I am yet to see anything from the manufacturer.[30]

\*\*\*

Truck less than 2 year old and already had to replace the AC.[31]

\*\*\*

Dozens of 2014 Chevrolet Silverado owners have contacted us over their frustration about their trucks' air conditioning problems. Owners say that they are unable to get their trucks fixed properly. Owners of 2014 Chevrolet Silverados are apparently not getting much help in solving problems with the air conditioning on their trucks. I first wrote about this problem with 2014 Chevrolet Silverados and GMC Sierras in October of 2016.. Since then I have received dozens of comments from other angry owners, convinced that General Motors is not doing anything to help them.[32]

\*\*\*

---

[28] *See* http://www.carcomplaints.com/GMC/Sierra_1500/2014/AC_heater/AC_not_working.shtml by "jadair80, Bakersfield, US" on July 25, 2017 (last visited Oct. 30, 2017). **(Exhibit GG)**

[29] *Id*. by "]jrdavenp, Tullahoma, US" on March 2, 2016.

[30] *Id*. by "Edgardo C., Jacksonville, FL, USA" on September 15, 2015.

[31] *Id*. by "Ted. S., Bedford, IN, USA" on July 17, 2015.

[32] https://www.torquenews.com/3768/owners-2014-chevrolet-silverados-are-furious-they-cant-get-their-ac-fixed (June 12, 2017) (last visited Oct. 30, 2017). **(Exhibit HH)**

The 2014 Chevrolet Silverado has many drivers hot under the collar because of continual problems with the truck's air conditioning. There are multiple forums dedicated to the same issue. Some drivers had problems right after buying their pickups. Others are suffering with sweltering temperatures right now.

One forum I checked has 19 pages of complaints dedicated to the air conditioning issues. The last post, in September of 2016, pretty well sums up the frustration. This 2014 Silverado owner says he has had to take it in for repairs every three months. 'This was my first new car to me. I was planning to buy one for my daughter, but not with this track record. I just had the AC fixed 2 months ago. Today, on the way home from work, the compressor seized and the belt broke. Now it's Friday, no service centers are open, and I live in the south so it is hot and I have no AC. I was planning to take the kids out on the boat, but I am not putting them in a hot truck with no AC. This may very well be the last Chevy I ever

\*\*\*

Regarding 2015 Chevrolet Silverado 1500:   Air conditioner started blowing hot air. Took to dealer they found a weld broken loose on the top left corner of the condenser causing a leak. Currently GM condensers are on back order. Due to the overwhelming problem nationwide. They charge me to refill the system with freon (or equivalent), 24 hours later it has leaked out and is blowing hot air again. Dealer guessed 3 to 6 weeks before they would get the replacement part in. Truck has 68,000 miles with cost going to be $1300.00. We also have a 2015 chevrolet suburban with 74,000 miles on it that had the exact same problem. Cost $1300.00 to fix.[33]

\*\*\*

Regarding 2015 Chevrolet Silverado 1500:   My truck only has 42,000 miles on it. Over the course of 3 days I noticed the air conditioner go from blowing cold air to blowing warmer air until it no longer was cold. The dealer inspected the system and said the ac condenser needs to be replaced. Since it is out of warranty, it will cost approximately

---

[33] https://www.aboutautomobile.com/Consumer-Complaint/2015/Chevrolet/Silverado-1500/10994603 (Incident date June12, 2017) (last visited Oct. 26, 2017). **(Exhibit II)**

$1,300 to fix. The part is on backorder for at least 3 weeks. The current "feel like" temperature in florida is 106 degrees fahrenheit outside. That would be a long time to go without a/c without a loaner from the dealer, which the dealer did offer.[34]

\*\*\*

2015 GMC Yukon.  Air conditioner condenser went out and it cost $944. 00 on a vehicle that is only 3 years old and has only 65000 miles on it.[35]

\*\*\*

2015 GMC Yukon.  The air conditioner condenser failed 1st week of June 2017 and the part is not available any where in the country. The vehicle is dangerous to drive when it rains because the windows fog over and are unable to clear with air system.[36]

\*\*\*

2015 Sierra.  I am having problems with my air conditioning again. My A/C is blowing warm air and this is the second time I have had this problem since buying my 2015 Sierra less than 6 months ago. A few months ago I had the exact same problem and my dealership diagnosed it as a leaking hose and all of the freon was gone. They had to order a new hose and it took a week for it to come in. They installed the new hose and added more freon and it has been fine for the past 3 months until today. This morning I noticed that the air coming out was warmer than normal even though I have the A/C set at 65 degrees. It was fine yesterday. I am going to monitor it and see if it gets worse and if so make an appointment to take it to the dealer again.[37]

---

[34] https://www.aboutautomobile.com/Consumer-Complaint/2015/Chevrolet/Silverado-1500/11010471 (Incident date July 25, 2017) (last visited Oct. 26, 2017). **(Exhibit JJ)**
[35] http://www.carproblemzoo.com/gmc/yukon/air-conditioner-problems.php (Failure date: August 5, 2017) (last visited Oct. 30, 2017).  **(Exhibit KK)**
[36] http://www.carproblemzoo.com/gmc/yukon/air-conditioner-problems.php (Failure date: June 7, 2017) (last visited Oct. 30, 2017).  **(Exhibit LL)**
[37] http://www.gm-trucks.com/forums/topic/171070-ac-blowing-warm-air-not-cold-air/ (Posted March 24, 2015) (last visited Oct. 30, 2017).  **(Exhibit MM)**

*\*\**

I am TRULY disappointed with my 2015 Tahoe SUV. I bought it in 2015 at a Chevy dealership and Its already having AC issues. The dealership told me that I MUST order a new AC condenser, only available AFTERMARKET nationwide because the original part is coming from overseas and no matter what, it will cost me $1300, for a 2 years old car. WHO wants to drive a vehicle without AC in FL??? To make things worse, electronic problems, AC failure, already a new battery, and there is NO RECALLS.[38]

*\*\**

2015 50k [Tahoe] vehicle AC has gone out 2 times in 8 months. First time 8 months ago when vehicle was 1 1/2 yr old, told it was condenser and paid $700 to replace part and labor. 8 months later AC stops working again, take it back and told this time it is the Compressor and want $950 to replace. I am hosed because I have high freeway mileage, never any accidents, live in Pacific NW (low AC usage). Hundreds of people complaining about this same issue in the year range on internet. NW Chevy and GM refuse any assistance or responsibility in this clearly faulty part. AC should not be going out in a new and supposedly "quality" vehicle.[39]

274.   The timing of the aforementioned complaints, coupled with the other means through which GM monitors vehicle performance, clearly establish that GM had knowledge of the Defect prior to the time of sale of all Class Vehicles.

275.   In sum, as early as 2012, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, GM was aware of the AC

---

[38] https://www.consumeraffairs.com/automotive/gm_tahoe.html (Reviewed July 4, 2017) (last visited Oct. 30, 2017).  **(Exhibit NN)**
[39] https://www.consumeraffairs.com/automotive/gm_tahoe.html (Reviewed June 13, 2017) (last visited Oct. 30, 2017).  **(Exhibit OO)**

-99-

System Defect, should have been aware of the AC System Defect through the exercise of reasonable care, and/or was negligent in failing to be aware of the AC System Defect, based on, among others, the following sources:

       a.    Pre-release design, manufacturing, engineering, and testing data;

       b.    Service bulletins sent by GM to its dealerships evincing knowledge of ongoing issues with AC Systems in the Class Vehicles;

       c.    Detailed data gathered by GM about large number of AC System Defect repairs;

       d.    Knowledge GM had of the large number of replacement AC System parts ordered from GM;

       e.    Numerous and consistent consumer complaints made directly to GM about the AC System Defect;

       f.    Numerous and consistent consumer complaints collected by NHTSA ODI about the AC System Defect;

       g.    Numerous and consistent consumer complaints made on online vehicle owner forums; and

       h.    GM service center employees' familiarity with and knowledge of the AC System Defect.

276.    Moreover, the large number and consistency of Class Member complaints describing the AC System's propensity to crack, leak refrigerant, lose pressure, and fail to function underscores the fact that Class Members considered the AC System Defect to be a material safety issue to the reasonable consumer.

## E.    GM's "Special Coverage Program"

277.    In approximately November 2017, well after Plaintiffs commenced this litigation, Defendants began informing certain Plaintiffs and Class members via letter that particular Class Vehicles "may have a condition where thermal cycling on the combination transmission fluid/oil and the AC condenser creates a crack that may allow refrigerant to escape . . . [and] consequently may deactivate the AC system . . . ."  A copy of an exemplar letter is attached hereto as **Exhibit D.**

278.    GM's letters further informed recipients that GM had implemented a "special coverage program" in connection with the "condition" referenced therein. Specifically, GM would agree to repair the "condition" at no charge if it "occur[ed]" within the lesser of 5 years/60,000 miles in Chevrolet Suburban, Tahoe, GMC Yukon or Yukon XL vehicles, or 6 years/72,000 miles in Cadillac Escalade and Escalade ESV vehicles.  GM also offered to reimburse owners of those vehicles for repairs incurred within the extended warranty periods.

279.    GM posted additional information concerning the special coverage program to its Advanced Automotive Diagnostics website.[40]

280.    Although GM's "special coverage program" provides *some* relief to *a subset* of Class members, it does not provide the full relief to which the Class is entitled.

281.    *First*, GM did not extend the program to owners of 2014-17 GMC Sierra and Chevrolet Silverado vehicles.  Owners of those Class Vehicles—of which there are more than three million—will continue to bear the inconvenience and substantial repair costs associated with the Defect, notwithstanding the fact that the AC Systems incorporated into each and every Class Vehicle are identical.

282.    *Second*, GM has agreed to cover, or reimburse Class members for, only a subset of the repairs the Defect necessitates.  GM's "special coverage ONLY covers an air conditioning condenser refrigerant leak at the [condenser] coupler . . . ." *See* Ex. D.  "If the air conditioning condenser is NOT leaking in the specific area", service personnel are to "[i]nform the customer that any additional diagnosis and repairs are not covered under this special coverage." *Id.*

283.    Specifically, GM will extend coverage or offer reimbursement only for "air conditioning system leak testing, recover[ing] and recharg[ing] the air

_____

[40] https://gm.oemdtc.com/8154/17336-02-special-coverage-combi-cooler-air-conditioner-refrigerant-leak-2015-2017-cadillac-chevrolet-gmc. **(Exhibit PP)**

conditioning system, and air conditioning condenser replacement." *Id.* GM will not reimburse customers for, or cover pursuant to the special coverage program, replacement of hoses, compressors or other components that fail as a direct and proximate result of the Defect.

284.   *Third*, although many Plaintiffs and Class members experienced—or will soon experience—the Defect outside GM's arbitrary special coverage periods, GM will not reimburse them or cover future repairs necessitated by the Defect.

285.   *Fourth*, many Plaintiffs and Class members repaired their Class Vehicles before GM released purportedly non-defective condensers sometime in late 2017.  Those Class Vehicles may have been repaired using equally defective replacement condensers that will likewise fail, but well outside the extended warranty periods, and owners thereof will be forced to pay yet again for unnecessary and unexpected repairs as a result of the Defect.

286.   In short, GM's special coverage program fails to provide relief to many (if not most) Plaintiffs and Class members.

## V.   <u>APPLICABLE WARRANTIES</u>

287.   GM sold and leased most Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.  Cadillac Escalade and Escalade ESV vehicles are subject to a written express

warranty that purportedly provides coverage for four years or 50,000 miles, whichever comes first.

288.   GM's New Vehicle Limited Warranties expressly "cover[ ] repairs to correct any vehicle defect" and state that repairs will be done within a "reasonable time."

289.   The same warranties are made in GM's Certified Pre-Owned ("CPO") 12-Month/12,000 Mile Bumper-to-Bumper Limited Warranty.

290.   GM provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicle is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

291.   GM also provides an express written warranty with all GM "Original Equipment" replacement parts. The AC System component parts are covered by GM's "Limited Lifetime Parts Warranty," which promises that GM will repair or replace, free of all charges except labor, any covered part that was originally installed by a GM dealership at the consumer's expense.

## VI.   GM'S MARKETING AND CONCEALMENT

292.   Upon information and belief, GM knowingly marketed and sold/leased the Class Vehicles with the AC System Defect, while willfully concealing the true inferior quality and sub-standard performance of the Class Vehicles' AC Systems.

-104-

293.   GM directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

294.   GM's marketing material describes the various Class Vehicles as "reliable," "durable," with "functional," "customer-focused" interior AC Systems.

295.   In practice, the Class Vehicles are not as comfortable or reliable as GM's marketing suggests. GM concealed the fact that the Class Vehicles instead are not even comfortable or enjoyable under ordinary conditions because the AC Systems repeatedly and consistently leak refrigerant, lose pressure, and fail to provide cool air into the passenger cabin.

296.   Plaintiffs and Class Members were exposed to GM's long-term, national, multimedia marketing campaign touting the supposed quality, safety, and comfort of the Class Vehicles, and Class Members justifiably made their decisions to purchase or lease their Class Vehicles based on GM's misleading marketing that concealed the true, defective nature of the Class Vehicles.

297.   Further, GM knowingly misled Class Members about the true, defective nature of the Class Vehicles. As detailed above, upon information and belief, GM has been aware of the AC System Defect since at least 2012, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, through pre-release evaluation and testing; investigations resulting in

TSBs; the high number of AC System repairs and replacement part sales; and the numerous and consistent complaints about the AC System Defect made directly to GM, collected by NHTSA, and posted in public online forums.

298.    In sum, GM has actively concealed the existence and nature of the AC System Defect from Class Members since at least 2012 despite its knowledge of the existence and pervasiveness of the AC System Defect. Specifically, GM has:

a.      Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the AC System Defect;

b.      Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' AC Systems were defective and not fit for their intended purposes;

c.      Failed to disclose, and actively concealed, the fact that the Class Vehicles' AC Systems were defective, despite that GM learned of the AC System Defect as early as 2012, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles;

d.      Failed to disclose, and actively concealed, the existence and pervasiveness of the AC System Defect even when directly asked about it by Class Members during communications with GM, GM Customer Care, GM dealerships, and GM service centers;

-106-

      e.      Actively concealed the AC System Defect by forcing Class

Members to bear the cost of temporary "fixes" while at the same time performing

those "fixes" at no (or lower) cost for those who complained vocally and often, and

calling these "goodwill" services; and

      f.      Actively concealed the AC System Defect by consistently

treating the AC System failures with temporary "fixes," so that the AC System

Defect is not effectively corrected in Class Members' vehicles, even though Class

Members were led to believe that the "fixes" had cured the AC System Defect in

their Vehicles.

     299.   By engaging in the conduct described above, GM has concealed, and

continues to conceal, the AC System Defect from Class Members. If Class

Members had had knowledge of the information GM concealed, they would not

have purchased or leased the Class Vehicles or would have paid less to do so.

## VII.   FRAUDULENT CONCEALMENT ALLEGATIONS

     300.   Absent discovery, Plaintiffs are unaware of, and unable through

reasonable investigation to obtain, the true names and identities of those

individuals at GM responsible for disseminating false and misleading marketing

materials regarding the Class Vehicles. GM necessarily is in possession of all of

this information. Plaintiffs' claims arise out of GM's fraudulent concealment of the

AC System Defect, and its representations about the quality, safety, and comfort of

the Class Vehicles. To the extent that Plaintiffs' claims arise from GM's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles, GM knew, or was reckless in not knowing, of the AC System Defect; GM was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its concealment of it; and GM never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner.

301.   Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to GM:

a.   ***Who***:  GM actively concealed the AC System Defect from Plaintiffs and Class Members while simultaneously touting the safety, comfort, sophistication, and quality of the Class Vehicles, as alleged in  the preceding paragraphs. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at GM responsible for such decisions.

b.   ***What***:  GM knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the AC System Defect, as alleged in the preceding paragraphs. GM concealed the Defect and made representations about the safety,

comfort, sophistication, world-class quality, and other attributes of the Class Vehicles, as specified above in the preceding paragraphs.

c.      ***When***:  GM concealed material information regarding the Defect at all times and made representations about the quality, safety, and comfort of the Class Vehicles, starting no later than 2012, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, as alleged above in the preceding paragraphs. GM still has not disclosed the truth about the Defect in the Class Vehicles to anyone outside of GM. GM has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers brought their Vehicles to GM complaining of the AC System failures, GM denied any knowledge of or responsibility for the AC System Defect.

d.      ***Where***:  GM concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which GM disclosed the truth about the Defect in the Class Vehicles to anyone outside of GM. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on GM's website.

-109-

e.   ***How***:  GM concealed the AC System Defect from Plaintiffs and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. GM actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and GM promised in its marketing materials that Class Vehicles have qualities that they do not have.

f.   ***Why***:  GM actively concealed material information about the Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality, safety, and comfort of the Class Vehicles. Had GM disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would have paid less for them.

## VIII.  <u>TOLLING OF STATUTES OF LIMITATIONS</u>

### <u>Fraudulent Concealment Tolling</u>

302.   Upon information and belief, GM has known of the AC System Defect in the Class Vehicles since at least 2012, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, and yet has

concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the AC System Defect. GM continues to conceal the Defect to this day.

303.   Any applicable statute of limitation has been tolled by GM's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## Estoppel

304.   GM was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. GM actively concealed—and continues to conceal—the true character, quality, and nature of the Class Vehicles and knowingly made representations about the world-class quality, sophistication, state-of-the-art safety, and comfort of the Class Vehicles. Plaintiffs and Class Members reasonably relied upon GM's knowing representations and active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## Discovery Rule

305.   The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the AC System Defect.

306.   Plaintiffs and Class Members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest—after the AC System Defect caused their AC Systems to leak refrigerant, lose pressure, and fail to function. Even then, Plaintiffs and Class Members had no reason to know the AC System failures were caused by a defect in the Class Vehicles because of GM's active concealment of the AC System Defect.

307.   Plaintiffs and Class Members were not reasonably able to discover the AC System Defect until after they had purchased or leased their Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the AC System Defect caused their Vehicles' AC Systems to leak refrigerant, lose pressure, and fail to function.

## X.    CHOICE OF LAW ALLEGATIONS

308.   GM is headquartered in Detroit, Michigan, the "center of gravity" of this case.

309.   GM does substantial business in Michigan. Nearly half of GM's United States manufacturing plants are in Michigan, as are a third of its assembly plants. Upon information and belief, there are approximately 20,000 GM employees in Michigan alone.

310.   In addition, the conduct that forms the basis for each and every Class members' claims against GM emanated from GM's headquarters in Detroit, Michigan.

311.   On information and belief, GM personnel responsible for customer communications are and were located at the Michigan headquarters, and the core decision not to disclose AC System Defect to consumers was made and implemented from there.

312.   On information and belief, throughout the Class Period, GM, in concert with their Michigan-based advertising agencies, failed to disclose the existence of the AC System.

313.   On information and belief, marketing campaigns falsely promoting GM cars as safe and reliable were conceived and designed in Michigan.

314.   On information and belief, GM personnel responsible for managing the customer service division are and were located at the Michigan headquarters. Customers are directed to send correspondence to GM Company, P.O. Box 33170, Detroit, MI 48232-5170. In addition, personnel from GM in Detroit, Michigan, also communicate via e-mail with customers concerned about the AC System Defect.

315. On information and belief, GM personnel responsible for communicating with dealers regarding known problems with Class Vehicles are and were also located at the Michigan headquarters.

316. On information and belief, GM personnel responsible for managing the distribution of replacement parts to dealerships are and were located at the Michigan headquarters.

317. On information and belief, GM's presence is more substantial in Michigan than any other state.

318. For these reasons, Michigan has a materially greater interest than any other State in enforcing the rights and remedies granted to consumers under the Michigan laws invoked in this Complaint. These rights and remedies further strong fundamental public policies of the State of Michigan.

319. As an alternative to the application of Michigan law to the Nationwide Class (as defined below), the Court can and should apply the laws of the states of Alabama, Arizona, California, Florida, Georgia, Louisiana, Michigan, New Jersey, New York, Oklahoma, Tennessee, Texas, and Washington to those State Class members' claims.

## XI.   CLASS ALLEGATIONS

320. Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other Class Members similarly situated pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(2), (b)(3), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

321.   As alleged throughout this Complaint, the Class's claims all derive directly from a single course of conduct by GM. This case is about the responsibility of GM, at law and in equity, for its knowledge, its conduct, and its products. GM has engaged in uniform and standardized conduct toward the Class. It did not differentiate, in its degree of care or candor, its actions or inactions, or in the content of its statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each cause of action asserted by the respective Classes, the same legal standards govern.

322.   Pursuant to Rules 23(a); (b)(2); and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action and seek to certify and maintain it as a class action on behalf of themselves and a Nationwide Class, as defined below, or, in the alternative, for statewide State Classes, as defined below.

323.   Plaintiffs seek a Nationwide Class (or State Classes) for damages under Rule 23(b)(3) for those Class Members who have paid out-of-pocket for AC System repairs.

324.    Plaintiffs seek a Nationwide Class (or State Classes) for declaratory relief under Rule 23(b)(2) for those whose AC System Defect has not yet manifested.

### A.    The Nationwide Class

325.    The Nationwide Class is initially defined as follows:

All persons or entities in the United States that purchased or leased a Class Vehicle (i.e. 2015-2017 Cadillac Escalade, 2014-2016 Chevrolet Silverado 1500, 2015-2017 Chevrolet Suburban, 2015-2017 Chevrolet Tahoe, 2014-2016 GMC Sierra 1500, and 2015-2017 GMC Yukon).

### B.    The State Classes

326.    In the alternative to the Nationwide Class, Plaintiffs allege statewide class action claims on behalf of state-wide classes for certain states ("State Classes"). Each of these State Classes is initially defined as follows:

**Alabama Class**
All members of the Nationwide Class who are residents of Alabama or purchased or leased a Class Vehicle in Alabama.

**Arizona Class**
All members of the Nationwide Class who are residents of Arizona or purchased or leased a Class Vehicle in Arizona.

**California Class**
All members of the Nationwide Class who are residents of California or purchased or leased a Class Vehicle in California.

**Florida Class**
All members of the Nationwide Class who are residents of Florida or

-116-

purchased or leased a Class Vehicle in Florida.

**Georgia Class**
All members of the Nationwide Class who are residents of Georgia or purchased or leased a Class Vehicle in Georgia.

**Louisiana Class**
All members of the Nationwide Class who are residents of Louisiana or purchased or leased a Class Vehicle in Louisiana.

**Michigan Class**
All members of the Nationwide Class who are residents of Michigan or purchased or leased a Class Vehicle in Michigan.

**New Jersey Class**
All members of the Nationwide Class who are residents of New Jersey or purchased or leased a Class Vehicle in New Jersey.

**New York Class**
All members of the Nationwide Class who are residents of New York or purchased or leased a Class Vehicle in New York.

**Oklahoma Class**
All members of the Nationwide Class who are residents of Oklahoma or purchased or leased a Class Vehicle in Oklahoma.

**Tennessee Class**
All members of the Nationwide Class who are residents of Tennessee or purchased or leased a Class Vehicle in Tennessee.

**Texas Class**
All members of the Nationwide Class who are residents of Texas or purchased or leased a Class Vehicle in Texas.

**Washington Class**
All members of the Nationwide Class who are residents of Washington or purchased or leased a Class Vehicle in Washington.

327.    The Nationwide Class and the State Classes and their members are

sometimes referred to herein as the "Class" or "Classes."

328.   Excluded from the proposed Class are: (1) GM, any entity or division in which GM has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's immediate family and staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

## Numerosity

329.   Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in GM's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

## Typicality

330.   The claims of Plaintiffs are typical of the claims of Class Members in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, marketed, distributed, warranted, sold/leased, and

serviced by GM. Plaintiffs, like all Class Members, have been damaged by GM's misconduct in that they purchased/leased a Vehicle they would not have purchased/leased, or would not have purchased/leased at the price paid, and incurred or will incur the cost of repairs relating to and caused by the AC System Defect. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

## Adequate Representation

331.   Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving Class Vehicles.

332.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class Members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of Class Members.

## Predominance of Common Issues

333.   There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a.    whether the AC System in the Class Vehicles is defective;

b.    whether GM knew or should have known about the AC System Defect, and, if yes, how long GM has known of the Defect;

c.    whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase or lease a Class Vehicle;

d.    whether GM had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members;

e.    whether GM omitted and failed to disclose material facts about the Class Vehicles;

f.    whether GM's concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing or leasing Class Vehicles;

g.    whether GM's representations and omissions about the true defective nature of the Class Vehicles were likely to mislead or deceive, and therefore fraudulent;

h.    whether GM's representations and omissions about the true defective nature of the Class Vehicles were and are unfair;

-120-

i.      whether GM represented, through its words and conduct, that the Class Vehicles had characteristics, uses, or benefits that they did not actually have;

j.      whether GM represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

k.      whether GM advertised the Class Vehicles with the intent not to sell/lease them as advertised;

l.      whether GM's representations and omissions about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding;

m.      whether GM's representations and omissions about the true defective nature of the Class Vehicles were and are deceptive;

n.      whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o.      whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the AC Systems in Class Vehicles are defective and/or not merchantable;

p.      whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the Class Vehicles are defective in that their AC

Systems crack, leak refrigerant, lose pressure, and fail. The AC System Defect may not manifest until after the warranty provided by GM has expired. The AC System is material and requires disclosure to all Class Members.

        q.      whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that all Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by GM.

        r.      whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that because the Class Vehicles have the AC System Defect, and because GM knew of this Defect before the time of sale or lease, the GM warranty (and "Special Coverage Program") is insufficient to remediate the defects known by GM to exist. Therefore GM's existing warranty, limited to three years or 36,000 miles, or four years or 40,000 miles depending on the Class Vehicle at issue, is invalid, and, as such that limitation is unenforceable. GM shall provide notice to all persons covered by that warranty of the removal of this time limitation.

        s.      whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that GM shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the AC Defect in the Class Vehicles.

t.      whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that GM shall establish a repair program and protocol to be communicated to class members, which will require GM to inspect, upon request, a class member's vehicle to determine whether the AC System Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties.

## Superiority

334.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of GM's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

335.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for GM's misconduct. Absent a class action, Class Members will continue to incur damages, and GM's misconduct will continue without remedy.

336.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class

treatment will conserve the resources of the courts and the litigants, and will

promote consistency and efficiency of adjudication.

## XII.   CAUSES OF ACTION

### A.   NATIONWIDE CLASS CLAIMS

### FIRST CAUSE OF ACTION

### BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT

337.   Plaintiffs incorporate by reference all preceding allegations as though
fully set forth herein.

338.   Plaintiffs bring this Count on behalf of members of the Nationwide
Class who are residents of all fifty states and Washington D.C.

339.   This Court has jurisdiction to decide claims brought under 15 U.S.C. §
2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

340.   The Class Vehicles are "consumer products" within the meaning of
the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

341.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss
Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons
entitled under applicable state law to enforce against the warrantor the obligations
of its express and implied warranties.

342.   GM is a "supplier" and "warrantor" within the meaning of the
Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

-124-

343.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

344.   GM's warranties are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

345.   GM breached the express warranties by:

a.   Providing a 4 year/50,000 miles New Vehicle Limited Warranty for Cadillac Escalade and Escalade ESV vehicles, and a 3 year/36,000 miles New Vehicle Limited Warranty and a Service Parts Warranty with the purchase or lease of all other Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee;

b.   Selling and leasing Class Vehicles with the Defect, and which thus were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

c.   Refusing and/or failing to honor the express warranties by effectively repairing or replacing the defective AC Systems free of charge and within a reasonable time.

346.   GM provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their

vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled. Mich. Comp. Laws § 440.2314(2)(a), (c), and (e); U.C.C. § 2-314.

347.   GM breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share common design defects in that they are equipped with defective AC Systems that can suddenly fail during normal use and operation. GM has admitted that the Class Vehicles are defective in issuing its "Special Coverage Program," but the Program is woefully insufficient to fully address the Defect.

348.   In its capacity as a warrantor, as GM had knowledge of the inherent defects in the Class Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

349.   The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between GM and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from GM.

350.   The limitations on the warranties are substantively unconscionable. GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. GM failed to disclose these defects to Plaintiffs and the other Class members. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

351.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either GM or its agents (dealerships) to establish privity of contract. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.

352.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give GM notice and an opportunity to cure until

such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

353.   Furthermore, affording either GM an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

354.   Moreover, GM received reasonable notice of Plaintiffs' nationwide breach of warranty claims no later than May 4, 2018 when Plaintiffs filed a Consolidated Master Class Action Complaint against GM on behalf of themselves and all others similarly situated.

355.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation

of acceptance and return immediately any payments made, Plaintiffs and the other

Class members have not re-accepted their Class Vehicles by retaining them.

356.   As a direct and proximate cause of GM's breach of the written

warranties, Plaintiff and the other Class members sustained damages and other

losses in an amount to be determined at trial. GM's conduct damaged Plaintiff and

the other Class members, who are entitled to recover actual damages,

consequential damages, specific performance, diminution in value, and costs,

including statutory attorneys' fees, and/or other relief as deemed appropriate.

357.   The amount in controversy of Plaintiffs' individual claims meets or

exceeds the sum of $25. The amount in controversy of this action exceeds the sum

of $50,000, exclusive of interest and costs, computed on the basis of all claims to

be determined in this lawsuit. Plaintiffs, individually and on behalf of the other

Class members, seek all damages permitted by law, including diminution in value

of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15

U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover

a sum equal to the aggregate amount of costs and expenses (including attorneys'

fees based on actual time expended) determined by the Court to have reasonably

been incurred by Plaintiffs and the other Class members in connection with the

commencement and prosecution of this action.

358. Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Plaintiffs also seek available declaratory relief. Based on GM's continuing failures to fix the known defects, Plaintiffs seek declarations that:

a. The Class Vehicles are defective in that their AC Systems crack, leak refrigerant, lose pressure, and fail. The AC System Defect may not manifest until after the warranty provided by GM has expired. The AC System is material and requires disclosure to all Class Members.

b. All Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by GM.

c. Because the Class Vehicles have the AC System Defect, and because GM knew of this Defect before the time of sale or lease, the GM warranty (and "Special Coverage Program") is insufficient to remediate the defects know by GM to exist. Therefore GM's existing warranty, limited to three years or 36,000 miles, is invalid, and, as such that limitation is unenforceable. GM shall provide notice to all persons covered by that warranty of the removal of this time limitation.

d. GM shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based

on warranty or on other grounds, of claims related to the AC Defect in the Class

Vehicles.

    e.  GM shall establish a repair program and protocol to be

communicated to class members, which will require GM to inspect, upon request, a

class member's vehicle to determine whether the AC System Defect is manifest.

Any disputes over coverage shall be adjudicated by a Special Master appointed by

the Court and/or agreed to by the parties.

   359. Plaintiffs also request, as a form of equitable monetary relief, re-

payment of the out-of-pocket expenses and costs they have incurred in attempting

to rectify the AC System Defect in their vehicles. Such expenses and losses will

continue as Plaintiffs and Class members must take time off from work, pay for

rental cars or other transportation arrangements, child care, and the myriad

expenses involved in going through the repair process.

   360. The right of Class members to recover these expenses as an equitable

matter to put them in the place they would have been but for GM's conduct

presents common questions of law. Equity and fairness requires the establishment

by Court decree and administration under Court supervision of a program funded

by GM, using transparent, consistent, and reasonable protocols, under which such

claims can be made and paid.

## SECOND CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (MICH. COMP. LAWS § 440.2314)

361.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

362.   This claim is brought on behalf of the Nationwide Class for breach of implied warranty under Michigan law.

363.   GM were merchants with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

364.   Under Mich. Comp. Laws § 440.2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Class members purchased their Class Vehicles.

365.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that there are defects in the AC Systems that cause them to crack, leak refrigerant, lose pressure, and fail to function.

366.   GM was provided notice of these issues through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; early consumer complaints made directly to GM, collected by NHTSA ODI, and/or posted on public online vehicle owner

forums; complaints filed against them; and by numerous individual letters and communications sent by the Class before or within a reasonable amount of time after GM began its "Special Coverage Program" and the allegations of vehicle defects became public.

367.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the Class has been damaged in an amount to be proven at trial.

368.   Plaintiffs also seek available declaratory relief. Based on GM's continuing failures to fix the known defects, Plaintiffs seek declarations that:

a.   The Class Vehicles are defective in that their AC Systems crack, leak refrigerant, lose pressure, and fail. The AC System Defect may not manifest until after the warranty provided by GM has expired. The AC System is material and requires disclosure to all Class Members.

b.   All Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by GM.

c.   Because the Class Vehicles have the AC System Defect, and because GM knew of this Defect before the time of sale or lease, the GM warranty (and "Special Coverage Program") is insufficient to remediate the defects know by GM to exist. Therefore GM's existing warranty, limited to three years or 36,000 miles, is invalid, and, as such that limitation is unenforceable. GM shall provide

-133-

notice to all persons covered by that warranty of the removal of this time limitation.

        d.      GM shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the AC Defect in the Class Vehicles.

        e.      GM shall establish a repair program and protocol to be communicated to class members, which will require GM to inspect, upon request, a class member's vehicle to determine whether the AC System Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties.

## THIRD CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

369.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

370.   This claim is brought on behalf of the Nationwide Class under Michigan law, or, alternatively, under the laws of the all states other than Oklahoma, as there is no material difference in the law of fraudulent concealment as applied to the claims and questions in this case.

371.   GM concealed and suppressed material facts concerning the Class Vehicles.

372.   As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

373.   GM knew these representations were false when made.

374.   The vehicles purchased or leased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing.

375.   GM had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing, because Plaintiffs relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

376.   The aforementioned concealment was material, because if it had been disclosed Plaintiffs would not have bought, leased or retained their vehicles.

377.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

-135-

378. Plaintiffs relied on GM's reputation-along with their failure to disclose the AC System problems and GM's affirmative assurances that their vehicles were safe and reliable and other similar false statements – in purchasing, leasing or retaining the Class Vehicles.

379. However, GM each concealed and suppressed material facts concerning the culture of GM – a culture that emphasized cost-cutting, avoidance of dealing with safety issues and a shoddy design process.

380. Further, GM had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to GM who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiff and the Classes. As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability and value of the Class Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT

381. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

382.   This claim for unjust enrichment is brought on behalf of the Nationwide Class under Michigan law, or alternatively, under the laws of all states as there is no material difference in the law of unjust enrichment as it applies to the claims and questions in this case.

383.   GM has received and retained a benefit from the Plaintiffs and the Nationwide Class, and inequity has resulted.

384.   GM benefitted while Plaintiffs, who originally overpaid for their GM cars, have been forced to pay additional out-of-pocket costs and incur additional expense and losses in connection with repairs.

385.   It is inequitable for GM to retain the benefits of its misconduct.

386.   As a result of GM's conduct, the amount of GM's unjust enrichment should be disgorged, in an amount according to proof.

### B.   STATE CLASS CLAIMS

#### 1.   ALABAMA

### FIFTH CAUSE OF ACTION

### VIOLATION OF ALABAMA'S DECEPTIVE TRADE PRACTICES ACT
(Ala. Code §8-19-5, *et seq.*)

387.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

388.   Plaintiff Rodney Martin brings this claim on behalf of himself and the Alabama Class.

389.    Plaintiffs, the Alabama Class, and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

390.    The Class Vehicles and/or the Defective AC Systems installed in them are "goods" within the meaning of Ala. Code § 8-19-3(3).

391.    Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

392.    GM violated the Alabama Deceptive Trade Practices Act, Ala. Code §8-19-5, ("Alabama DTPA") by selling Class Vehicles with the Defect.

393.    The Alabama DTPA, declares several specific actions to be unlawful, including:

   a.    "Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

   b.    "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and

   c.    "Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

Ala. Code §8-19-5

394.    In the course of GM's business, they willfully failed to disclose the Defect in the Class Vehicles as described above.  GM also actively concealed the

-138-

Defect by failing to disclose the Defect when GM learned of its existence.

Accordingly, GM engaged in unfair and deceptive acts or practices.

395.   GM knowingly misrepresented the Class Vehicles as fit for the purpose for which they were intended, when, in fact, GM knew the Class Vehicles were defective, dangerous, and unable to perform as advertised. Indeed, Defendants misrepresented the AC systems in the Class Vehicles as functional and suited for their intended purpose, when, in fact, they were and are not.

396.   These acts and practices have deceived Plaintiff and are likely to, and did, deceive the public.  In failing to disclose the Defect and suppressing material facts from Plaintiff and the Class members, GM breached its duties to disclose these facts.

397.   The omissions and acts of concealment by GM pertained to information that was material to Plaintiff and Class members, as it would have been to all reasonable consumers.

398.   GM's conduct, as described hereinabove, constitutes violations of the Alabama DTPA. GM's conduct violates at least the following enumerated Alabama DTPA provisions:

A. Ala. Code §8-19-5(2) "Causing confusion or misunderstanding as to the source sponsorship, approval, or certification of goods or services"

B. Ala. Code §8-19-5(7) "Representing that goods or services are of a

particular standard, quality or grade, or that goods are of a particular style or model, if they are of another"

C. Ala. Code §8-19-5(27) "Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce"

399.   GM knew or should have known that its conduct violated the Alabama DTPA.

400.   Plaintiff and the Alabama Class have suffered injury in fact and actual damages as a direct and proximate result of GM's material omissions and misrepresentations.  Had Plaintiff and the Alabama Class known Class Vehicles suffered from the Defect, they would not have purchased the Class Vehicles, would have paid less for them or would have avoided the extensive repair costs associated therewith.

401.   Plaintiff and the Alabama Class are entitled to equitable and monetary relief under the Alabama DTPA, as well as punitive damages and attorneys' fees pursuant to Ala. Code § 8-19-10(a)(2) and (3).

402.   Plaintiff provided GM with pre-suit notice of the violations alleged herein via a letter delivered to GM's headquarters on June 29, 2018, in accordance with Ala. Code § 8-19-10(e).

403.   Rule 23 of the Federal Rules of Civil Procedure, which sets out the procedures for pursuing a class action in federal court, unambiguously authorizes

any plaintiff, in any federal civil proceeding, to maintain a class action if the Rule 23's prerequisites are met. The prohibition of class actions in Ala. Code § 8-19-10(f) is procedural, not substantive, and so directly conflicts with a federal rule of procedure: Rule 23. Therefore Rule 23 controls here pursuant to the Rules Enabling Act, 28 U.S.C. § 2072; *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331 (11th Cir. 2015); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); and *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

## SIXTH CAUSE OF ACTION
### FRAUD BY CONCEALMENT

404.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

405.    Plaintiff Rodney Martin brings this claim on behalf of himself and the Alabama Class. This claim is plead in the alternative to Plaintiffs' Alabama DTPA claim.

406.    As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

407.    GM knew these representations were false when made.

408.    The vehicles purchased or leased by the Alabama Class were, in fact, defective, unsafe and unreliable, because the vehicles' AC Systems were prone to cracking, losing pressure, leaking refrigerant, and failing.

409.   GM had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles' AC Systems were prone to cracking, losing pressure, leaking refrigerant, and failing, because the Alabama Class relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

410.   The aforementioned concealment was material, because if it had been disclosed the Alabama Class would not have bought, leased or retained their vehicles or would have paid less for them.

411.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM knew or recklessly disregarded that their representations were false because they knew that people had experienced AC System problems and failures as the result of the vehicles' defective AC Systems. GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

412.   The Alabama Class relied on GM's reputation—along with their failure to disclose the AC System problems and GM's affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Class Vehicles.

-142-

413.   As a result of their reliance, the Alabama Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

414.   GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Alabama Class. The Alabama Class is therefore entitled to an award of punitive damages.

## 2.  **ARIZONA**

### **SEVENTH CAUSE OF ACTION**

**VIOLATIONS OF THE CONSUMER FRAUD ACT**
**(Arizona Rev. Stat. § 44-1521, *et. seq.*)**

415.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

416.   Plaintiff Kenneth Gay brings this claim on behalf of himself and the Arizona Class.

417.   This claim is brought on behalf of Class members who are Arizona residents (the "Arizona Class").

418.   Plaintiffs, GM, and the Arizona Class, are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

419.   The Class Vehicles and/or the Defective AC Systems installed in them are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

420.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud,. . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

421.   In the course of its business, GM willfully failed to disclose and actively concealed the dangerous AC System Defects in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles. GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Arizona CFA.

422.   As alleged above, GM knew of the AC System Defects, while the Class was deceived by GM's omission into believing the Class Vehicles were safe, and the information could not have reasonably been known by the consumer.

423.   GM knew or should have known that their conduct violated the Arizona CFA.

424.   As alleged above, GM made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

425.   GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale. GM deliberately withheld the information about the vehicles' AC Systems being prone to cracking, losing pressure, leaking refrigerant, and failing in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

426.   From its inception in 2009, GM has known of the AC System Defects that exist in millions of Class Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, GM concealed the defects and allowed unsuspecting new and used car purchasers to continue to buy the Class Vehicles and allowed all Defective Vehicle owners to continue driving unreliable and dangerous vehicles.

-145-

427.   GM owed the Arizona Class a duty to disclose the defective nature of Class Vehicles, including the propensity for the AC System's cracking, losing pressure, leaking refrigerant, and failing, because they:

a.   Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

b.   Intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing campaign that they designed to hide serious problems from the Arizona Class; and/or

c.   Made incomplete representations about the safety and reliability of Class Vehicles generally, and the AC System in particular, while purposefully withholding material facts from the Arizona Class that contradicted these representations.

428.   GM's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Arizona Class, about the true safety and reliability of Class Vehicles. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the Arizona Class.

429.   The propensity of the AC Systems in Class Vehicles to crack, lose pressure, leak refrigerant, and fail during ordinary operation was material to the Arizona Class. Had the Arizona Class known that their vehicles had these serious

defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

430.    As a direct and proximate result of GM's unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience failure of their Class Vehicles' AC Systems, for which there is no effective fix, and for which they must pay out of pocket.  Plaintiff and Class Members relied on GM's representations regarding the safety and durability of Class Vehicles.  Had GM refrained from making the misrepresentations and omissions alleged herein, Plaintiff and Class Members would not have purchased Class Vehicles and would have avoided the extensive repair costs associated with the Defect, or would have paid less for their Class Vehicles.

431.    All members of the Arizona Class suffered ascertainable loss caused by GM's misrepresentations, concealment, failure to disclose material information regarding the AC System Defect in the Class Vehicles. The Arizona Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the AC System defect, the value of their Class Vehicles has diminished now that the safety issues in the Class Vehicles, and the many other serious AC System issues and myriad defects in GM's vehicles have come to light, and the Arizona Class own vehicles that are not safe.

-147-

432.    The Arizona Class members risk irreparable injury as a result of GM's act and omissions in violation of the Arizona CFA, and these violations present a continuing risk to the Arizona Class as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

433.    The repairs instituted by GM have not been adequate because the repairs are not an effective remedy.

434.    As a direct and proximate result of GM's violations of the Arizona CFA, the Arizona Class has suffered injury-in-fact and/or actual damage.

435.    The Arizona Class seeks monetary relief against GM in an amount to be determined at trial. The Arizona Class also seeks punitive damages because GM engaged in aggravated and outrageous conduct with an evil mind.

436.    The Arizona Class also seeks an order enjoining GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## EIGHTH CAUSE OF ACTION
## FRAUD BY CONCEALMENT

437.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

438.    Plaintiff Kenneth Gay brings this claim on behalf of himself and the Arizona Class.

439.    As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

440.    GM knew these representations were false when made.

441.    The vehicles purchased or leased by the Arizona Class were, in fact, defective, unsafe and unreliable, because the vehicles' AC Systems were prone to cracking, losing pressure, leaking refrigerant, and failing.

442.    GM had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles' AC Systems were prone to cracking, losing pressure, leaking refrigerant, and failing, because the Arizona Class relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

443.    The aforementioned concealment was material, because if it had been disclosed the Arizona Class would not have bought, leased or retained their vehicles or would have paid less for them.

444.    The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM knew or recklessly disregarded that their representations were false because they knew that people had experienced AC System problems and failures as the result of the vehicles' defective AC Systems.

-149-

GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

445.   The Arizona Class relied on GM's reputation—along with their failure to disclose the AC System problems and GM's affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Class Vehicles.

446.   As a result of their reliance, the Arizona Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

447.   GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Arizona Class. The Arizona Class are therefore entitled to an award of punitive damages.

### 3.   CALIFORNIA

### NINTH CAUSE OF ACTION

**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") CAL. CIV. CODE § 1750, *et seq.***

448.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

449.   Plaintiffs Carl Williams and Clarence Larry bring this claim on behalf of themselves and the California Class.

-150-

450.   Plaintiffs, the California Class, and GM are a "persons" as defined by the CLRA. Cal. Civ. Code § 1761(c).

451.   Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

452.   The purchases and leases of Class Vehicles by Plaintiffs and Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

453.   The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code §1761(a) and (b).

454.   Plaintiffs and Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

455.   GM's representations, active concealment, failures to disclose, and omissions regarding the Class Vehicles violated the CLRA in the following ways:

   a.     GM misrepresented that the Class Vehicles had characteristics, benefits, or uses that they did not have (Cal. Civ. Code § 1770(a)(5));

   b.     GM misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

-151-

       c.     GM advertised the Class Vehicles with an intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

       d.     GM misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code § 1770(a)(14)); and

       e.     GM misrepresented that the Class Vehicles were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

456.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm to purchasers and lessees of the Class Vehicles.

457.   The AC System Defect is central to Class Vehicles' functioning because a properly functioning AC System is necessary to maintain safe internal temperatures and to maintain visibility in the event of windshield fogging.

458.   GM knew, by 2012 at the latest, and certainly before the sale or lease of the Class Vehicles, that the Class Vehicles' AC Systems suffered from an inherent defect, were defectively designed or manufactured, would fail repeatedly, and were not suitable for their intended use.

459.   By 2012 at the latest, GM had exclusive knowledge of material facts concerning the existence of the AC System Defect in its Class Vehicles. Furthermore, GM actively concealed the Defect from consumers by denying the existence of the Defect to Class Members who contacted GM about their AC System failures, failing to provide an effective remedy for the AC System Defect within a reasonable time under warranty (thereby causing GM's warranty to fail of its essential purpose) and replacing defect AC System components with the same defective replacement parts.

460.   GM was under a duty to Plaintiffs and Class Members to disclose the defective nature of the AC Systems, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the AC System Defect, because:

a.   GM was in a superior position to know the true state of facts about the AC System Defect in the Class Vehicles;

b.   Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the AC System Defect until, at the earliest, the manifestation of the Defect; and

c.   GM knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the AC System Defect prior to its manifestation.

-153-

461.   In failing to disclose the defective nature of the Class Vehicles, GM knowingly and intentionally concealed material facts and breached its duty not to do so.

462.   The facts concealed or not disclosed by GM to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the AC System Defect to be an undesirable quality, as Plaintiffs and Class Members did. Had Plaintiffs and other Class Members known that the Class Vehicles had the AC System Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

463.   Plaintiffs and Class Members are reasonable consumers who did not expect their Class Vehicles to contain a defective AC System. It is a reasonable and objective consumer expectation for consumers to expect the AC System not to leak refrigerant, lose pressure, and fail to function.

464.   As a result of GM's misconduct, Plaintiffs and Class Members have been harmed and have suffered actual damages in that the Class Vehicles contain defective AC Systems and repeatedly crack, leak refrigerant, lose pressure, and fail to function due to the AC System Defect, causing inconvenience, creating an uncomfortable and unhealthy environment for vehicle occupants, and causing

Class Members to spend money, even when the Vehicle was still under warranty, to attempt to remedy the Defect.

465. As a direct and proximate result of GM's unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered and will continue to suffer actual damages in that they have a Vehicle with a defective AC System and they have experienced and may continue to experience their Class Vehicles' AC Systems leaking refrigerant, losing pressure, and failing to function, for which there is no effective fix.

466. Plaintiffs and the Class seek an order enjoining GM's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

467. In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of Plaintiffs, has served GM with notice of their alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiffs and Class Members, and demanded that GM, within thirty (30) days of such notice, corrects or agrees to correct the actions described therein and agrees to reimburse Plaintiffs and Class Members' associated out-of-pocket costs. If GM fails to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to seek compensatory and monetary damages and attorneys' fees to which Plaintiffs and Class Members are entitled under the CLRA.

468.   GM received proper notice of its alleged violations of the CLRA pursuant to Cal. Civ. Code § 1782(a), via a letter sent to GM and its registered service agent on October 5, 2017, on behalf of California Class Vehicle owner Yamet Garcia and all others similarly situated. GM failed to provide the appropriate relief for its violation of the CLRA within 30 days of the date of the notification letter.

469.   Thus, pursuant to Cal. Civ. Code §§ 1780(a), 1780(e), and 1782(a), Plaintiffs seek, in addition to equitable relief, actual damages, restitution, punitive damages, attorneys' fees and costs, and any other relief the Court deems proper.

## **TENTH CAUSE OF ACTION**

### **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, ET SEQ.**

470.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

471.   Plaintiffs Carl Williams and Clarence Larry bring this claim on behalf of themselves and the California Class.

472.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." GM engaged in conduct that violated each of this statute's three prongs.

473.   GM committed an unlawful business act or practice in violation of
Cal. Bus. & Prof. Code § 17200, et seq., by systematically breaching its warranty
obligations and by violating the CLRA and the Song-Beverly Consumer Warranty
Act as alleged above and below.

474.   GM committed unfair business acts and practices in violation of Cal.
Bus. & Prof. Code § 17200, et seq., because the acts and practices described
herein, including but not limited to GM's failure to provide an effective remedy to
fix the AC System Defect, were immoral, unethical, oppressive, unscrupulous,
unconscionable, and/or substantially injurious to Plaintiffs and Class Members.
GM's acts and practices were additionally unfair because the harm to Plaintiffs and
Class Members is substantial and is not outweighed by any countervailing benefits
to consumers or competition. Further, GM's acts and practices were unfair in that
they were contrary to legislatively declared or public policy.

475.   GM committed fraudulent business acts and practices in violation of
Cal. Bus. & Prof. Code § 17200, et seq., when it concealed the existence and
nature of the AC System Defect, while representing in its marketing, advertising,
and other broadly disseminated representations that the Class Vehicles were
"reliable," "durable," with "functional," "customer-focused" interior AC Systems,
when, in fact, they are not. The AC System Defect is central to Class Vehicles'
functioning because a properly functioning AC System is necessary to maintain

safe internal temperatures and to maintain visibility in the event of windshield fogging. GM's representations and active concealment of the Defect are likely to mislead the public with regard to the true defective nature of the Class Vehicles.

476.   GM's unfair or deceptive acts or practices occurred repeatedly in the course of GM's trade or business, and were likely to mislead a substantial portion of the purchasing public.

477.   Plaintiffs relied on GM's material representations and nondisclosures, and would not have purchased/leased, or would have paid less for, the Class Vehicles had they known the truth.

478.   As a direct and proximate result of GM's unfair, unlawful, and deceptive practices, Plaintiffs have lost money.

479.   Plaintiffs and Class Members seek an order enjoining GM from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

## ELEVENTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY PURSUANT TO SONG-BEVERLY CONSUMER WARRANTY ACT

480.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

481.   Plaintiffs Carl Williams and Clarence Larry bring this claim on behalf of themselves and the California Class.

482.   The Class Vehicles are "consumer goods" under Cal. Civ. Code § 1791(a).

483.   GM is and was at all relevant times a "manufacturer" and seller of the Class Vehicles under Cal. Civ. Code § 1791(j); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles under Cal. Civ. Code § 1791(i).

484.   Plaintiffs and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by GM.

485.   GM expressly warranted the Class Vehicles against defects including the AC System Defect, as described above, within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2.

486.   As described above, the AC System in the Class Vehicles is defective. The AC System Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiffs and Class Members.

487.   GM knew of the AC System Defect when it expressly warranted the Class Vehicles, wrongfully and fraudulently concealed material facts regarding the Defect, failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiffs and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

-159-

488.   GM is obligated, under the terms of its express warranties and pursuant to Cal. Civ. Code §§ 1793.2 and 1795.4, to effectively and within a reasonable time repair and/or replace the defective AC System at no cost to Plaintiffs and Class Members.

489.   GM breached its express warranties by supplying the Class Vehicles to Plaintiffs and Class Members with the AC System Defect, by failing to provide repairs within a reasonable time, and by replacing failed AC System parts with equally defective replacement parts instead of providing a one-time, effective fix.

490.   GM breached its express warranties by failing to repair the Class Vehicles under warranty and by failing to provide to Plaintiffs or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to Plaintiffs and Class Members.

491.   As more fully detailed above, GM was provided with appropriate notice and has been on notice of the Defect and of its breach of its express written warranties from various sources, including Plaintiffs.

492.   Plaintiffs have given GM a reasonable opportunity to cure its failures with respect to its warranties, and GM has failed to do so.

493.   Affording GM any further opportunity to cure their breach of written warranties is unnecessary and futile here.

494.    Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Plaintiffs and Class Members whole and because GM has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

495.    Accordingly, recovery by the Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

496.    Any attempt by GM to limit or disclaim the express warranties in a manner that would exclude coverage of the AC System Defect is unenforceable and void pursuant to Cal. Civ. Code § 1790.1.

497.    As a direct and proximate result of GM's breach of its express warranties, Plaintiffs and Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

498.    Pursuant to Cal. Civ. Code § 1794 and 1795.4, Plaintiffs and Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## TWELFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

499.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

500.    Plaintiffs Carl Williams and Clarence Larry bring this claim on behalf of themselves and the California Class.

501.    The Class Vehicles are and were at all relevant times "goods" within the meaning of, inter alia, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

502.    GM is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, inter alia, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles, under, inter alia, Cal. Com. Code § 10103(a)(16).

503.    Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of, inter alia, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

504.    Plaintiffs and Class Members bought or leased Class Vehicles designed, manufactured, warranted, marketed to them, and intended to be purchased or leased by consumers such as them, by GM.

505.    GM expressly warranted the Class Vehicles against defects, including the AC System Defect, within the meaning of, inter alia, Cal. Com. Code §§ 2313, 2316, 10210, and 10214.

506.    As described above, the AC System in the Class Vehicles is defective. The AC System Defect substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers, including Plaintiffs and Class Members.

507. GM knew of the AC System Defect when it expressly warranted the Class Vehicles and failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiffs and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

508. GM is obligated, under the terms of its express warranties, to effectively repair and/or replace the AC Systems within a reasonable time for Plaintiffs and Class Members.

509. GM breached its express warranties by supplying the Class Vehicles to Plaintiffs and Class Members with the AC System Defect, by failing to provide repairs within a reasonable time, and by replacing failed AC System parts with equally defective replacement parts instead of providing a one-time, effective fix.

510. GM breached its express warranties by failing to repair the Class Vehicles and by failing to provide to Plaintiffs or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it promised when it sold the Class Vehicles to Plaintiffs and Class Members.

511. As more fully detailed above, GM was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources, including Plaintiffs.

512. Plaintiffs have given GM a reasonable opportunity to cure its failures with respect to its warranties, and GM has failed to do so.

-163-

513.   Affording GM any further opportunity to cure their breach of written warranties is unnecessary and futile here.

514.   Any express warranties promising to repair and/or correct any defects fail in their essential purposes because the contractual remedy is insufficient to make Class Members whole and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

515.   Accordingly, recovery by the Class Members is not restricted to any written warranties promising to repair and/or correct defects, and they seek all remedies as allowed by law.

516.   In its capacity as a warrantor, and by the conduct described herein, any attempt by GM to limit or disclaim the express warranties in a manner that would exclude coverage of the AC System Defect is unconscionable as a matter of law because the relevant purchase/lease transactions were tainted by GM's concealment of material facts. Thus any such effort by GM to disclaim, or otherwise limit, its liability for the AC System Defect is null and void.

517.   As a direct and proximate result of GM's breach of express warranties, Plaintiffs and Class Members received goods that have substantially impaired value and have suffered damages in an amount to be determined at trial.

518.   Plaintiffs and Class Members are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees.

## THIRTEENTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY UNDER SONG-BEVERLY CONSUMER WARRANTY ACT

519.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

520.   Plaintiffs Carl Williams and Clarence Larry bring this claim on behalf of themselves and the California Class.

521.   GM's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

522.   GM is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

523.   Plaintiffs and Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

524.   GM impliedly warranted to Plaintiffs and Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792.

525.   GM impliedly warranted to Plaintiffs and Class Members that it would repair or replace any defective products, including the defective AC System.

526.   The propensity of the AC System Defect to cause the AC System to leak refrigerant, lose pressure, and fail to function renders the Class Vehicles to not be of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

527.   The AC System Defect is latent and was present at the time of sale/lease (indeed, GM's own TSB indicates dealers could discover the Defect during "Pre-Delivery Inspections" done prior to delivering the Vehicle to the consumer), and therefore the Vehicles were not merchantable at the time of sale/lease.

528.   The Class Vehicles do not conform to the promises or affirmations of fact made by GM in its promotional materials and vehicle owner manuals in that the AC System Defect creates an environment in the Class Vehicles' cabin that is neither "functional" nor "customer-focused."

529.   In violation of Cal. Civ. Code § 1791.1(a), GM breached its implied warranty by selling/leasing Class Vehicles that were defective and refusing to effectively replace and/or repair the defective AC Systems.

-166-

530. The AC System Defect has deprived Plaintiffs and Class Members of the benefit of their bargain, and have caused the Class Vehicles to depreciate in value.

531. Any attempt by GM to limit or disclaim the implied warranties in a manner that would exclude coverage of the AC System Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

532. As a result of GM's breach of its implied warranties, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

## FOURTEENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

533. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

534. Plaintiffs Carl Williams and Clarence Larry bring this claim on behalf of themselves and the California Class.

535. The Class Vehicles are and were at all relevant times "goods" within the meaning of, inter alia, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

536.   GM is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, inter alia, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles, under, inter alia, Cal. Com. Code § 10103(a)(16).

537.   Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of, inter alia, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

538.   When it sold or leased its Class Vehicles, GM extended an implied warranty to Class Members that the subject Vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

539.   Plaintiffs and other Class Members who purchased or leased a Class Vehicle directly from GM are entitled to the benefit of their bargain: a Vehicle with a nondefective AC System that does not leak refrigerant, lose pressure, or fail to function.

540.   Likewise, Plaintiffs and other Class Members who purchased or leased a GM Certified Pre-Owned Class Vehicle are entitled to the benefit of their bargain: a vehicle with a nondefective AC System that does not leak refrigerant, lose pressure, or fail to function.

541. Class Members who purchased new Class Vehicles from GM-affiliated dealerships and Certified Pre-Owned Class Vehicles are the intended ultimate consumers of the Class Vehicles, and therefore are third-party beneficiaries for the purposes of their implied warranty claims.

542. GM breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

543. The AC System Defect is latent and was present at the time of sale/lease (indeed, GM's own TSB indicates dealers could discover the Defect during "Pre-Delivery Inspections" done prior to delivering the Vehicle to the consumer), and therefore the Vehicles were not merchantable at the time of sale/lease.

544. Had the AC System Defect that existed at the time of sale been known, the Class Vehicles could not have been sold or leased, or could not have been sold or leased at the same price.

545. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION

## FRAUD BY CONCEALMENT

546.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

547.   Plaintiffs Carl Williams and Clarence Larry bring this claim on behalf of themselves and the California Class.

548.   GM concealed and suppressed material facts concerning the quality of the Class Vehicles, and the AC Systems in the Class Vehicles.

549.   GM concealed and suppressed material facts concerning the serious Defect causing Class Vehicles' AC Systems to leak refrigerant, lose pressure, and fail to function. Upon information and belief, the Defect lies in the AC System components located within the engine compartment of the Class Vehicles. GM knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles and GM failed to disclose and/or denied the existence of the Defect prior to Plaintiffs' and Class Members' purchase of their Class Vehicles. GM further failed to disclose and/or denied the existence the Defect when Plaintiffs and Class Members complained of their AC System's failure.

550.   GM did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of GM vehicles that the Class Vehicles were world class, comfortable, warranted, and reliable vehicles and concealed the information

-170-

in order to prevent harm to GM and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

551.   These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in Plaintiffs and Class Members' decisions to purchase or lease the Class Vehicles.

552.   GM had a duty to disclose the AC System Defect in the Class Vehicles because it was known and/or accessible only to GM; GM had superior knowledge and access to the facts; and GM knew the facts were not known to or reasonably discoverable by Plaintiffs and Class Members.

553.   GM also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, comfort, and usability.

554.   Even when faced with complaints regarding the Defect, GM misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the

time of purchase or lease and again when the AC System failure was complained of to GM.

555.   The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiffs and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a consumer.

556.   GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of Plaintiffs and Class Members.

557.   On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding defects that exist in GM vehicles.

558.   Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiffs and Class Members' actions were justified. GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

-172-

559. Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the AC System Defect that GM failed to disclose, and they paid for temporary repairs and equally defective replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

560. Accordingly, GM is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

561. GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### 4. FLORIDA

### SIXTEENTH CAUSE OF ACTION

**VIOLATIONS OF THE FLORIDA DECEPTIVE
AND UNFAIR TRADE PRACTICES ACT
FLA. STAT. § 501.201, *ET SEQ.***

562. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

-173-

563.   Plaintiffs Erica Wolfe, Andrew C. Hill, and Edilberto Gomez bring this claim on behalf of themselves and the Florida Class.

564.   The purpose of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is "to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202 (2).

565.   Plaintiffs and the Florida Class are "consumers" within the meaning of the FDUTPA.

566.   The actions of Defendants, as set forth above, occurred in the conduct of trade or commerce.

567.   In the course of GM's business, it willfully failed to disclose the dangerous risk of the Defect in the Class Vehicles as described above.  Defendants also actively concealed the Defect by failing to inform customers of the Defect well after it was originally known. Accordingly, Defendants engaged in unfair and deceptive acts or practices.

568.   Defendants should have disclosed this information because it was in a superior position to know the true facts related to the Defect, and Plaintiffs and the Class could not reasonably be expected to learn or discover the true facts related to this Defect. Defendants, by the conduct, statements, and omissions described

above, also knowingly and intentionally concealed from Plaintiffs and the Class that Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the vehicles arising therefrom).

569.   Defendants knowingly misrepresented the Class Vehicles as fit to be used for the purpose for which they were intended, when, in fact, Defendants knew the Class Vehicles were defective, dangerous, and not what was advertised. Indeed, Defendants misrepresented the AC Systems in Class Vehicles as functional and suited for their intended purpose, when, in fact, they were not.

570.   These acts and practices have deceived Plaintiffs and are likely to, and did, deceive the public. In failing to disclose the Defect and suppressing material facts from Plaintiffs and the Class, Defendants breached their duties to disclose these facts, violated the FDUTPA, and caused injuries to Plaintiffs and the Class. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and the Class, as it would have been to all reasonable consumers.

571.   The injuries suffered by Plaintiffs and the Class are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class should have reasonably avoided.

572.   GM's conduct proximately caused injuries to Plaintiffs and the Class. Had Plaintiffs and the Class known about the Defect, they would not have

purchased the Class Vehicles, would have paid less for them or would have avoided the extensive repair costs associated therewith.

## SEVENTEENTH CAUSE OF ACTION
## FRAUD BY CONCEALMENT

573.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

574.   Plaintiffs Erica Wolfe, Andrew C. Hill, and Edilberto Gomez bring this claim on behalf of themselves and the Florida Class.

575.   As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

576.   GM knew these representations were false when made.

577.   The vehicles purchased or leased by the Florida Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing.

578.   GM had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing, because the Florida Class relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

-176-

579. The aforementioned concealment was material, because if it had been disclosed the Florida Class would not have bought, leased or retained their vehicles.

580. The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM knew or recklessly disregarded that their representations were false because they knew that people had experienced AC System problems and failures as the result of the vehicles' defective AC Systems. GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

581. The Florida Class relied on GM's reputation—along with their failure to disclose the AC System problems and GM's affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Class Vehicles.

582. As a result of their reliance, the Florida Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

583.   GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Florida Class. the Florida Class are therefore entitled to an award of punitive damages.

## EIGHTEENTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Fla. Stat. § 672.314)

584.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

585.   Plaintiffs Erica Wolfe, Andrew C. Hill, and Edilberto Gomez bring this claim on behalf of themselves and the Florida Class.

586.   GM is and was at all relevant times a merchant with respect to motor vehicles.

587.   A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the AC Systems were not adequately designed, manufactured, and tested, and cannot withstand the ordinary pressure to which it is exposed during operation.  Class Vehicles thus are unsuited for the ordinary and intended purpose of providing safe and reliable transportation.

588.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either GM or its agents (dealerships) to establish privity of contact with GM. Moreover, Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.

589.   Through the express warranties GM issues every purchaser of a new Class Vehicle, GM attempts to impose durational limits on the implied warranty of merchantability.  GM, however, provided these warranties to Plaintiffs and Class members after they had completed their purchase/lease of their Class Vehicles; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.  Accordingly, Plaintiffs and Class members suffered from unequal bargaining power at the time of purchase and lease, rendering the limitations on the warranties procedurally unconscionable.

590.   The limitations on the warranties, including the durational limits GM attempts to impose on the implied warranty of merchantability, are substantively unconscionable. GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired, and failed to

disclose these defects to Plaintiffs and the other Class members. Conversely, the Defect was unknown to, and could not be discovered by, Plaintiffs and Class members until after the Defect had manifested. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

591.   GM was provided notice of these issues by complaints lodged by consumers before or within a reasonable amount of time after the allegations of the Defect became public, and Plaintiffs also notified GM of its breach after the Defect manifested in their respective vehicles.

592.   As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

5.   **GEORGIA**
**NINETEENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**

593.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

594.   Plaintiff Leslie Griffin brings this claim on behalf of herself and the Georgia Class.

595.   GM is and was at all relevant times a "merchant" with respect to motor vehicles, and specifically the Class Vehicles, under, inter alia, Ga. Code

-180-

Ann. § 11-2-104(1), and "sellers" of motor vehicles, and specifically the Class

Vehicles, under, inter alia, Ga. Code Ann. § 11-2-103(1)(d); and, with respect to

leases, is and was at all relevant times a "lessor" of motor vehicles, and specifically

the Class Vehicles, under, inter alia, Ga. Code Ann. § 11-2A-103(1)(p).

596.   The Class Vehicles are and were at all relevant times "goods" within

the meaning of, inter alia, Ga. Code Ann. §§ 11-2-105 and 11-9-102(a)(45).

597.   Plaintiffs and Class Members bought or leased Class Vehicles

manufactured, marketed to them, and intended to be purchased by consumers such

as them, by GM.

598.   GM expressly warranted the Class Vehicles against defects including

the AC System Defect, as described above, within the meaning of, inter alia,

O.C.G.A § 11-2-313(1).

599.   GM's express warranties formed a basis of the bargain that was

reached when Class Members purchased or leased their Class Vehicles.

600.   As described above, the AC System in the Class Vehicles is defective.

The AC System Defect substantially impairs the use, value, and safety of the Class

Vehicles to reasonable consumers, including Plaintiff and Class Members.

601.   GM knew of the AC System Defect, and that this Defect poses serious

safety risks to consumers like Plaintiffs and Class Members, when it expressly

warranted against the Defect, wrongfully and fraudulently concealed material facts

regarding the Defect, failed to inform Class Members that the Class Vehicles had the Defect, and induced Plaintiffs and Class Members to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

602.   Specifically, Class Vehicles were sold to Plaintiffs and Class Members with a new vehicle three-year and 36,000-mile express warranty.

603.   Plaintiffs and Class Members were either in privity with GM as original purchasers or lessees, or otherwise afforded the benefits of the express warranty as subsequent purchasers because of the express language of the warranty.

604.   GM's warranty expressly "covers repairs to correct any vehicle defect" and states that repairs will be done within a "reasonable time."

605.   GM breached its express warranties by supplying the Class Vehicles to Plaintiffs and Class Members with the AC System Defect.

606.   GM is obligated, under the terms of its express warranties, to make repair and/or replacements to effectively correct the AC System Defect for Plaintiffs and Class Members.

607.   As more fully detailed above, GM was provided with appropriate notice and has been on notice of the Defect and of its breach of express written warranties from various sources.

608.   The Class Vehicles were under this express warranty when they exhibited the AC System Defect.

609.   Plaintiffs gave GM a reasonable opportunity to cure its failures with respect to its warranties, and GM failed to do so free of charge or at all.

610.   GM breached its express warranties by failing to effectively repair the Class Vehicles and by failing to provide to Plaintiff or Class Members, as a warranty replacement, a product that conforms to the qualities and characteristics that it expressly warranted when it sold the Class Vehicles to Plaintiff and Class Members.

611.   Affording GM a reasonable opportunity to cure its breach of written warranties was unnecessary and futile here. When Plaintiffs and other Class Members provided such notice and sought relief under the warranty,

612.   GM refused to do so and charged them for temporary, inadequate "fixes."

613.   To the extent any express warranties do not by their terms cover the defects alleged in this Complaint, and to the extent the contractual remedy is in any other respect insufficient to make Plaintiffs and Class Members whole, the warranties fail of their essential purpose and, accordingly, recovery by Plaintiffs and Class Members is not restricted to the promises in any written warranties, and they seek all remedies that may be allowed.

614.   GM provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicle is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties. Accordingly, Plaintiffs and Class members suffered from unequal bargaining power at the time of purchase and lease, rendering the limitations on the warranties procedurally unconscionable.

615.   The limitations on the warranties also are substantively unconscionable. GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. GM failed to disclose these defects to Plaintiffs and the other Class members. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience, and any attempt by GM to limit or disclaim the express warranties in a manner that would exclude coverage of the AC System Defect is unconscionable as a matter of law.

616.   As a direct and proximate result of GM's breach of express warranties, Plaintiffs and Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including out-of-pocket costs and the costs of needed present and future repairs, in an amount to be determined at trial, and are entitled to the relief requested *infra*.

-184-

## TWENTIETH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

617.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

618.   Plaintiff Leslie Griffin brings this claim on behalf of herself and the Georgia Class.

619.   GM is a merchant with respect to the goods which it sold to Plaintiffs and Class Members, including the Class Vehicles and/or defective AC Systems installed in Class Vehicles.

620.   When it sold its Class Vehicles, GM extended an implied warranty to Class Members that the subject vehicles were merchantable and fit for the ordinary purpose for which such goods were sold.  Ga. Code Ann. § 11-2-314.

621.   Persons who purchased a vehicle from GM are entitled to the benefit of their bargain: a vehicle with a nondefective AC System.

622.   GM breached this implied warranty of merchantability in that its Class Vehicles are (1) not fit for ordinary use of providing safe and reliable transportation, and (2) not of a merchantable quality.

623.   Had the fact that the AC System Defect existed been disclosed at the time of sale, the Class Vehicles could not have been sold, or could not have been sold at the same price.

624.   Through the express warranties GM issues every purchaser of a new Class Vehicle, GM attempts to impose durational limits on the implied warranty of merchantability.  GM, however, provided these warranties to Plaintiffs and Class members after they had completed their purchase/lease of their Class Vehicles; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.  Accordingly, Plaintiffs and Class members suffered from unequal bargaining power at the time of purchase and lease, rendering the limitations on the warranties procedurally unconscionable.

625.   The limitations on the warranties, including the durational limits GM attempts to impose on the implied warranty of merchantability, are substantively unconscionable. GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired, and failed to disclose these defects to Plaintiffs and the other Class members. Conversely, the Defect was unknown to, and could not be discovered by, Plaintiffs and Class members until after the Defect had manifested. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

626.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

## TWENTY-FIRST CAUSE OF ACTION

## VIOLATIONS OF GEORGIA FAIR BUSINESS PRACTICES ACT
### (Ga. Code Ann. § 10-1-390, et seq.)

627.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

628.   Plaintiff Leslie Griffin brings this claim on behalf of herself and the Georgia Class.

629.   Defendants are "persons" as defined by the Georgia Fair Business Practices Act ("Georgia FBPA"). Ga. Code Ann. § 10-1-392(a)(24).

630.   Plaintiff and Class Members are "consumers" within the meaning of the Georgia FBPA. Ga. Code Ann. § 10-1-392(a)(6).

631.   The purchase or lease of Class Vehicles by Plaintiff and Class Members constituted "consumer transactions" as defined by the Georgia FBPA. Ga. Code Ann. § 10-1-392(a)(10).

632.   The Georgia FBPA declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another,"

-187-

and "[a]dvertising goods or services with intent not to sell them as advertised," *id.*
§§ 10-1-393(b)(5), (7) & (9).

633.   By failing to disclose the defective nature of the Class Vehicles to
Plaintiff and Class Members, GM violated the Georgia FBPA, because GM
represented that the Class Vehicles had characteristics and benefits that they do not
have, and represented that the Class Vehicles were of a particular standard, quality,
or grade (i.e. state-of-the-art, comfortable, etc.) when they were of another. See Ga.
Code Ann. §§ 10-1-393(b)(5) & (7).

634.   GM advertised the Class Vehicles (as state-of-the-art, comfortable,
etc.) with the intent not to sell them as advertised, in violation of § 10-1-393(b)(9).

635.   GM's unfair and deceptive acts or practices occurred repeatedly in
GM's course of trade or business, were material, were capable of deceiving a
substantial portion of the purchasing public, and as a result, caused economic harm
to owners and purchasers of the Class Vehicles.

636.   GM knew, by 2012 at the latest, and certainly before the sale or lease
of the Class Vehicles, that the Class Vehicles' AC Systems suffered from an
inherent defect, were defectively designed or manufactured, would fail repeatedly,
and were not suitable for their intended use.

637.   By 2012 at the latest, GM had exclusive knowledge of material facts
concerning the existence of the AC System Defect in its Class Vehicles.

-188-

Furthermore, GM actively concealed this Defect from consumers by denying the existence of the Defect to Class Members who contacted GM about the AC System failures, and failing to offer Class Members an effective solution to the AC System Defect.

638.   GM was under a duty to Plaintiff and Class Members to disclose the defective nature of the AC Systems, as well as the associated costs that would have to be repeatedly expended in order to repair the Class Vehicles due to the AC System Defect, because:

a.   GM was in a superior position to know the true state of facts about the AC System Defect in the Class Vehicles;

b.   Plaintiff and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the AC System Defect until, at the earliest, the first instance of AC; and

c.   GM knew that Plaintiff and Class Members could not reasonably have been expected to learn or discover the AC System Defect prior to its manifestation.

639.   GM knew or should have known that its conduct violated the Georgia FBPA.

-189-

640.   In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause and remedy of the AC System failures, GM knowingly and intentionally concealed material facts and breached its duty not to do so.

641.   The facts GM concealed from Plaintiff and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the AC System Defect to be an undesirable quality, as Plaintiff and Class Members did. Had Plaintiffs and Class Members known that the Class Vehicles had the AC System Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for them.

642.   Plaintiff and Class Members, like all objectively reasonable consumers, did not expect their Class Vehicles to contain a defective AC System. It is a reasonable and objective consumer expectation for consumers to expect the AC System not to leak refrigerant, lose pressure, and fail to function.

643.   As a result of GM's misconduct, Plaintiff and Class Members have been harmed and suffered actual damages including in that the Class Vehicles repeatedly fail due to the AC System Defect, causing inconvenience, creating an uncomfortable environment for Vehicle occupants, and causing Plaintiff and Class Members to spend money to repeatedly repair or temporarily fix the AC System.

644.   As a direct and proximate result of GM's unfair or deceptive acts or practices, Plaintiff and Class Members suffered and will continue to suffer actual damages in that they have experienced and may continue to experience failure of their Class Vehicles' AC Systems, for which there is no effective fix, and for which they must pay out of pocket.  Plaintiff and Class Members relied on GM's representations regarding the safety and durability of Class Vehicles.  Had GM refrained from making the misrepresentations and omissions alleged herein, Plaintiff and Class Members would not have purchased Class Vehicles and would have avoided the extensive repair costs associated with the Defect, or would have paid less for their Class Vehicles.

645.   GM's violations present a continuing risk to Plaintiff and to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

646.   Plaintiff and Class Members are entitled to equitable relief.

647.   Plaintiff provided GM with pre-suit notice of the violations alleged herein via a letter delivered to GM's headquarters on June 29, 2018, in accordance with Ga. Code Ann. § 10-1-399(b).

648.   Rule 23 of the Federal Rules of Civil Procedure, which sets out the procedures for pursuing a class action in federal court, unambiguously authorizes any plaintiff, in any federal civil proceeding, to maintain a class action if the Rule

23's prerequisites are met. The prohibition of class actions in Ga. Code Ann. § 10-1-399(a) is procedural, not substantive, and so directly conflicts with a federal rule of procedure: Rule 23. Therefore Rule 23 controls here pursuant to the Rules Enabling Act, 28 U.S.C. § 2072; *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010); and *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

649.   Thus, pursuant to Ga. Code Ann. § 10-1-399, Plaintiff seeks, in addition to equitable relief, actual and statutory damages, attorneys' fees and expenses, treble damages, and punitive damages as permitted under the Georgia FBPA and applicable law.

## TWENTY-SECOND CAUSE OF ACTION
### VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (Ga. Code Ann. § 10-1-370, *et seq.*)

650.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

651.   Plaintiff Leslie Griffin brings this claim on behalf of herself and the Georgia Class.

652.   GM, Plaintiffs, and Class Members are "persons" within the meaning of Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA"). Ga. Code Ann. § 10-1-371(5).

653.   The Georgia UDTPA prohibits "deceptive trade practices" which include the "misrepresentation of standard, quality, or grade of goods and

-192-

services," "engaging in any other conduct which similar creates a likelihood of confusion or misunderstanding," and "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have," and "[a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-372.

654.   By failing to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members, GM engaged in deceptive trade practices in violation of the Georgia UDTPA, because GM represented that the Class Vehicles had characteristics and benefits that they do not have, and represented that the Class Vehicles were of a particular standard, quality, or grade (i.e. state- of-the-art, comfortable, etc.) when they were of another. See Ga. Code Ann. §§ 10-1- 372(5), (7), (9).

655.   GM advertised the Class Vehicles (as state-of-the-art, comfortable, etc.) with the intent not to sell them as advertised, in violation of Ga. Code Ann. § 10-1-372(12).

656.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused economic harm on owners and purchasers of the Class Vehicles.

657.   GM knew, by 2012 at the latest, and certainly before the sale or lease of the Class Vehicles, that the Class Vehicles' AC Systems suffered from an inherent design defect, would repeatedly fail, and were not suitable for their intended use.

658.   By 2012 at the latest, GM had exclusive knowledge of material facts concerning the existence of the AC System Defects in its Class Vehicles. Furthermore, GM actively concealed these defects from consumers by denying the existence of the defects to Class Members who contacted GM about the failing AC Systems, and failing to offer Class Members an effective solution to the AC System Defect.

659.   GM was under a duty to Plaintiffs and Class Members to disclose the defective nature of the AC Systems, as well as the associated costs that would have to be repeatedly expended in order to repair the Class Vehicles due to the AC System Defect, because, inter alia:

a.   GM was in a superior position to know the true state of facts about the AC System Defect in the Class Vehicles;

b.   Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the AC System Defect until, at the earliest, the first instance of AC System failure; and

-194-

c. GM knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the AC System Defect prior to its manifestation.

660. Despite possessing information to the contrary, GM failed to disclose and actively concealed the Defect while continuing to market the Class Vehicles as comfortable, world-class, and reliable. The deception made reasonable consumers believe that Class Vehicles were of high quality and designed and made by a company that stood behind its vehicles once they were on the road.

661. GM knew or should have known that its conduct violated the Georgia UDTPA.

662. In failing to disclose the defective nature of the Class Vehicles, and/or denying and misleading as to the true cause and remedy of the AC System failures, GM knowingly and intentionally concealed material facts and breached its duty not to do so.

663. The facts GM concealed from Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the AC System Defect to be an undesirable quality, as Plaintiffs and Class Members did. Had Plaintiffs and Class

Members known that the Class Vehicles had the AC System Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for them.

664. Plaintiffs, like all objectively reasonable consumers, did not expect their Class Vehicles to contain a defective AC System. It is a reasonable and objective consumer expectation for consumers to expect the AC System not to leak refrigerant, lose pressure, and fail to function.

665. As a result of GM's misconduct, Plaintiffs and Class Members have been harmed and suffered actual damages in that the Class Vehicles repeatedly fail due to the AC System Defect, causing inconvenience, creating an uncomfortable and unsafe environment for vehicle occupants, and causing Class Members to spend money to repeatedly repair or temporarily fix the AC System.

666. As a direct and proximate result of GM's unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered and will continue to suffer actual damages in that they have experienced and may continue to experience failure of their Class Vehicles' AC Systems, for which there is no effective fix and for which they must pay out of pocket.

667. GM's violations present a continuing risk to Plaintiffs and to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

-196-

668.   As a direct and proximate result of GM's violations of the Georgia UDTPA, Plaintiffs and Class Members have suffered injury-in-fact and/or actual damage.

669.   Plaintiffs seek an order enjoining GM's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA and applicable law.

## TWENTY-THIRD CAUSE OF ACTION
## FRAUD BY CONCEALMENT

670.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

671.   Plaintiff Leslie Griffin brings this claim on behalf of herself and the Georgia Class.

672.   GM concealed and suppressed material facts concerning the quality of the Class Vehicles.

673.   GM concealed and suppressed material facts concerning the quality of the AC Systems in the Class Vehicles.

674.   GM concealed and suppressed material facts concerning the serious AC System Defect causing Class Vehicles' AC Systems to crack, leak refrigerant, lose pressure, and fail to function. Upon information and belief, the Defect lies in the AC Systems deep within the Class Vehicles. GM knew that Plaintiffs and Class

Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the vehicles. GM furthered and relied upon this lack of disclosure to further promote payments for temporary fixes, and in some cases accused Plaintiffs and Class Members of causing the problem – all the while concealing the true nature of the Defect from Plaintiffs and Class Members. GM further denied the very existence the Defect when Plaintiffs and Class Members complained of the Defect.

675.   GM concealed and suppressed material facts that point to the nature of the Defect being a faulty evaporator design, a $400 to $800 or more part  requiring extensive labor and parts to replace and instead pushed "fixes" consisting of filter changes and cleanings which are temporary at best.

676.   GM committed the foregoing acts and omissions in order to boost confidence in its vehicles and falsely assure purchasers and lessees of GM vehicles, that the Class Vehicles were world class, comfortable, warranted and reliable vehicles and concealed the information in order to prevent harm to GM and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the

representations and omissions played a significant role in the decision to purchase or lease the Class Vehicles.

677.   GM had a duty to disclose the Defect in the Class Vehicles because they were known and/or accessible only to GM; GM had superior knowledge and access to the facts; and GM knew the facts were not known to, or reasonably discoverable, by Plaintiffs and Class Members. GM also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, comfort, and usability. Even when faced with complaints regarding the Defect, GM misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at purchase/lease and again when the AC System failure was complained of to GM. The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiffs and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose it was purchased, are material concerns to a consumer.

678.    GM actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, avoid recalls that would hurt the brand's image and cost money, and did so at the expense of Plaintiffs and Class Members.

679.    On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding the Defect that exists in the Class Vehicles.

680.    Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, i.e., they would not have purchased or leased Class Vehicles, or would have paid less for them. Plaintiffs and Class Members' actions were justified. GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

681.    Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damage because they negotiated and paid value for the Class Vehicles not considerate of the Defect that GM failed to disclose and paid for temporary measures and replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs would have paid less for their vehicles or would not have purchased or leased them at all.

682.   Accordingly, GM is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

683.   GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and Class Members' rights and well-being to enrich GM. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## 6.   LOUISIANA

### TWENTY-FOURTH CAUSE OF ACTION

**VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(La. Rev. Stat. § 51:1401,** *et seq.***)**

684.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

685.   Plaintiff Richie Ainsworth brings this claim on behalf of himself and the Louisiana Class.

686.   Defendants, Plaintiff, and the Louisiana Class are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

687.   Plaintiff and the Louisiana Class are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

688.   Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

689.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce."  La. Rev. Stat. § 51:1405(A).  Defendants participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

690.   In the course of its business, Defendants willfully failed to disclose and actively concealed the Defect discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

691.   Defendants knew they had installed a Defect, knew that the Defect was not safe, as advertised, and knew it the Class Vehicles were not fit for their intended purpose.

692.   Defendants were also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants.  Defendants concealed this information as well.

693.   By failing to disclose that the Defect was not safe, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable

manufacturer that valued safety and stood behind its vehicles after they were sold, Defendants engaged in deceptive business practices in violation of the Louisiana CPL.

694.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true performance of the Class Vehicles, the quality of the GM brand, the devaluing of safety and performance at GM, and the true value of the Class Vehicles.

695.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Louisiana Class.

696.   Defendants knew or should have known that its conduct violated the Louisiana CPL.

697.   As alleged above, Defendants made material statements about the safety and utility of the Class Vehicles and the GM brand that were either false or misleading.

698.   Defendants owed Plaintiff a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at GM, because Defendants:

a.      Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that included a Defect and did not perform as advertised;

b.      Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.      Made incomplete representations about the safety and performance of the Class Vehicles generally, and the Defect in particular, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

699.   Because Defendants fraudulently concealed the Defect and the true performance of cars equipped with the Defect, resulting in a raft of negative publicity once the defects finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to those vehicles by GM's conduct, they are now worth significantly less than they otherwise would be.

700.   GM's fraudulent use of the Defect and the true performance of the Class Vehicles were material to Plaintiff and the Louisiana Class.  A vehicle made by a reputable manufacturer of safe, high-performing vehicles is safer and worth

-204-

more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe, vehicles that conceals defects rather than promptly remedying them.

701.  Plaintiff and the Louisiana Class suffered ascertainable loss caused by GM's misrepresentations and its concealment of and failure to disclose material information.  Class members who purchased the Class Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for GM's violations of the Louisiana CPL.

702.  Defendants had an ongoing duty to all GM customers to refrain from unfair and deceptive practices under the Louisiana CPL.  All owners of the Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of GM's deceptive and unfair acts and practices made in the course of GM's business.

703.  GM's violations present a continuing risk to Plaintiffs as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

704.  As a direct and proximate result of GM's violations of the Louisiana CPL, Plaintiff and the Louisiana Class have suffered injury-in-fact and/or actual damage.

705.  Because Defendants fraudulently concealed the Defect and the true performance of cars equipped with the Defect, resulting in a raft of negative

-205-

publicity once the defects finally began to be disclosed, the value of the Class

Vehicles has greatly diminished.  In light of the stigma attached to those vehicles

by GM's conduct, they are now worth significantly less than they otherwise would

be.

706.   Pursuant to La. Rev. Stat. § 51:1409, Plaintiff and the Louisiana Class

seek to recover actual damages in an amount to be determined at trial; treble

damages for GM's knowing violations of the Louisiana CPL; an order enjoining

GM's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys'

fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

## TWENTY-FIFTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/
### WARRANTY AGAINST REDHIBITORY DEFECTS
### (La. Civ. Code Art. 2520, 2524)

707.   Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

708.   Plaintiff Richie Ainsworth brings this claim on behalf of himself and

the Louisiana Class.

709.   Defendants are and were at all relevant times merchants with respect

to motor vehicles.

710.   A warranty that the Class Vehicles were in merchantable condition is

implied by law in the instant transactions.  These Class Vehicles, when sold and at

all times thereafter, were not in merchantable condition and are not fit for the

ordinary purpose for which cars are used.  Specifically, the Class Vehicles are inherently defective in that the air conditioning system was not adequately designed, manufactured, and tested.

711.   Defendants were provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like GM routinely monitor—before or within a reasonable amount of time after the allegations of the Class Vehicle defects became public.

712.   As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

<u>**TWENTY-SIXTH CAUSE OF ACTION**</u>

**VIOLATIONS OF LOUISIANA PRODUCTS LIABILITY ACT**
**(La. Stat. Ann. § 9:2800.51 *et seq.*)**

713.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

714.   Plaintiff Richie Ainsworth brings this claim on behalf of himself and the Louisiana Class.

715.   The Class Vehicles are unreasonable dangerous for the following reasons:

a.   They are unreasonably dangerous in construction and/or composition as provided in R.S. 9:2800.55;

-207-

b.      They are unreasonably dangerous in design as provided in R.S. 9:2800.56;

c.      They are unreasonably dangerous because an adequate warning about the Class Vehicles and its Defect as required by R.S. 9:2800.57; and

d.      They are unreasonably dangerous because they do not conform to an express warranty of the manufacturer about the Class Vehicles as provided in R.S. 9:2800.58

716.   The characteristics of the Class Vehicles that render them unreasonably dangerous under R.S. 9:2800.55 et seq., existed at the time the product left the control of Defendants and/or resulted from reasonable anticipation or modification of the Class Vehicles.

717.   At all times material hereto, Defendants were engaged in the business of manufacturing, assembling, promoting, advertising, selling, and distributing vehicles in the United States, including but not limited to, the Class Vehicles.

718.   Defendants knew and expected for the Class Vehicles to eventually be sold to and operated by purchasers, lessees, and/or eventual owners of the Class Vehicles, including Plaintiff and the Louisiana Subclass. Consequently, Plaintiff and the Louisiana Subclass were expected users of the Class Vehicles.

719.   The Class Vehicles reached Plaintiff and the Louisiana Sublcass without substantial change in their condition from the time of completion of manufacture by Defendants.

720. The Defect in the Class Vehicles could not have been contemplated by any reasonable person expected to operate the Class Vehicles, and, therefore, presented an unreasonably dangerous situation for expected users of the Class Vehicles even though the Class Vehicles were operated by expected users in a reasonable manner.

721. An alternative design was available to Defendants – namely the use of a bracket to hold in place components in the AC System of the Class Vehicles – something that Defendants have since used as a remedy to attempt to cure the Defect in the Class Vehicles.

722. Defendants should have reasonably foreseen that the dangerous conditions caused by the Defect in the Class Vehicles would subject Plaintiff and the Louisiana Subclass to harm resulting from the failure of the AC System in the Class Vehicles.

723. Plaintiff and the Louisiana Subclass have used the Class Vehicles reasonable and as intended, to the fullest degree possible given the defective nature of the Class Vehicles, and, nevertheless, have suffered damages through no fault of their own.

724. As a direct result of Defendants' design, manufacture, assembly, marketing, and sales of the defective subject vehicles, Plaintiff and the Louisiana Subclass have suffered and will continue to suffer all damages caused by the

-209-

unreasonable characteristics of the Class Vehicles Defendants manufactured and

distributed.

725.   Therefore, Plaintiff and the Louisiana Subclass seek to recover actual

damages for the conduct caused by Defendants in violation of the Louisiana

Products Liability Act.

### 7.   MICHIGAN

### TWENTY-SEVENTH CAUSE OF ACTION

**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**
**(Mich. Comp. Laws § 445.903, *et. seq.*)**

726.   Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

727.   Plaintiff Corey Steketee brings this claim on behalf of himself and the

Michigan Class.

728.   Michigan Class Members were "person[s]" within the meaning of the

Mich. Comp. Laws § 445.902(1)(d).

729.   At all relevant times hereto, GM were "persons" engaged in "trade or

commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

730.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits

"[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct

of trade or commerce…." Mich. Comp. Laws § 445.903(1). GM engaged in unfair,

unconscionable, or deceptive methods, acts or practices prohibited by the Michigan

-210-

CPA, including: "(c) Representing that goods or services have… characteristics… that they do not have.…;" "(e) Representing that goods or services are of a particular standard… if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the dangerous AC System Defect in the Class Vehicles, GM both participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

731.   In the course of their business, both GMs willfully failed to disclose and actively concealed the dangerous AC System Defects in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale of Class

Vehicles. GM is directly liable for engaging in unfair and deceptive acts or

practices in the conduct of trade or commerce in violation of the Michigan CPA.

732. As alleged above, GM knew of the AC System Defects, and the

Michigan Class was deceived by GM's omissions into believing the Class Vehicles

were safe. The true information could not have reasonably been known by the

consumer.

733. GM knew or should have known that their conduct violated the

Michigan CPA.

734. As alleged above, GM made material statements about the safety and

reliability of Class Vehicles that were either false or misleading.

735. GM engaged in a deceptive trade practice when it failed to disclose

material information concerning the Class Vehicles which it knew at the time of

the sale. GM deliberately withheld the information about the propensity for the AC

System's cracking, losing pressure, leaking refrigerant, and failing in order to

ensure that consumers would purchase its vehicles and to induce the consumer to

enter into a transaction.

736. From its inception in 2009, GM has known of the AC System Defects

that exist in millions of Class Vehicles sold in the United States. But, to protect its

profits and to avoid remediation costs and a public relations nightmare, GM

concealed the defects and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy the Class Vehicles and allowed all Defective Vehicle owners to continue driving highly dangerous vehicles.

737.   GM each owed the Michigan Class an independent duty, based on their respective knowledge, to disclose the defective nature of Class Vehicles, including the propensity for the AC System's cracking, losing pressure, leaking refrigerant, and failing, because they each:

a.   Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

b.   Intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing campaign and Special Coverage Program that they designed to hide the AC System problems from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of Class Vehicles generally, and the AC System in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

738.   GM's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Michigan Class, about the true safety and reliability of Class Vehicles. GM intentionally and knowingly misrepresented

material facts regarding the Class Vehicles with an intent to mislead the Michigan Class.

739.   The propensity of the Class Vehicles AC Systems cracking, losing pressure, leaking refrigerant, and failing during ordinary operation was material to the Michigan Class. Had the Michigan Class known that their vehicles had these serious safety defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

740.   The Michigan Class suffered ascertainable loss caused by GM's failure to disclose material information. The Michigan Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious safety defect, the value of their Class Vehicles has diminished now that the AC System issues in the Class Vehicles have come to light, and the Michigan Class owns vehicles that are defective and unsafe.

741.   The Michigan Class has been damaged by GM's misrepresentations, concealment, and non-disclosure of the AC System Defects in the Class Vehicles, as they are now holding vehicles whose value has greatly diminished because of GM's failure to timely disclose and remedy the serious defects.

742.   Michigan Class Members were—and continue to be—at risk of irreparable injury as a result of the respective Companies' acts and omissions in

-214-

violation of the Michigan CPA, and these violations present a continuing risk to the Michigan Class as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

743.  The repairs instituted by GM have not been adequate. The Special Coverage Program is not an effective remedy and is not offered for all Class Vehicles.

744.  As a direct and proximate result of GM's violations of the Michigan CPA, the Michigan Class has suffered injury-in-fact and/or actual damage.

745.  The Michigan Class seeks injunctive relief to enjoin GM from continuing its unfair and deceptive acts; monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each Michigan Class Member; reasonable attorneys' fees; declaratory relief in the nature of a judicial determination of whether each Company's conduct violated the Michigan Statute, the just total amount of penalties to be assessed against each thereunder, and the formula and procedure for fair and equitable allocation of statutory penalties among the Michigan Class; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

746.  The Michigan Class also seeks punitive damages against GM because it carried out despicable conduct with willful and conscious disregard of the rights

and safety of others. GM intentionally and willfully misrepresented the safety and reliability of Class Vehicles, deceived Michigan Class Members, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting flaws in the Class Vehicles it repeatedly promised Michigan Class Members were safe. GM's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## TWENTY-EIGHTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Mich. Comp. Laws § 440.2314)

747.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

748.   Plaintiff Corey Steketee brings this claim on behalf of himself and the Michigan Class.

749.   GM were merchants with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

750.   Under Mich. Comp. Laws § 440.2314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Michigan Class members purchased their Class Vehicles.

751.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles are inherently defective in that

there are defects in the AC Systems that permit cracking, losing pressure, leaking refrigerant, and failing to occur.

752.   Through the express warranties GM issues every purchaser of a new Class Vehicle, GM attempts to impose durational limits on the implied warranty of merchantability.  GM, however, provided these warranties to Plaintiffs and Class members after they had completed their purchase/lease of their Class Vehicles; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.  Accordingly, Plaintiffs and Class members suffered from unequal bargaining power at the time of purchase and lease, rendering the limitations on the warranties procedurally unconscionable.

753.   The limitations on the warranties, including the durational limits GM attempts to impose on the implied warranty of merchantability, are substantively unconscionable. GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired, and failed to disclose these defects to Plaintiffs and the other Class members. Conversely, the Defect was unknown to, and could not be discovered by, Plaintiffs and Class members until after the Defect had manifested. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

754.   GM was provided notice of these issues by numerous complaints filed against them, internal investigations, and by numerous individual letters and

-217-

communications sent by the Michigan Class before or within a reasonable amount of time after allegations of vehicle defects became public.  In addition, Plaintiff directly notified GM of its breach and sought warranty coverage for repairs necessitated by the Defect, and provided GM with further written notice of its breach by letter delivered to GM on June 29, 2018.

755.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, the Michigan Class has been damaged in an amount to be proven at trial.

756.   Plaintiffs also seek available declaratory relief. Based on GM's continuing failures to fix the known defects, Plaintiffs seek declarations that:

a.      The Class Vehicles are defective in that their AC Systems crack, leak refrigerant, lose pressure, and fail. The AC System Defect may not manifest until after the warranty provided by GM has expired. The AC System is material and requires disclosure to all Class Members.

b.      All Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by GM.

c.      Because the Class Vehicles have the AC System Defect, and because GM knew of this Defect before the time of sale or lease, the GM warranty (and "Special Coverage Program") is insufficient to remediate the defects know by GM to exist. Therefore GM's existing warranty, limited to three years or 36,000

miles, is invalid, and, as such that limitation is unenforceable. GM shall provide notice to all persons covered by that warranty of the removal of this time limitation.

        d.     GM shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the AC Defect in the Class Vehicles.

        e.     GM shall establish a repair program and protocol to be communicated to class members, which will require GM to inspect, upon request, a class member's vehicle to determine whether the AC System Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties.

<h3 style="text-align:center"><u>TWENTY-NINTH CAUSE OF ACTION</u></h3>
<h3 style="text-align:center">FRAUD BY CONCEALMENT</h3>

757. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

758. Plaintiff Corey Steketee brings this claim on behalf of himself and the Michigan Class.

759. As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

-219-

760.   GM knew these representations were false when made.

761.   The vehicles purchased or leased by the Michigan Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing.

762.   GM had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing, because the Michigan Class relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

763.   The aforementioned concealment was material, because if it had been disclosed the Michigan Class would not have bought, leased or retained their vehicles.

764.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM knew or recklessly disregarded that their representations were false because they knew that people had experienced AC System problems and failures as the result of the vehicles' defective AC Systems. GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

765.   The Michigan Class relied on GM's reputation—along with their failure to disclose the AC System problems and GM's affirmative assurance that its vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Class Vehicles.

766.   As a result of their reliance, the Michigan Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

767.   GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Michigan Class, who are therefore entitled to an award of punitive damages.

## 8.   NEW JERSEY

## THIRTIETH CAUSE OF ACTION

### VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT
(N.J. Stat. Ann. § 56:8-1, *et. seq.*)

768.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

769.   Plaintiff Jones Won brings this claim on behalf of himself and the New Jersey Class.

770.   The New Jersey Class and GM are or were "person[s]" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

-221-

771.   GM engaged in the "sale" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

772.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. GM engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

773.   In the course of their business, GM willfully failed to disclose and actively concealed the dangerous AC System Defects in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such

-222-

concealment, suppression or omission, in connection with the sale of Class Vehicles. GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the New Jersey CFA.

774.   As alleged above, GM knew of the AC System Defect, while the New Jersey Class was deceived by GM's omission into believing the Class Vehicles were safe, and the information could not have reasonably been known by the consumer.

775.   GM knew or should have known that their conduct violated the New Jersey CFA.

776.   As alleged above, GM made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

777.   GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale. GM deliberately withheld the information about the vehicles' AC Systems' propensity to crack, lose pressure, leak refrigerant, and fail in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

778.   GM has known for some time of the AC System Defect in Class Vehicles, but to protect its profits and to avoid remediation costs and a public

relations nightmare, GM concealed the Defect and allowed unsuspecting new and used car purchasers to continue to buy defective Class Vehicles.

779.   GM owed the New Jersey Class a duty to disclose the defective nature of Class Vehicles, including the AC System's propensity for cracking, losing pressure, leaking refrigerant, and failing, because they:

a.   Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

b.   Intentionally concealed the hazardous situation with Class Vehicles through their deceptive marketing campaign and Special Coverage Program that they designed to hide the AC System problems from the New Jersey Class; and/or

c.   Made incomplete representations about the safety and reliability of Class Vehicles generally, and the AC System in particular, while purposefully withholding material facts from the New Jersey Class that contradicted these representations.

780.   GM's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the New Jersey Class, about the true safety and reliability of Class Vehicles. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the New Jersey Class.

781.    The propensity of the AC System in Class Vehicles to crack, lose pressure, leak refrigerant, and fail during ordinary and foreseeable operation was material to the New Jersey Class. Had the New Jersey Class known that their vehicles had these safety defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

782.    All members of the New Jersey Class suffered ascertainable losses caused by GM's failure to disclose material information. The New Jersey Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious defect, the value of their Class Vehicles has diminished now that the AC System issues in the Class Vehicles have come to light, and the New Jersey Class owns vehicles that are defective and unsafe.

783.    The New Jersey Class Members have been damaged by GM's misrepresentations, concealment, and non-disclosure of the AC System Defect in the Class Vehicles, as they are now holding vehicles whose value has greatly diminished because of GM's failure to timely disclose and remedy the serious defects.

784.    New Jersey Class Members risk irreparable injury as a result of GM's act and omissions in violation of the New Jersey CFA, and these violations present

a continuing risk to them as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

785.   The "Special Coverage Program" instituted by GM is inadequate. It is not an effective remedy and is not offered for all Class Vehicles.

786.   As a direct and proximate result of GM's violations of the New Jersey CFA, the New Jersey Class has suffered injury-in-fact and/or actual damage.

787.   The New Jersey Class is entitled to recover legal and/or equitable relief including an order enjoining New GM's unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

788.   Pursuant to N.J. Stat. Ann. § 56:8-20, the New Jersey Class will mail a copy of the complaint to New Jersey's Attorney General within ten (10) days of filing it with the Court.

## THIRTY-FIRST CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(N.J. Stat. Ann. § 12A:2-314)

789.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

790.   Plaintiff Jones Won brings this claim on behalf of himself and the New Jersey Class.

791.   GM were merchants with respect to motor vehicles.

792.   A warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when the New Jersey Class purchased their Class Vehicles.

793.   These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles are inherently defective in that there are defects in the AC Systems that permit cracking, losing pressure, leaking refrigerant, and failing to occur.

794.   Through the express warranties GM issues every purchaser of a new Class Vehicle, GM attempts to impose durational limits on the implied warranty of merchantability.  GM, however, provided these warranties to Plaintiffs and Class members after they had completed their purchase/lease of their Class Vehicles; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.  Accordingly, Plaintiffs and Class members suffered from unequal bargaining power at the time of purchase and lease, rendering the limitations on the warranties procedurally unconscionable.

795.   The limitations on the warranties, including the durational limits GM attempts to impose on the implied warranty of merchantability, are substantively unconscionable. GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired, and failed to

disclose these defects to Plaintiffs and the other Class members. Conversely, the Defect was unknown to, and could not be discovered by, Plaintiffs and Class members until after the Defect had manifested. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

796. GM was provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by the New Jersey Class.

797. As a direct and proximate result of GM's breach of the warranties of merchantability, the New Jersey Class has been damaged in an amount to be proven at trial.

## THIRTY-SECOND CAUSE OF ACTION
### FRAUD BY CONCEALMENT

798. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

799. Plaintiff Jones Won brings this claim on behalf of himself and the New Jersey Class.

800. As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

801. GM knew these representations were false when made.

802.   The vehicles purchased or leased by the New Jersey Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing.

803.   GM had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing because the New Jersey Class relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

804.   The aforementioned concealment was material because if it had been disclosed the New Jersey Class would not have bought, leased or retained their vehicles.

805.   The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM knew or recklessly disregarded that their representations were false because they knew that people had experienced AC System problems and failures as the result of the vehicles' defective AC Systems. GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

806.   The New Jersey Class relied on GM's reputation—along with their failure to disclose the AC System problems and GM's affirmative assurance that

its vehicles were safe and reliable and other similar false statements—in

purchasing, leasing or retaining the Class Vehicles.

807.   As a result of their reliance, the New Jersey Class Members have been

injured in an amount to be proven at trial, including, but not limited to, their lost

benefit of the bargain and overpayment at the time of purchase and/or the

diminished value of their vehicles.

808.   GM's conduct was knowing, intentional, with malice, demonstrated a

complete lack of care, and was in reckless disregard for the rights of the New

Jersey Class, who are therefore entitled to an award of punitive damages.

### 9.   **NEW YORK**

### **THIRTY-THIRD CAUSE OF ACTION**

**VIOLATION OF NY DECEPTIVE AND UNFAIR TRADE PRACTICES &
FALSE ADVERTISIGN ACTS
(GBL § 349 & 350)**

809.   Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

810.   Plaintiff Jones Won brings this claim on behalf of himself and the

New York Class.

811.   New York General Business Law § 349 ("NY GBL § 349") prohibits

"[d]deceptive acts or practices in the conduct of any business, trade or commerce

or in furnishing of any service in this state…"  NY GBL § 349(a).

812.    Any person who has been injured by reason of any violation of NY GBL § 349 "may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendants willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff." NY GBL § 349(h).

813.    GM's actions, as set forth above, occurred in the conduct of business, trade or commerce.

814.    In the course of GM's business, it willfully failed to disclose the risk of the Defect in the Class Vehicles as described above. Moreover, Defendants misrepresented the AC Systems in the Class Vehicles as functional and suited for their intended purpose, when, in fact, they were not. Accordingly, Defendants engaged in unfair and deceptive acts or practices.

815.    Defendants should have disclosed this information because they were in a superior position to know the true facts related to the Defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this Defect. Defendants, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from Plaintiffs and

the Class members that Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the vehicles as a result of this problem).

816.   These acts and practices have deceived Plaintiff and are likely to, and did, deceive the public.  In failing to disclose the Defect and suppressing material facts from Plaintiffs and the Class members, Defendants breached their duties to disclose these facts, violated the NY GBL § 349, and caused injuries to Plaintiffs and the Class members.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and Class members, as it would have been to all reasonable consumers.

817.   The acts and omissions of Defendants were likely to mislead a reasonable consumer into purchasing GM's products. GM's deceptive acts are material because they concern an essential feature of the Class Vehicles—the air conditioning system.

818.   The sale and distribution in New York of the Class Vehicles was a consumer-oriented act, and thereby falls under the New York deceptive acts and practices statute.

819.   GM's conduct proximately caused injuries to Plaintiffs and other Class members. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles, they would not have purchased the Class Vehicles, would have

paid less for them or would have avoided the extensive repair costs associated
therewith.

820.   At all times, GM's conduct in employing these unfair and deceptive
trade practices was malicious, willful, wanton and outrageous.

821.   GM's actions impact the public interest because Plaintiffs and
members of the New York Class were injured in exactly the same way as
thousands of others who purchased the Class Vehicles.

822.   Defendants also have refused to act on grounds generally applicable to
the injunctive relief sought by Plaintiffs, thereby making final injunctive relief
appropriate.

823.   Defendants persist in their deceptive and unfair marketing and sales
practices regarding the Class Vehicles to the detriment of consumers across the
country, including Plaintiffs and the Class.

824.   If Defendants are allowed to continue with these practices, consumers,
including Plaintiffs and the Class, will be irreparably harmed. Plaintiffs and the
Class do not have a plain, adequate, speedy, or complete remedy at law to address
all of the wrongs alleged in this Complaint unless injunctive relief is granted to
stop GM's deceptive marketing and sale of the Class Vehicles.

825.   Thus, Plaintiffs are entitled to compensatory damages, equitable and
declaratory relief, punitive damages, costs and reasonable attorneys' fees, as well

as injunctive relief requiring Defendants to cease their unfair and deceptive

practices relating to the sale of the Class Vehicles.

## THIRTY-FOURTH CAUSE OF ACTION

### DAMAGES FOR VIOLATIONS OF NY GBL §§ 349 AND 350 (DECEPTIVE AND UNFAIR TRADE PRACTICES/FALSE ADVERTISING)

826.   Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

827.   Plaintiff Jones Won brings this claim on behalf of himself and the

New York Class.

828.   Plaintiff brings this claim for damages under NY GBL §§ 349 and

350.

829.   Defendants engaged in consumer-oriented commercial conduct by

selling and advertising the Class Vehicles to Plaintiff and the Class.

830.   Defendants misrepresented and omitted material facts regarding the

Class Vehicles, including the Defect and the resulting failure of the air

conditioning systems in the Class Vehicles. Indeed, Defendants misrepresented the

AC systems in the Class Vehicles as functional and suited for their intended

purpose, when, in fact, they were not.

831.   GM's misrepresentations, omissions, and concealment of material

facts constitute unconscionable commercial practices, deception, fraud, false

advertising, misrepresentation, and/or the knowing concealment, suppression, or omission in connection with the sale and advertisement of the Class Vehicles, in violation of NY GBL § 349.

832.   Defendants knowingly misrepresented the Class Vehicles as fit to be used for the purpose for which they were intended, when, in fact, Defendants knew the Class Vehicles were defective, dangerous, and not what was advertised. Indeed, Defendants misrepresented the AC systems in the Class Vehicles as functional and suited for their intended purpose, when, in fact, they were not.

833.   Defendants engaged in the deceptive acts and practices alleged herein in order to sell the Class Vehicles to Plaintiff and the Class.

834.   GM's practices, acts, policies, and course of conduct, including its omissions and subsequent failure to inform the public about the Defect, as described above, were intended to induce, and did induce, Plaintiff to purchase one of the Class Vehicles.

835.   Defendants sold the Class Vehicles knowingly concealing the fact that they contained the Defect alleged herein.

836.   GM's conduct proximately caused injuries to Plaintiff and other Class members. Had Plaintiff and the Class known about the defective nature of the Class Vehicles, they would not have purchased the Class Vehicles, would have

paid less for them or would have avoided the extensive repair costs associated therewith.

837.   Thus, Plaintiff and the Class are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

<u>THIRTY-FIFTH CAUSE OF ACTION</u>
**BREACH OF EXPRESS WARRANTY**

838.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

839.   Plaintiff Jones Won brings this claim on behalf of himself and the New York Class.

840.   Defendants provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the bargain.  Accordingly, GM's warranties are express warranties under state law.

841.   The parts affected by the Defect in the Class Vehicles were manufactured and distributed by Defendants, and are covered by the warranties Defendants provided all purchasers and lessors of Class Vehicles.

842.   Defendants breached these warranties by selling and leasing Class Vehicles with the Defect, which required repair or replacement within the applicable warranty periods, but making only temporary and ineffective repairs

-236-

using equally defective replacement parts, and requiring Plaintiffs and Class members to cover the full cost of subsequent repairs when the defective replacement components invariably failed.

843.   Plaintiffs notified Defendants of the breach within a reasonable time. Defendants also know of the Defect, and yet chose to conceal it and refuse to comply with their warranty obligations.

844.   As a direct and proximate cause of GM's breach, Plaintiffs and the other Class members incurred substantial repair costs for which Defendants should have borne responsibility pursuant to the terms of their express warranties.

845.   Plaintiffs and Class members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## 10.  <u>OKLAHOMA</u>

### <u>THIRTY-SIXTH CAUSE OF ACTION</u>

#### VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT
(Okla. Stat. Tit. 15 § 751, *et. seq.*)

846.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

847.   Plaintiff Hayes Ellis brings this claim on behalf of himself and the Oklahoma Class.

848.   Oklahoma Class members are "persons" under the Oklahoma Consumer Protection Act ("Oklahoma CPA"), Okla. Stat. tit. 15 § 752.

849.   GM is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15 § 15-751(1).

850.   The sale or lease of the Class Vehicles to the Oklahoma Class members was a "consumer transaction" within the meaning of Okla. Stat. tit. 15 § 752, and GM's actions as set forth herein occurred in the conduct of trade or commerce.

851.   The Oklahoma CPA declares unlawful, *inter* alia, the following acts or practices when committed in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics…, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." *See* Okla. Stat. tit. 15, § 753.

852.   By failing to disclose and actively concealing the AC System's propensity to crack, lose pressure, leak refrigerant, and fail in Class Vehicles, GM engaged in unfair and deceptive business practices prohibited by the Oklahoma

CPA, including: representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; and advertising Class Vehicles with the intent not to sell or lease them as advertised; misrepresenting, omitting and engaging in other practices that have deceived or could reasonably be expected to deceive or mislead; and engaging in practices which offend established public policy or are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

853.   GM willfully failed to disclose and actively concealed the dangerous AC System Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles. GM is directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the Oklahoma CPA.

854.   As alleged above, GM knew of the AC System Defect while the Oklahoma Class was deceived by GM's omission into believing the Class Vehicles

-239-

were safe, and the information could not have reasonably been known by the consumer.

855.   GM knew or should have known that their conduct violated the Oklahoma CPA.

856.   As alleged above, GM made material statements about the safety and reliability of Class Vehicles that were either false or misleading.

857.   GM engaged in a deceptive trade practice when it failed to disclose material information concerning the Class Vehicles which it knew at the time of the sale. GM deliberately failed to disclose the AC System's propensity to crack, lose pressure, leak refrigerant, and fail in order to ensure that consumers would purchase its vehicles and to induce the consumer to enter into a transaction.

858.   Since at least 2012, GM has known of the AC System Defect that exists in millions of Class Vehicles sold in the United States. But, to protect its profits and to avoid remediation costs and a public relations nightmare, GM concealed the Defect and allowed unsuspecting new and used car purchasers to continue to buy defective Class Vehicles.

859.   GM owed the Oklahoma Class a duty to disclose the defective nature of Class Vehicles, including the AC System's propensity to crack, lose pressure, leak refrigerant, and fail, because they:

a.  Possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles;

b.  Intentionally concealed the Defect through their deceptive marketing campaign; and/or

c.  Made incomplete representations about the safety and reliability of Class Vehicles generally, while purposefully withholding material facts from the Oklahoma Class that contradicted these representations.

860.  GM's unfair or deceptive acts or practices were likely to deceive reasonable consumers, including the Oklahoma Class, about the true safety and reliability of Class Vehicles. GM intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the Oklahoma Class.

861.  The AC System's propensity to crack, lose pressure, leak refrigerant, and fail during ordinary and foreseeable operation was material to the Oklahoma Class. Had the Oklahoma Class known that their vehicles had these safety defects, they would either not have purchased their Class Vehicles, or would have paid less for them than they did.

862.  The Oklahoma Class suffered ascertainable losses caused by GM's failure to disclose material information. The Oklahoma Class overpaid for their vehicles and did not receive the benefit of their bargain. As the result of the

concealment and failure to remedy the serious safety defect, the value of their

Class Vehicles has diminished.

863.   Oklahoma Class Members risk irreparable injury as a result of GM's

act and omissions in violation of the Oklahoma CPA, and these violations present a

continuing risk to them as well as to the general public. GM's unlawful acts and

practices complained of herein affect the public interest.

864.   As a direct and proximate result of GM's violations of the Oklahoma

CPA, the Oklahoma Class has suffered injury-in-fact and/or actual damage.

865.   Oklahoma Class members seek punitive damages against GM because

GM's conduct was egregious. GM misrepresented the safety and reliability of

millions of Class Vehicles, concealed the Defect in millions of Class Vehicles,

deceived Oklahoma Class members, and concealed material facts that only it

knew,. GM's egregious conduct warrants punitive damages.

866.   GM's conduct as alleged herein was unconscionable since (1) GM,

knowingly or with reason to know, took advantage of consumers reasonably

unable to protect their interests because of their age, physical infirmity, ignorance,

illiteracy, inability to understand the language of an agreement or similar factor;

(2) at the time the consumer transaction was entered into, GM knew or had reason

to know that price grossly exceeded the price at which similar vehicles were

readily obtainable in similar transactions by like consumers; and (3) GM knew or

had reason to know that the transaction GM induced the consumer to enter into
was excessively one-sided in favor of GM.

867.   Because GM's unconscionable conduct caused injury to Oklahoma
Class members, the Oklahoma Class seeks recovery of actual damages,
discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees,
under Okla. Stat. tit. 15 § 761.1. The Oklahoma Class further seeks an order
enjoining GM's unfair and/or deceptive acts or practices, and any other just and
proper relief available under the Oklahoma CPA.

## THIRTY-SEVENTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (12a Okla. Stat. Ann. § 2-314)

868.   Plaintiffs incorporate by reference all allegations of the preceding
paragraphs as though fully set forth herein.

869.   Plaintiff Hayes Ellis brings this claim on behalf of himself and the
Oklahoma Class.

870.   GM are merchants with respect to motor vehicles.

871.   A warranty that the Class Vehicles were in merchantable condition
was implied by law in the transactions when the Oklahoma Class purchased their
Class Vehicles.

872.   These vehicles, when sold and at all times thereafter, were not
merchantable and are not fit for the ordinary purpose of providing safe and reliable

-243-

transportation. Specifically, the Class Vehicles are inherently defective in that there are defects in the AC Systems that permit cracking, losing pressure, leaking refrigerant, and failing.

873.   Through the express warranties GM issues every purchaser of a new Class Vehicle, GM attempts to impose durational limits on the implied warranty of merchantability.  GM, however, provided these warranties to Plaintiffs and Class members after they had completed their purchase/lease of their Class Vehicles; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.  Accordingly, Plaintiffs and Class members suffered from unequal bargaining power at the time of purchase and lease, rendering the limitations on the warranties procedurally unconscionable.

874.   The limitations on the warranties, including the durational limits GM attempts to impose on the implied warranty of merchantability, are substantively unconscionable. GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired, and failed to disclose these defects to Plaintiffs and the other Class members. Conversely, the Defect was unknown to, and could not be discovered by, Plaintiffs and Class members until after the Defect had manifested. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

-244-

875.   GM were provided notice of these issues by numerous complaints filed against it, internal investigations, and by numerous individual letters and communications sent by the Oklahoma Class before or within a reasonable amount of time after allegations of vehicle defects became public. In addition, Plaintiff notified GM of its breach when he brought his Class Vehicle to an authorized GM dealership for repairs necessitated by the Defect.

876.   As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiff and the Oklahoma Class have been damaged in an amount to be proven at trial.

## THIRTY-EIGHTH CAUSE OF ACTION
### FRAUD BY CONCEALMENT

877.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

878.   Plaintiff Hayes Ellis brings this claim on behalf of himself and the Oklahoma Class.

879.   As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

880.   GM knew these representations were false when made.

881.    The vehicles purchased or leased by the Oklahoma Class were, in fact, defective, unsafe and unreliable, because the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing.

882.    GM had a duty to disclose that these vehicles were defective, unsafe and unreliable in that the vehicles were subject to the AC System's cracking, losing pressure, leaking refrigerant, and failing because the Oklahoma Class relied on GM's representations that the vehicles they were purchasing and retaining were safe and free from defects.

883.    The aforementioned concealment was material because if it had been disclosed the Oklahoma Class would not have bought, leased or retained their vehicles.

884.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle. GM knew or recklessly disregarded that their representations were false because of their longstanding knowledge of the Defect.

885.    The Oklahoma Class relied on GM's reputation—along with their failure to disclose the Defect and GM's affirmative assurance that their vehicles were safe and reliable and other similar false statements—in purchasing, leasing or retaining the Class Vehicles.

-246-

886.   As a result of their reliance, the Oklahoma Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

887.   GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Oklahoma Class, who are therefore entitled to an award of punitive damages.

### 11.   **TENNESSEE**

### **THIRTY-NINTH CAUSE OF ACTION**

### **VIOLATION OF TENNESSEE'S CONSUMER PROTECTION ACT ("TCPA")**
### **(Tenn. Code Ann. § 47-18-101, *et seq*.)**

888.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

889.   Plaintiffs Billy Frank and John O'Brien bring this claim on behalf of themselves and the Tennessee Class.

890.   GM are "person[s]" as defined by the TCPA. Tenn. Code Ann. § 47-18-103(13).

891.   Plaintiffs and Class Members are "consumers" within the meaning of the TCPA. Tenn. Code Ann. § 47-18-103(2).

892.   The purchases and leases of Class Vehicles by Plaintiffs and Class Members constitute "consumer transactions" as defined by the TCPA. Tenn. Code Ann. § 47-18-103(19).

893.   The Class Vehicles constitute "goods" or "services" as defined by the TCPA. Tenn. Code Ann. §§ 47-18-103(7) and (18).

894.   Plaintiffs and Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the TCPA. Tenn. Code Ann. § 47-18-103(7).

895.   GM's representations, active concealment, failures to disclose, and omissions regarding the Class Vehicles violated the TCPA in the following ways:

a.   GM misrepresented that the Class Vehicles had characteristics, benefits, or uses that they did not have (Tenn. Code Ann. § 47-18-104(5));

b.   GM misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Tenn. Code Ann. § 47-18-104(7));

c.   GM advertised the Class Vehicles with an intent not to sell/lease them as advertised (Tenn. Code Ann. § 47-18-104(9)); and

d.   GM misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Tenn. Code Ann. § 47-18-104(19)).

-248-

896. GM's unfair and deceptive acts or practices occurred repeatedly in GM's course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused ascertainable economic harm to purchasers and lessees of the Class Vehicles.

897. GM knew, by 2012 at the latest, and certainly before the sale or lease of the Class Vehicles, that the Class Vehicles' AC Systems suffered from an inherent defect, were defectively designed or manufactured, would fail repeatedly, and were not suitable for their intended use.

898. By 2012 at the latest, GM had exclusive knowledge of material facts concerning the existence of the AC System Defect in its Class Vehicles. Furthermore, GM actively concealed the Defect from consumers by denying the existence of the Defect to Class Members who contacted GM about their AC System failures, failing to provide an effective remedy for the AC System Defect within a reasonable time under warranty (thereby causing GM's warranty to fail of its essential purpose) and replacing defect AC System components with the same defective replacement parts.

899. GM was under a duty to Plaintiffs and Class Members to disclose the defective nature of the AC Systems, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the AC System Defect, because:

-249-

a.      GM was in a superior position to know the true state of facts about the AC System Defect in the Class Vehicles;

b.      Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles had the AC System Defect until, at the earliest, the manifestation of the Defect; and

c.      GM knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the AC System Defect prior to its manifestation.

900.   In failing to disclose the defective nature of the Class Vehicles, GM knowingly and intentionally concealed material facts and breached its duty not to do so.

901.   The facts concealed or not disclosed by GM to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the AC System Defect to be an undesirable quality, as Plaintiffs and Class Members did. Had Plaintiffs and other Class Members known that the Class Vehicles had the AC System Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

902.   Plaintiffs and Class Members are reasonable consumers who did not expect their Class Vehicles to contain a defective AC System. It is a reasonable

-250-

and objective consumer expectation for consumers to expect the AC System not to leak refrigerant, lose pressure, and fail to function.

903. As a result of GM's misconduct, Plaintiffs and Class Members have been harmed and have suffered ascertainable damages in that the Class Vehicles contain defective AC Systems and repeatedly crack, leak refrigerant, lose pressure, and fail to function due to the AC System Defect, causing inconvenience, creating an uncomfortable and unhealthy environment for vehicle occupants, and causing Class Members to spend money, even when the Vehicle was still under warranty, to attempt to remedy the Defect.

904. As a direct and proximate result of GM's unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered and will continue to suffer ascertainable damages in that they have a Vehicle with a defective AC System and they have experienced and may continue to experience their Class Vehicles' AC Systems leaking refrigerant, losing pressure, and failing to function, for which there is no effective fix.

905. Accordingly, Plaintiffs seek an order enjoining GM's unfair or deceptive acts or practices and equitable relief under Tenn. Code Ann. § 47-18-109(b), compensatory and monetary damages under Tenn. Code Ann. § 47-18-109(a)(1), treble damages for knowing and willful violations under Tenn. Code Ann. § 47-18-109(a)(3), attorneys' fees under Tenn. Code Ann. § 47-18-109(e)(1),

and any other relief to which Plaintiff and Class Members are entitled under the TCPA.

906.   Rule 23 of the Federal Rules of Civil Procedure, which sets out the procedures for pursuing a class action in federal court, unambiguously authorizes any plaintiff, in any federal civil proceeding, to maintain a class action if the Rule 23's prerequisites are met. The prohibition of class actions in TCPA sections 47-18-109(a)(1) and 47-18-109(g) is procedural, not substantive, and so directly conflicts with a federal rule of procedure: Rule 23. Therefore Rule 23 controls here pursuant to the Rules Enabling Act, 28 U.S.C. § 2072; *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393 (2010); and *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). Moreover, by their express terms, sections 47-18-109(a)(1) and 47-18-109(g) apply only to claims for damages, and therefore do not preclude class actions for claims for injunctive relief under the TCPA.

## FORTIETH CAUSE OF ACTION
## FRAUD BY CONCEALMENT

907.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

908.   Plaintiffs Billy Frank and John O'Brien bring this claim on behalf of themselves and the Tennessee Class.

909. GM had a duty to disclose the AC System Defect in the Class

Vehicles because, under Tennessee law, even in the absence of a special

relationship, a seller must:

      a.    disclose enough information to prevent its statements from

being misleading;

      b.    disclose any condition or defect that it knows or should know

about that renders the product defective or dangerous; and

      c.    disclose basic, material information if it knows that the buyer is

about to act without knowledge of the information and is without reasonable means

to acquire the information itself.

910. GM concealed and suppressed material facts concerning the serious

Defect causing Class Vehicles' AC Systems to leak refrigerant, lose pressure, and

fail to function. Upon information and belief, the Defect lies in the AC System

components located within the engine compartment of the Class Vehicles. GM

knew that Plaintiffs and Class Members would not be able to inspect or otherwise

detect the Defect prior to purchasing or leasing the Vehicles.

911. GM did so in order to boost confidence in its vehicles and falsely

assure purchasers and lessees of GM vehicles that the Class Vehicles were world

class, comfortable, warranted, and reliable vehicles and concealed the information

in order to prevent harm to GM and its products' reputations in the marketplace

and to prevent consumers from learning of the defective nature of the Class

Vehicles prior to their purchase or lease.

912.   These omissions were material to consumers, both because they

concerned the quality of the Class Vehicles and because the omissions played a

significant role in Plaintiffs and Class Members' decisions to purchase or lease the

Class Vehicles.

913.   GM further failed to disclose and/or denied the existence the Defect

when Plaintiffs and Class Members complained of their AC System's failure. As a

result, Class Members were misled as to the true condition of the Class Vehicles

once at the time of purchase or lease and again when the AC System failure was

complained of to GM.

914.   Plaintiffs and Class Members were unaware of these omitted material

facts and would not have acted as they did if they had known of the concealed

and/or suppressed facts, in that they would not have purchased or leased their Class

Vehicles or would have paid less for them. Plaintiffs and Class Members' actions

were justified. GM was in exclusive control of the material facts and such facts

were not known to the public, Plaintiffs, or Class Members.

915.   Because of the concealment and/or suppression of the facts, Plaintiffs

and Class Members sustained damages because they negotiated and paid value for

the Class Vehicles not considerate of the AC System Defect that GM failed to

disclose. Moreover, they paid for repairs, including for replacement of the defective parts with equally defective replacement parts or aftermarket parts. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

## 12.  <u>TEXAS</u>

### <u>FORTY-FIRST CAUSE OF ACTION</u>

### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT (Tex. Bus. & Com. Code § 17.01, *et seq*.)

916.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

917.   Plaintiff Marcus Bell brings this claim on behalf of himself and the Texas Class.

918.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

919.   Plaintiffs bring this claim on behalf the Texas Class.

920.   The Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann. § 17.01, *et seq*. ("DTPA") declares unlawful any false, misleading, or deceptive acts or practices in the conduct of any trade or commerce.

921. The actions of GM, as set forth above, occurred in the conduct of trade or commerce.

922. GM willfully failed to disclose and actively concealed the dangerous risk of the Defect in the Class Vehicles as described above. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in the DTPA, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; advertising Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

923. The Defect constitutes a safety issue that triggered GM's duty to disclose the safety issue to consumers as set forth above.

924. GM should have disclosed this information because it was in a superior position to know the true facts related to the Defect, and Texas Class members could not reasonably be expected to learn or discover the true facts related to this Defect. GM, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from the Texas Class members that Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the vehicles as a result of this problem).

925. These acts and practices have deceived Class members and are likely to deceive the public. In failing to disclose the Defect and suppressing other

material facts from Class members, GM breached its duties to disclose these facts, violated the DTPA, and caused injuries to Texas Class members.  The omissions and acts of concealment by GM pertained to information that was material to Texas Class members, as it would have been to all reasonable consumers.

926.   The injuries suffered by Texas Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Texas Class members should have reasonably avoided.

927.   A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by members the Texas Class.  Had members of the Texas Class known about the defective nature of the Class Vehicles, they would not have purchased the Class Vehicles, would have paid less for them or would have avoided the extensive repair costs associated therewith.

928.   Plaintiffs complied with the DTPA's notice requirements by providing written notice to GM more than sixty-days prior to commencing this action by a letter delivered to GM via certified mail on September 18, 2017.

## FORTY-SECOND CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Tex. Bus. & Com. Code § 2.314)

929.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

930. Plaintiff Marcus Bell brings this claim on behalf of himself and the Texas Class.

931. GM is and was at all relevant times a merchant with respect to motor vehicles.

932. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions. These Class Vehicles, when sold and all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose of providing safe and reliable transportation. Specifically, the Class Vehicles are inherently defective in that the AC Systems was not adequately designed, manufactured, and tested.

933. Through the express warranties GM issues every purchaser of a new Class Vehicle, GM attempts to impose durational limits on the implied warranty of merchantability. GM, however, provided these warranties to Plaintiffs and Class members after they had completed their purchase/lease of their Class Vehicles; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties. Accordingly, Plaintiffs and Class members suffered from unequal bargaining power at the time of purchase and lease, rendering the limitations on the warranties procedurally unconscionable.

934. The limitations on the warranties, including the durational limits GM attempts to impose on the implied warranty of merchantability, are substantively

unconscionable. GM knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired, and failed to disclose these defects to Plaintiffs and the other Class members. Conversely, the Defect was unknown to, and could not be discovered by, Plaintiffs and Class members until after the Defect had manifested. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

935.   GM was provided notice of these issues by complaints lodged by consumers before or within a reasonable amount of time after the allegations of the Class Vehicle Defect became public. Plaintiff also notified by GM of its breach by presenting his vehicle to a GM authorized dealer for service, and by written letter delivered to GM via certified mail on September 18, 2017.

936.   As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

### 13.   <u>WASHINGTON</u>

### <u>FORTY-THIRD CAUSE OF ACTION</u>

**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Wash. Rev. Code § 19.86.010,** *et seq.***)**

937.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

938.   Plaintiffs Aaron and Jan Howard bring this claim on behalf of themselves and the Washington Class.

939.   Washington's Consumer Protection Act ("WCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Wash. Rev. Code § 19.86.020.

940.   The actions of Defendants, as set forth above, occurred in the conduct of trade or commerce.

941.   In the course of GM's business, it willfully failed to disclose the dangerous risk of the Defect in the Class Vehicles as described above.  Defendants also actively concealed the Defect by failing to inform customers of the Defect well after it was originally known.  Accordingly, Defendants engaged in unfair and deceptive acts or practices.

942.   Defendants should have disclosed this information because it was in a superior position to know the true facts related to the Defect, and Plaintiff and Class members could not reasonably be expected to learn or discover the true facts related to this Defect.  Defendants, by the conduct, statements, and omissions described above, also knowingly and intentionally concealed from Plaintiff and the Class members that Class Vehicles suffer from the Defect (and the costs, safety risks, and diminished value of the vehicles arising therefrom).

943.   Defendants knowingly misrepresented the Class Vehicles as fit to be used for the purpose for which they were intended, when, in fact, Defendants knew the Class Vehicles were defective, dangerous, and not what was advertised. Indeed, Defendants misrepresented the AC Systems in the Class Vehicles as functional and suited for their intended purpose, when, in fact, they were not.

944.   These acts and practices have deceived Plaintiffs and are likely to, and did, deceive the public.  In failing to disclose the Defect and suppressing material facts from Plaintiff and the Class members, Defendants breached their duties to disclose these facts, violated the WCPA, and caused injuries to Plaintiff and the Class members.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff and Class members, as it would have been to all reasonable consumers.

945.   The injuries suffered by Plaintiff and the Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff and the Class members should have reasonably avoided.

946.   GM's conduct proximately caused injuries to Plaintiff and other Class members.  Had Plaintiff and the Class known about the defective nature of the Class Vehicles, they would not have purchased the Class Vehicles, would have

paid less for them or would have avoided the extensive repair costs associated therewith.

947. Pursuant to Washington Revised Code section 19.86.090, Plaintiff requests that the Court grant treble damages, attorneys' fees and all other relief the Court deems just and proper.

## RELIEF REQUESTED

948. Plaintiffs, on behalf of themselves, and all others similarly situated, request the Court to enter judgment against GM, as follows:

a. an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

b. a declaration that the AC Systems in the Class Vehicles are defective;

c. a declaration that the Class Vehicles are defective in that their AC Systems crack, leak refrigerant, lose pressure, and fail. The AC System Defect may not manifest until after the warranty provided by GM has expired. The AC System is material and requires disclosure to all Class Members;

d. a declaration that all Class Members are to be provided the best practicable notice of the defect, which cost shall be borne by GM;

e.      a declaration that because the Class Vehicles have the AC System Defect, and because GM knew of this Defect before the time of sale or lease, the GM warranty (and "Special Coverage Program") is insufficient to remediate the defects know by GM to exist. Therefore GM's existing warranties are invalid, and, as such, any mileage and time limitations are unenforceable. GM shall provide notice to all persons covered by that warranty of the removal of this time limitation;

f.      a declaration that GM shall re-audit and reassess all prior warranty claims, including claims previously denied in whole or in part, where the denial was based on warranty or on other grounds, of claims related to the AC Defect in the Class Vehicles;

g.      a declaration that GM shall establish a repair program and protocol to be communicated to class members, which will require GM to inspect, upon request, a class member's vehicle to determine whether the AC System Defect is manifest. Any disputes over coverage shall be adjudicated by a Special Master appointed by the Court and/or agreed to by the parties;

h.      an order enjoining GM from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles;

-263-

i.      an award to Plaintiffs and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

j.      a declaration that GM must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

k.      an award of attorneys' fees and costs, under Cal. Code Civ. Proc. § 1021.5, 15 U.S.C. § 2310(d)(1), and as otherwise allowed by law;

l.      an award of pre-judgment and post-judgment interest, as provided by law;

m.      leave to amend this Complaint to conform to the evidence produced at trial;

n.      such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

949.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated:  August 14, 2018           Respectfully submitted,

*/s/ E. Powell Miller*          /s/ *Annika K. Martin*
E. Powell Miller (P39487)      Annika K. Martin
Sharon S. Almonrode (P33938)   LIEFF CABRASER HEIMANN
Dennis A. Lienhardt (P81118)    & BERNSTEIN, LLP
THE MILLER LAW FIRM, P.C.   250 Hudson Street, 8th fl.
950 West University, Suite 300   New York, NY 10013
Rochester, Michigan 48306     212.355.9500
248.841.2201                akmartin@lchb.com
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

*/s/ Bryan L. Clobes*           */s/ Joseph G. Sauder*
Bryan L. Clobes           Joseph G. Sauder (admission pending)
CAFFERTY CLOBES MERIWETHER SAUDER SCHELKOPF LLC
& SPRENGEL LLP         555 Lancaster Avenue
1101 Market St., Suite 2650    Berwyn, PA 19312
Philadelphia, PA 19107      610.200.0580
215.864.2800              jgs@sstriallawyers.com
bclobes@caffertyclobes.com

*Co-Lead Counsel on behalf of Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned herby certifies that on this 14th day of August, 2018, a copy of Consolidated Class Action Complaint was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Michigan, using the CM/ECF system, which will send a Notice of Electronic filing to all parties of record.

/s/ E. Powell Miller_____
E. Powell Miller (P39487)