# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE: GENERAL MOTORS
AIR CONDITIONING MARKETING          Case Number: 18-md-02818
AND SALES PRACTICES
LITIGATION
_____/    Hon. Matthew F. Leitman

ALL CASES

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (ECF #35)

In this putative consolidated class action, seventeen plaintiffs from thirteen states bring a variety of claims against Defendant General Motors Company ("GM") arising out of alleged defects in the air conditioning systems of their GM vehicles. GM has now moved to dismiss most of Plaintiffs' claims. (*See* Mot. to Dismiss, ECF #35.) For the reasons that follow, GM's motion is **GRANTED IN PART AND DENIED IN PART**.

## I

GM is one of the world's leading automakers. Plaintiffs are consumers who purchased various GM vehicles under the Chevrolet, GMC, and Cadillac brands (the "Class Vehicles").[1] Plaintiffs claim that the air conditioning systems in the Class

---

[1] "The vehicles at issue in this action include the 2015-2017 Cadillac Escalade and Escalade ESV, 2014-2017 Chevrolet Silverado 1500, 2015-2017 Chevrolet

Vehicles are defective and that GM's efforts to repair the defects have failed. More specifically, Plaintiffs assert that the Class Vehicles "have a serious defect that causes the [air conditioning systems] to (a) crack and leak refrigerant; (b) lose pressure within the [air conditioning system]; and (c) fail to properly function to provide cooled air into the [v]ehicle's passenger cabin" (the "AC Defect"). (Am. Compl. at ¶3, ECF #24 at Pg. ID 1013.) According to Plaintiffs, the AC Defect "inhibits Plaintiffs['] … expected, comfortable, and safe use of their [v]ehicles, and requires [them] to go months without functioning [air conditioning] while waiting for replacement parts, and to pay for equally defective replacement parts that themselves are susceptible to failure." (*Id.* at ¶10, Pg. ID 1015.) Plaintiffs further allege that the AC Defect "also creates a safety risk for Plaintiffs … because [the defect] subjects the occupants of the [v]ehicles to unsafely high temperatures and can lead to decreased visibility due to fogging of the windows and an inability to use the [air conditioning system] to de-fog the windows." (*Id.* at ¶11, Pg. ID 1015.) Finally, Plaintiffs claim that GM "knew" of the AC Defect before Plaintiffs purchased or leased their vehicles but "failed to disclose and actively concealed the [defect] from [Plaintiffs] and the public." (*Id.* at ¶12, Pg. ID 1015-16.)

---

Suburban, 2015-2017 Chevrolet Tahoe, 2014-2017 GMC Sierra 1500, and 2015-2017 GMC Yukon." (Am. Compl. at ¶2, ECF #24 at Pg. ID 1013.)

**II**

Plaintiffs filed their First Amended Consolidated Master Class Action Complaint (the "First Amended Complaint"), the operative pleading in this action, on August 14, 2018. (*See* Am. Compl., ECF #24.)  The named Plaintiffs are as follows:

- Rodney Martin, an Alabama resident who "purchased a new 2015 Chevrolet Silverado" from an "authorized GM dealer" in Alabama in 2015. (*See id.* at ¶¶ 23-24, Pg. ID 1020);

- Kenneth Gay, an Arizona resident who "purchased a new 2014 Chevrolet Silverado" from an "authorized GM dealer" in Arizona in 2013. (*See id.* at ¶¶ 32-33, Pg. ID 1022);

- Carl Williams, a California resident who "purchased a new [2014 Chevrolet Silverado]" in California in 2014. (*See id.* at ¶43, Pg. ID 1024);

- Clarence Larry, a California resident who "purchased a new 2015 Chevrolet Tahoe" from "an authorized GM dealer" in California in 2015. (*See id.* at ¶¶ 54-55, Pg. ID 1028);

- Erica Wolfe, a Florida resident who "purchased a certified pre-owned 2015 Chevrolet Tahoe … with an extended warranty" from "an authorized GM dealer" in Florida in 2016. (*See id.* at ¶¶ 68-69, Pg. ID 1031);

- Andrew C. Hill, a Florida resident who "purchased a new 2014 Chevrolet Silverado" from "an authorized GM dealer" in Florida in 2014. (*See id.* at ¶¶ 79-80, Pg. ID 1033);

- Richie Ainsworth, a Louisiana resident who "purchased a used 2014 Chevrolet Silverado" from "an authorized GM dealer" in Louisiana in 2015. (*See id.* at ¶¶ 87-88, Pg. ID 1035);

- James Won, a New Jersey resident who purchased (1) "a new 2015 Chevrolet Suburban" from an "authorized GM dealer" in New York in 2014, (2) a "second Chevrolet Suburban" from an authorized GM dealer in New York in 2015, (3) "a third new 2015 Chevrolet Suburban" from an "authorized GM dealer" in New Jersey in 2016, and (4) a "a 2016 Cadillac Escalade" from an "authorized GM dealer" in New Jersey in 2016. (*See id.* at ¶¶ 99-103, Pg. ID 1037-38.)

- Hayes Ellis, an Alabama resident who purchased a "new 2014 GMC Sierra" from an "authorized GM dealer" in Oklahoma in 2014. (*See id.* at ¶¶ 119-20, Pg. ID 1041);

- Billy Frank, a Tennessee resident who purchased a new "2015 Chevrolet Suburban" in Tennessee in 2015. (*See id.* at ¶¶ 129-30, Pg. ID 1043);

- John O'Brien, a Tennessee resident who purchased a new "2014 GMC Sierra" in Tennessee in 2013. (*See id.* at ¶¶ 141-42, Pg. ID 1046);

- Marcus Bell, a Texas resident who purchased a "new 2014 GMC Sierra" from an "authorized GM dealer" in Texas in 2013. (*See id.* at ¶¶ 152-53, Pg. ID 1049);

- Aaron and Jan Howard, Washington residents who purchased a "new 2014 Chevrolet Silverado" from an "authorized GM dealer" in Washington in 2013. (*See id.* at ¶¶ 162-63, Pg. ID 1051);

- Leslie Griffin, a Georgia resident who purchased a "certified pre-owned 2015 Chevrolet Suburban" from an "authorized GM dealer" in Georgia in 2016. (*See id.* at ¶¶ 175-76, Pg. ID 1053-54);

- Edilberto Gomez, a Florida resident who purchased a "new 2015 Chevrolet Silverado" from an "authorized GM dealer" in Florida in 2016. (*See id.* at ¶¶ 185-86, Pg. ID 1056); and

- Corey Steketee, a Michigan resident who purchased a "new 2014 GMC Sierra" from an "authorized GM dealer" in Michigan in 2013. (*See id.* at ¶¶ 195-96, Pg. ID 1058).

These Plaintiffs bring claims for breach of the Class Vehicles' express and implied warranties, unjust enrichment, fraud, and violations of the consumer protection laws of various states. GM moved to dismiss Plaintiffs' claims on November 13, 2018. (*See* Mot. to Dismiss, ECF #35.) The Court held a hearing on the motion on June 25, 2019.

### III

GM moves to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *See id.* When assessing the sufficiency of a plaintiff's claim, a district court must accept all of a complaint's factual allegations as true. *See Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). "Mere conclusions," however, "are not entitled to the assumption of truth. While legal conclusions can provide the complaint's

framework, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A plaintiff must therefore provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV

GM moves to dismiss nearly all of Plaintiffs' claims on several different grounds.[2] In the motion to dismiss, GM separates its arguments into four categories:

- "Plaintiffs' Express and Implied Warranty Claims Should be Dismissed." (Mot. to Dismiss, ECF #35 at Pg. ID 1705-17);

---

[2] GM says in its motion to dismiss that it seeks dismissal of "*all* claims" in the First Amended Complaint. (Mot. to Dismiss, ECF #35 at Pg. ID 1676; emphasis added.) However, GM does not address several of Plaintiffs' claims in the motion to dismiss. More specifically, GM fails to address (1) Carl Williams' and Clarence Larry's claim that GM violated California's Legal Remedies Act (Count 9), (2) Carl Williams' and Clarence Larry's claim that GM violated California's Unfair Competition Law (Count 10), (3) Erica Wolfe's, Andrew C. Hill's, and Edilberto Gomez's claim that GM violated Florida's Deceptive and Unfair Trade Practices Act (Count 16), (4) Billy Frank's and John O'Brien's claim that GM violated Tennessee's Consumer Protection Act (Count 39), (6) Marcus Bell's claim that GM violated Texas' Deceptive Trade Practices Act (Count 41), and (7) Aaron and Jan Howard's claim that GM violated Washington's Consumer Protection Act (Count 43). In addition, while GM initially moved to dismiss Hayes Ellis' claim that GM violated the Oklahoma Consumer Protection Act (count 36), GM is no longer moving to dismiss that claim. (*See* Reply Br. at 15 n.7, ECF #46 at Pg. ID 2531.) GM may address any purported deficiencies in these claims on summary judgment.

- "Plaintiffs' Claim of Unjust Enrichment Should be Dismissed." (*Id.* at Pg. ID 1717-20);

- "Plaintiffs' Fraudulent Concealment Claims Should be Dismissed." (*Id.* at Pg. ID 1720-28); and

- "Plaintiffs' Claims Under the Consumer Protection Statutes Should be Dismissed." (*Id.* at Pg. ID 1728-42.)

The Court will address each of these categories in turn below.

**A**

**1**

In Counts 11, 12, 19, and 35 of the First Amended Complaint, Plaintiffs Carl Williams, Clarence Larry, Leslie Griffin, and James Won allege that GM breached the express "Limited Warranty" of the vehicles they purchased. (*See* Am. Compl., ECF #24 at Counts 11, 12, 19, and 35.) These "bumper-to-bumper" Limited Warranties provide that GM will pay for any necessary "repairs to correct any vehicle defect … related to materials or workmanship occurring during the warranty period." (Limited Warranty, ECF #35-2 at Pg. ID 1755.[3]) The "warranty period" for

---

[3] The Limited Warranty is referenced in the First Amended Complaint and is central to Plaintiffs' claims in this action. The Court may therefore consider the Limited Warranty under Federal Rule of Civil Procedure 12(b)(6) when resolving GM's motion to dismiss. *See*, *e.g.*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) ("[I]f a plaintiff references or quotes certain documents" in its complaint, then "a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment").

these vehicles is "3 years or 36,000 miles, whichever comes first." (*Id.*; *see also*, *e.g.*, Am. Compl. at ¶602, ECF #24 at Pg. ID 1194, describing the "new vehicle three-year and 36,000-mile Limited Warranty").

Likewise, Plaintiffs Carl Williams, Clarence Larry, Erica Wolfe, Andrew C. Hill, Edilberto Gomez, Leslie Griffin, Richie Ainsworth, Corey Steketee, James Won, Hayes Ellis, and Marcus Bell claim GM breached their vehicles' implied warranties. (*See* Am. Compl., ECF #24 at Counts 13, 14, 18, 20, 25, 28, 31, 37, and 42.) Under the terms of the Limited Warranty, any implied warranties are limited in duration to the same period (three years or 36,000 miles, whichever occurs first) that applies to the Limited Warranty: "**[A]ny implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty.**" (Limited Warranty, ECF #35-2 at Pg. ID 1764; emphasis in original.)

**2**

GM argues that all Plaintiffs – with the exception of Plaintiff Carl Williams[4] – cannot state a viable breach of express or implied warranty claim because the air conditioning systems in their vehicles did not allegedly fail until after their

---

[4] Carl Williams is the only Plaintiff to allege that his air conditioning system failed during the period of his warranty. The Court addresses Williams' warranty claims separately below in Section IV(B).

warranties expired. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1706; *see also id.* at Pg. ID 1714, discussing expiration of implied warranties.)  The Court agrees.

To maintain a claim for breach of an express or implied warranty, a plaintiff must, among other things, "seek warranty service within the [] period contained in the … [w]arranty." *In re Ford Motor Co. Speed Control Deactivation Switch Prods. Liab. Litig.*, 2007 WL 2421480, at *7 (E.D. Mich. Aug. 24, 2007) (noting that plaintiffs' breach of express and implied warranty claims "fail[ed]" because "[n]one of the named Plaintiffs allege[d] that they sought warranty service … within the three-year warranty period"); *see also In re OnStar Contract Litig.*, 600 F. Supp. 2d 861, 877-79 (E.D. Mich. 2009) (dismissing breach of express warranty claim where plaintiffs "fail[ed] to allege that they sought service for the OnStar equipment in their vehicle, or actually incurred any problems with same, within the durational limits specified in their respective express warranties").[5]

Here, no Plaintiff (other than Carl Williams) alleges that his or her air conditioning system failed and/or that he or she sought warranty coverage related to the air conditioning system during the durational limits covering the express and implied warranties.  Indeed, the air conditioning systems in many of the named

---

[5] *See also Miller v. Gen. Motors, LLC*, 2018 WL 2740240, at **7-8 (E.D. Mich. June 7, 2018) (holding that implied warranty was limited to same durational limits as express warranty and dismissing breach of express and implied warranty claims as barred by those durational limits).

Plaintiffs' vehicles did not fail until tens of thousands of miles after they reached the 36,000-mile durational limit under their warranties.[6]  Because Plaintiffs' warranties expired before their air conditioning systems allegedly failed, they have failed to state viable breach of express or implied warranty claims.

### 3

Plaintiffs counter that their express and implied warranty claims are viable because "[a]ny time and mileage limits set forth in the [Limited] Warranty [are] unconscionable" and therefore unenforceable as a matter of law. (Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1907; *see also id.* at Pg. ID 1917-18, discussing unconscionability of implied warranties.)   The Court disagrees.

"A plaintiff must allege both substantive and procedural unconscionability when claiming a breach of warranty based on the theory of unconscionability." *Rivera v. Ford Motor Co.*, 2017 WL 3485815, at *3 (E.D. Mich. Aug. 15, 2017). "A contract is substantively unconscionable if its provisions are so outrageously

---

[6] *See*, *e.g.*, Am. Compl. at ¶179, ECF #24 at Pg. ID 1054 ("In October 2017, with approximately 92,800 miles on the odometer, the [Air Conditioning] System in Plaintiff Griffin's Class Vehicle failed without warning."); ¶58, Pg. ID 1029 ("On or around April 27, 2017, with approximately 69,361 miles on the odometer, the [Air Conditioning] System in Plaintiff Larry's Class Vehicle failed without warning."); ¶72 at Pg. ID 1032 ("On or about June 5, 2017, with approximately 70,000 miles on the odometer, the [Air Conditioning] System in Plaintiff Wolfe's Class Vehicle failed without warning."); ¶123 at Pg. ID 1042 ("On or about February 24, 2017, with approximately 79,463 miles on the odometer, the [Air Conditioning] System in Plaintiff Ellis' Class Vehicle failed without warning.").

unfair as to shock the judicial conscious." *Id.* at *4. In assessing procedural unconscionability, a court asks: "[W]hat is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?" *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 322 (6th Cir. 1998) (applying Michigan law); *see also Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 993 (N.D. Cal. 2010) (applying California law and explaining that "[t]he procedural element of unconscionability focuses on two factors: oppression and surprise. Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice").[7] "Unconscionability is ultimately a question of law for the court." *Id.*

Plaintiffs fail to plausibly allege procedural unconscionability. They contend that the durational limits in the express and implied warranties are procedurally unconscionable because "there was unequal bargaining power between GM and

---

[7] In the parties' briefing on the unconscionability issue, they cited cases interpreting the laws of various jurisdictions, including Michigan, California, New York, New Jersey, and Tennessee. (*See*, *e.g.*, Mot. to Dismiss, ECF #35 at Pg. ID 1707-10, citing cases interpreting Michigan, California, Georgia, and New York law; Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1908-10, citing cases interpreting Texas, Washington, New York, New Jersey, and Tennessee law). The parties have not argued that the Court should apply a specific state's laws when analyzing the unconscionability issue, nor have the parties provided the Court any basis to conclude that the law is meaningfully different among any of the relevant states. "Because of the minimal attention given to this issue by both parties, and because [the laws of the relevant states] do not conflict at this stage of the proceedings, no choice-of-law analysis is necessary." *Rivera*, 2017 WL 3485815, at *3.

Plaintiffs … as Plaintiffs … had no other options for purchasing warranty coverage other than directly from GM." (Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1908.) But as GM aptly points out, "the auto industry is one of the most competitive marketplaces that exists." (Mot. to Dismiss, ECF #35 at Pg. ID 1709.) An individual seeking to purchase one of the Class Vehicles has many other options – sometimes within walking distance of his local GM dealership – if he is unhappy with the warranty that GM provides. For this reason, "the clear weight of authority" has rejected the argument that a vehicle "warranty [is] procedurally unconscionable because [consumers] had no meaningful choice in determining the time limits [of the warranty]." *Majdipour v. Jaguar Land Rover N. Am., LLC*, 2013 WL 5574626, at *20 (D.N.J. Oct. 9, 2013) (dismissing breach of express warranty claim and rejecting argument that warranty was procedurally unconscionable); *see also Rivera*, 2017 WL 3485815, at *4 (rejecting argument that durational limits in automobile warranty were unconscionable and noting that "such limitations are … routinely enforced by the courts").[8]

---

[8] *See also Alban v. BMW N. Am.*, 2011 WL 900114, at *9 (D.N.J. Mar. 15, 2011) (granting motion to dismiss breach of warranty claim, rejecting argument that warranty was unconscionable, and holding that plaintiff's "bare-bones allegations that he had 'no meaningful choice in determining' the time and mileage limitation, and that 'a gross disparity in bargaining power existed between him and BMW' … are no more than conclusions [that] are not entitled to the assumption of truth") (internal quotation marks omitted); *Robinson v. Kia Motors Am., Inc.*, 2015 WL 5334739, at *12 (D.N.J. Sept. 11, 2015) ("[A]llegations of unequal bargaining power

Plaintiffs respond that even if the automobile marketplace is competitive, the bargaining power here was especially unequal – and the warranty limitations were therefore procedurally unconscionable – because GM knowingly failed to disclose the AC Defect to Plaintiffs and the public. In support of that argument, Plaintiffs rely on *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801 (S.D. Ohio 2012). In *In re Porsche*, an automobile manufacturer moved to dismiss the plaintiffs' breach of warranty claims on the ground that the plaintiffs' claims were barred by the warranty's durational limits. The district court rejected that argument and held that "Plaintiffs ha[d] alleged sufficient facts to state a *prima facie* case [that the durational limits in the warranties were] unconscionab[le]." *Id.* at 822. The court concluded that "when a manufacturer is aware that its product is inherently defective *and* the buyer has no notice of or ability to detect the problem, there is perforce a substantial disparity in the parties' relative bargaining power." *Id.* (emphasis in original; internal quotation marks omitted).

The Court respectfully disagrees with and is not persuaded by *In re Porsche*. *In re Porsche* conflates a difference in knowledge with a difference in bargaining power. Bargaining power comes primarily from having viable alternatives in the marketplace, and a vehicle consumer with many options – like the Plaintiffs here –

---

with respect to the terms of [a] warranty are … insufficient to state a claim for unconscionability.").

has real and substantial bargaining power even where a seller like GM knowingly fails to disclose a defect. That is why the "majority" of courts have ruled that a seller's "presale knowledge [of an alleged defect,] … standing alone, is insufficient to establish procedural unconscionability." *Rivera*, 2017 WL 3485815, at *4. The Court joins that majority.

Plaintiffs have also failed to plausibly allege that the warranties' durational limits are substantively unconscionable. Plaintiffs insist that the limits are substantively unconscionable because "GM knew of the defect and did not disclose it." (Mot. to Dismiss, ECF #43 at Pg. ID 1908.) But "[c]ourts have routinely rejected express warranty claims premised on [this] theory." *Chiarelli v. Nissan N. Am., Inc.*, 2015 WL 5686507, at *7 (E.D.N.Y. Sept. 25, 2015) ("The case law is clear [] that a defendant's knowledge of a latent defect does not render unconscionable a limitation contained in an express warranty.").[9] As the United States Court of Appeals for the Second Circuit persuasively explained:

> [V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a "latent defect" that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later

---

[9] *See also Majdipour*, 2013 WL 5574626, at *20 (explaining that allegations that an automobile manufacturer "knew that [a d]efect might manifest after the express warranty term do[es] not implicate the conscionability of that term."); *Alban*, 2011 WL 900114, at *9 (Plaintiffs' "allegations that BMW knew that the sound insulation in his vehicle would fail after the expiration of his warranty agreement do not indicate that the time of mileage limitation clause was unconscionable."); *McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1358-59 (N.D. Ga. 2013) (same).

and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. Such knowledge is easily demonstrated by the fact that manufacturers must predict rates of failure of particular parts in order to price warranties and thus can always be said to "know" that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage.

*Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986).

For all of the reasons explained above, the Court **DISMISSES** all of Plaintiffs' express and implied warranty claims (Counts 11, 12, 13, 14, 18, 19, 20, 25, 28, 31, 35, 37, and 42) except for the warranty claims of Carl Williams, the only Plaintiff who alleges that his air conditioning system failed during the term of his warranty.[10]

## B

In Counts 11-14 of the First Amended Complaint, Plaintiff Carl Williams alleges that his air conditioning system failed during the term of his express and

---

[10] Because the Court concludes that none of the Plaintiffs except for Carl Williams sought warranty coverage within the durational limits of the warranties, and because it concludes that those durational limits are enforceable and are not procedurally or substantively unconscionable, the Court need not address GM's alternative grounds for dismissing the express and implied warranty claims (such as that the Plaintiffs did not provide written notice and an opportunity to cure, that the claims are untimely filed, that certain Plaintiffs lack privity with GM, or that the Class Vehicles are merchantable).

implied warranties and that GM breached those warranties when it failed to adequately repair the AC Defect. (*See* Am. Compl. at ¶¶ 42-53, ECF #24 at Pg. ID 1024-28; *see also id.* at Counts 11-14.) GM moves to dismiss these claims on several grounds. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1710-13, 1716-17.) The Court will address each of these arguments separately.

**1**

GM first argues that the Court should dismiss Williams' breach of express warranty claims because Williams "does not plead facts sufficient to show that GM actually breached the Limited Warranty." (*Id.* at Pg. ID 1710.) GM says that it "complied with the promises in the express warranty by paying for repairs made to [Williams'] vehicle" and that Williams' air conditioning system is currently working. Thus, GM insists that Williams cannot maintain claims for breach of the Limited Warranty. (*Id.*) The Court disagrees.

Williams plausibly alleges that GM has not adequately repaired his vehicle and that his vehicle will therefore require additional repair work in the future. More specifically, Williams alleges that GM has addressed the AC Defect by installing "equally defective replacement parts [that] leaves the [air conditioning system] susceptible to repeated failure." (Am. Compl. at ¶230, ECF #24 at Pg. ID 1067.) Williams further alleges that:

> GM's proposed "fixes" for the AC System have proven inadequate. Because GM discontinued the refrigerant hose

originally installed in Class Vehicles due to the hose's purported inability to withstand the pressures to which it is exposed, GM required Class members whose AC Systems failed to purchase a redesigned hose supposedly manufactured to specifications sufficient to avoid cracking during ordinary and intended use. GM also required its customers to install a line bracket to restrain the hose. These repairs were ineffective, however, because other AC System components, such as the condenser, also crack and spring leaks.

(*Id.* at ¶232, Pg. ID 1067-68.) Finally, Williams alleges that he did have his air conditioning system repaired once, that the repair did not work, and that he needed to have his vehicle serviced a second time. (*See id.* at ¶¶ 49-50, Pg. ID 1026.) Taken together, at the motion to dismiss stage, Williams plausibly alleges that GM breached the express Limited Warranty by not sufficiently repairing his air conditioning system. The Court therefore **DENIES** GM's motion to dismiss Williams' breach of express warranty claims (Counts 11 and 12) on this ground.

## 2

GM next argues that the Court should dismiss Williams' breach of express warranty claims because Williams did not comply with the terms of his warranty. GM says that the Limited Warranty required Williams to provide GM with "written notice of the purported defect and an opportunity to repair [his] vehicle[] prior to filing suit," but Williams failed to provide that pre-suit notice. (Mot. to Dismiss, ECF #35 at Pg. ID 1711.) The Court disagrees.

The provision of the Limited Warranty on which GM relies is titled "State Warranty Enforcement Laws." (Limited Warranty, ECF #35-2 at Pg. ID 1789.) It states that:

> Laws in many states permit owners to obtain a replacement vehicle or a refund of the purchase price under certain circumstances. The provisions of these laws vary from state to state. **To the extent allowed by state law, GM requires that you first provide us with written notification of any service difficulty … so that we have an opportunity to make any needed repairs before you are eligible for the remedies provided by these laws**.

(*Id.*; emphasis added.)

The Court cannot conclude at this time, as a matter of law, that this provision applies to Williams' claims. The provision is included in a section of the Limited Warranty that appears to relate to claims under state "lemon laws."[11] But Williams is neither bringing a "lemon law" claim nor seeking any "remedies provided by [state lemon laws]." *Id.* Moreover, Williams is not seeking a "replacement vehicle" or a "refund of his purchase price." For these reasons, it is not clear that the notice provision GM relies upon is applicable here. The Court therefore **DENIES** GM's motion to dismiss Williams' express warranty claims (Counts 11 and 12).

---

[11] Counsel for GM acknowledged at the hearing on the motion to dismiss that this section of the Limited Warranty "contemplate[s]" state lemon laws and is "geared towards lemon law[s]." (6/25/2019 Hr'g Tr., ECF #55 at Pg. ID 2627-28.) Counsel argued however, that the notice provision was not "limited" to state lemon laws. (*Id.*) The Court will benefit from further briefing and analysis concerning the scope and applicability of the notice provision at the summary judgment stage.

Williams brings two implied warranty claims: one under California's Song-Beverly Consumer Warranty Act (*see* Am. Compl. at ¶¶ 519-32 (Count 13), ECF #24 at Pg. ID 1177-79) and one under California's commercial code (*see id.* at ¶¶ 533-45 (Count 14), Pg. ID 1179-81.) The Court will address these claims separately.

**a**

GM first moves to dismiss Williams' implied warranty claim under California's commercial code on the basis that the code requires privity of contract and Williams "do[es] not adequately allege privity." (Mot. to Dismiss, ECF #35 at Pg. ID 1716.) The Court declines to dismiss on that basis.

Strict contractual privity is not an essential element of every breach of warranty claim under California's commercial code. *See In re Gen. Motors LLC CP4 Fuel Pump Litig.*, --- F. Supp. 3d ---, 2019 WL 3315286, at ** 7-8 (N.D. Cal. July 2, 2019). On the contrary, a plaintiff may assert a warranty claim against a manufacturer under the code if the plaintiff was an intended third-party beneficiary of the contract between the manufacturer and the seller from whom the consumer purchased the product. *See id.* Applying this principle, the federal court in *In re General Motors LLC,* recently concluded that a purchaser of a GM vehicle could

bring an implied warranty claim against GM under the California commercial code even though the purchaser was not in strict contractual privity with GM:

> The Court disagrees that direct privity is strictly required to make out a breach of implied warranty claim. As this Court has held in an analogous context, under California law, a third party beneficiary can enforce a contract made expressly for his benefit.... A contract made expressly for a third party's benefit does not need to specifically name the party as the beneficiary; the only requirement is that the party is more than incidentally benefitted by the contract. As Plaintiffs assert, the third-party beneficiary exception applies to them as the intended beneficiaries of GM's contracts with its dealers.

*Id.* at *8 (N.D. Cal. July 2, 2019) (internal citation omitted). Here, Williams plausibly alleges that, like the plaintiff in *In re General Motors, LLC*, he is an intended third-party beneficiary of the contracts between GM and its authorized dealers. (*See* Am. Compl. at ¶541, ECF #24 at Pg. ID 1181.) Given that allegation, he may proceed with his implied warranty claim under the California commercial code even though he lacks strict contractual privity with GM. The Court therefore **DENIES** GM's motion to dismiss Williams' breach of implied warranty claim under the California commercial code (Count 13).

### b

GM next argues that the Court should dismiss Williams' implied warranty claim under the Song-Berly Act because Williams fails to plausibly allege that his vehicle is unmerchantable. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1712-13.) GM

contends that "a vehicle is merchantable if it is reasonably suited for ordinary use," and GM insists that Williams does "not [plead] facts to support that [his] alleged [air conditioning system's] failure[s] somehow rendered [his] vehicle inoperable." (*Id.*) The Court disagrees.

Williams plausibly alleges that the AC Defect is sufficiently serious as to render his vehicle unmerchantable. Under the Song-Beverly Act, to be merchantable, a vehicle must be "fit for the ordinary purpose for which a vehicle is used," meaning that it is "in safe condition and substantially free of defects." *Isip v. Mercedes-Benz USA, LLC*, 65 Cal. Rptr. 3d 695, 700 (Cal. App. 4th 2007). Here, Williams plausibly alleges that his vehicle is not "substantially free of defects" and is not "in safe condition." Williams lives in Southern California in a warm climate where air conditioning is a standard and ordinary feature of an automobile that a consumer would expect to work. More importantly, Williams plausibly alleges that the lack of functioning air conditioning creates a safety risk by inhibiting his ability to de-fog his windshield and windows and thereby hindering his ability to see the road while he is driving. The safety risk that Williams identifies is not merely theoretical. The First Amended Complaint identifies numerous Class Vehicle owners who were unable to see the road or were unable to easily breathe inside the

vehicle compartment due to the AC Defect.[12] (*See* Am. Compl. at ¶240, ECF #24 at Pg. ID 1070-72.)

Finally, the Court is not persuaded by GM's argument that Williams' vehicle is merchantable just because he continued to drive it despite the AC Defect. The California court in *Isip*, examining a similar claim under the Song-Beverly Act, expressly "reject[ed] the notion that merely because a vehicle provides transportation from point A to point B, it necessarily does not violate the implied warranty of merchantability." *Isip*, 65 Cal. Rptr. 3d at 699. The Court concludes that Williams plausibly alleges that his vehicle is not merchantable under the Song-Beverly Act.

For all of these reasons, the Court **DENIES** GM's motion to dismiss Williams' implied warranty claim under the Song-Beverly Act (Count 14).

## C

In Count 1 of the First Amended Complaint, Plaintiffs seek to hold GM liable for breach of express and implied warranties under the federal Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* (the "MMWA"). (*See* Am. Compl. at ¶¶ 337-58, ECF #24 at Pg. ID 1136-43.) GM moves to dismiss this claim for all of the same

---

[12] At the hearing before the Court, counsel for GM argued that drivers of Class Vehicles could successfully de-fog their vehicles by rolling their windows down. But on a rainy or hot day, that may not be a viable option.

reasons that it moved to dismiss Plaintiffs' express and implied warranty claims. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1717.)

The parties agree that "[t]he MMWA lacks substantive requirements" and instead "provides a federal remedy for breach of warranties under state law." *McKee v. Gen. Motors LLC*, 376 F. Supp. 3d 751, 760 (E.D. Mich. 2019). "Thus, the applicability of the MMWA is directly dependent upon a sustainable claim for breach of warranty." *Id.* (internal punctuation omitted). In other words, "if there exists no actionable warranty claim, there can be no violation of the [MMWA]." *Temple v. Fleetwood Enters., Inc.*, 133 F. App'x 254, 268 (6th Cir. 2005).

Because the Court concluded in Sections IV(A) and (B) above that all Plaintiffs except for Carl Williams fail to state a viable claim for breach of warranty, the Court **DISMISSES** the MMWA claims of all Plaintiffs except for Carl Williams (Count 1).

## D

In Count 4 of the First Amended Complaint, Plaintiffs allege that GM has been unjustly enriched under Michigan law.[13] (*See* Am. Compl. ¶¶ 381-86, ECF #24 at Pg. ID 1148-49.) GM argues that the existence of the express warranty "forecloses

---

[13] Plaintiffs' unjust enrichment claim "is brought on behalf of the Nationwide Class under Michigan law, or alternatively, under the laws of all states as there is no material difference in the law of unjust enrichment as it applies to the claims and questions in this case." (Am. Compl. at ¶382, ECF #24 at Pg. ID 1149.)

any claim for unjust enrichment." (Mot. to Dismiss, ECF #35 at Pg. ID 1717.) The Court agrees.

"Under Michigan law, to plead a claim of unjust enrichment, a plaintiff must establish that the defendant has received and retained a benefit from the plaintiff and inequity has resulted." *Bowlers' Alley, Inc v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 824, 833 (E.D. Mich. 2014). "Michigan courts will then imply a contract to prevent unjust enrichment. However, courts will not *imply* a contract where there is an *express* contract governing the same subject matter." *Id.* (internal citation omitted; emphasis in original). "The law operates to imply a contract in order to prevent unjust enrichment, and this will not occur if there is already an express contract on the same subject matter." *Id.* (internal punctuation omitted).

Plaintiffs cannot maintain their unjust enrichment claim here because there is an express contract governing the same subject matter as that claim – the express Limited Warranty. *See id.* (dismissing unjust enrichment claim where valid contract covered the same subject matter). Courts have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims. *See, e.g., McKee*, 376 F. Supp. 3d at 762 ("Because the [w]arranty governs [p]laintiff's claims against GM for the Transmission Defect, a claim for unjust enrichment is unavailable to him."); *Mitchell v. Gen. Motors, LLC*,

2014 WL 1319519, at *15 (W.D. Ky. Mar. 31, 2014) (granting GM's motion to dismiss unjust enrichment claim where "the written [w]arranty is an explicit contract that governs their relationship"); *Miller*, 2018 WL 2740240, at *15 (holding that plaintiffs' "unjust enrichment claims … fail because the terms of the GM Limited Warranty governs the parties' rights and obligations with respect to defects in materials and workmanship, and thus no contract will be implied in law to defeat the GM Limited Warranties' express terms"). Because the express Limited Warranty governs the parties' relationship and the same subject matter as Plaintiffs' unjust enrichment claim, that claim fails.

Plaintiffs respond that they may plead their unjust enrichment claim in the alternative to their breach of express warranty claims even if they cannot ultimately recover under both theories. (*See* Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1921-22.) In support of that argument, Plaintiffs rely on the Sixth Circuit's decision in *Solo v. United Parcel Service, Co.*, 819 F.3d 788 (6th Cir. 2016). But *Solo* is no help to Plaintiffs.

In *Solo*, a defendant moved to dismiss a plaintiff's unjust enrichment claim on the ground that the "unjust enrichment claim was precluded by the existence of an express contract concerning the subject matter at issue." *Id.* at 796. The district court dismissed the enrichment claim on that basis, and the plaintiff appealed. The Sixth Circuit reversed. It held that it was "premature[]" to dismiss the unjust

enrichment claim at the motion-to-dismiss stage because the plaintiff had "properly pled alternative claims." *Id.* and 796-97. But the court in *Solo* stressed that it was unclear whether the defendant would "dispute [the existence of a valid and binding agreement] in subsequent stages of the proceedings." *Id.* at 796.

Here, in contrast, GM has not only acknowledged the existence of the express Limited Warranty, it is actively trying to *enforce* that agreement. Moreover, during the hearing on the motion to dismiss, counsel for GM represented to the Court that GM is not disputing the existence of the Limited Warranty. Thus, unlike the plaintiff in *Solo*, GM has not "kept its options open" to "deny the existence of a contract." *Id.* (quoting *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 182 (6th Cir. 1996)). Courts have regularly rejected plaintiffs' attempts to plead an unjust enrichment claim in the alternative where, as here, there is no dispute that an express contract covers the same subject matter. *See*, *e.g.*, *Bowlers' Alley*, 32 F. Supp. 3d at 834 ("A plaintiff can only plead breach of contract and implied contract claims in the alternative if there is doubt as to the existence of a contract."); *Mitchell*, 2014 WL 1319519, at *15 (holding that "[p]laintiff is not permitted to plead … breach of express warranty claims and unjust enrichment in the alternative" where "the parties do not dispute the existence of [the warranty]); *Miller*, 2018 WL 2740240, at *15 ("Plaintiffs' unjust enrichment claim fails not because they pled an alternative claim for breach of the GM Limited Warranty, but rather because the GM Limited

Warranty is an agreement between Plaintiffs and GM which governs the same subject matter as the unjust enrichment claims.").

For all of these reasons, Plaintiffs may not maintain an unjust enrichment claim as an alternative to their breach of express warranty claims. Accordingly, the Court **DISMISSES** Plaintiffs' unjust enrichment claim (Count 4).

### E

In the First Amended Complaint, Plaintiffs Rodney Martin, Kenneth Gay, Carl Williams, Clarence Larry, Erica Wolfe, Andrew C. Hill, Edilberto Gomez, Leslie Griffin, Corey Steketee, James Won, Hayes Ellis, Billy Frank, and John O'Brien bring fraudulent concealment claims against GM. (*See* Am. Compl., ECF #24 Counts 6, 8, 15, 17, 23, 29, 32, 38, and 40.) The essence of Plaintiffs' fraud claims is that GM knowingly failed to disclose the AC Defect and omitted the existence of the defect in their representations to Plaintiffs and the public. (*See id.*) GM moves to dismiss Plaintiffs' fraud claims on a number of grounds. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1720-28.) The Court is not persuaded that the claims are subject to dismissal at this time.[14]

---

[14] In Plaintiffs' response to GM's motion to dismiss, Plaintiffs' "voluntary concede[d] their fraudulent concealment claims under Michigan, New Jersey, and Oklahoma law." (Resp. to Mot. to Dismiss at n.22, ECF #43 at Pg. ID 1929.) The Court therefore **DISMISSES** the fraudulent concealment claims brought by Plaintiffs Corey Steketee under Michigan law (Count 29), James Won under New Jersey law (Count 32), and Hayes Ellis under Oklahoma law (Count 38).

**1**

"For claims involving fraudulent omissions," like those at issue here, Federal Rule of Civil Procedure 9(b) "requires a plaintiff to plead the who, what, when, where, and how of the alleged omission." *McKee*, 376 F. Supp. 3d at 760-61. "Specifically, a plaintiff pleading a fraudulent omission must allege (1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." *Id.* at 761 (internal quotation marks omitted). In the context of an allegedly defective product, "[a] complaint may suffice if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less for it had they known of the defect." *Id.*

**2**

GM first argues that the Court should dismiss Plaintiffs' fraud claims because Plaintiffs "fail[] to allege that GM had knowledge of the [AC Defect] at the time the majority of Plaintiffs purchased their vehicles." (Mot. to Dismiss, ECF #35 at Pg. ID 1720.) The Court disagrees.

Plaintiffs make several allegations that could plausibly establish GM's presale knowledge of the AC Defect. (*See* Am. Compl. at ¶¶ 241-75, ECF #24 at Pg.

1072-1112.) For example, Plaintiffs allege that "at least as early as 2012" (*i.e.*, before any of the named Plaintiffs purchased their vehicles) "GM learned of the [AC Defect] … through sources such as pre-release evaluation and testing; investigations leading to dealer service bulletins; repair data; replacement part sales data; early consumer complaints made directly to GM, collected by [the National Highway Safety Administration], and/or posted on public online vehicle owner forums; testing done in response to those complaints; [and] aggregate data from GM dealers." (*Id.* at ¶241, Pg. ID 1072.) Plaintiffs also allege that:

- GM conducted "more than 12.5 million miles of testing" of the Chevrolet Silverado – one of the Class Vehicles – before it put that vehicle on sale and therefore "knew or should have known" about the air conditioning defect based on this testing. (*Id.* at ¶247, Pg. ID 1074-75);

- GM issued a "Technical Service Bulletin" – an "alert" that informs "authorized service technicians to pervasive issues affecting particular models and model years" (*id.* at ¶248, Pg. ID 1075) – on October 6, 2014, "concerning cracks in the [air conditioning system] components" causing the system to "'blow[] warm' air instead of producing cold air." (*Id.* at ¶249, Pg. ID 1075);

- The October 6, 2014, bulletin was "highlighted at a 2014 meeting of the Cadillac National Services Managers Council." (*Id.* at ¶250, Pg. ID 1076);

- GM issued a second "Technical Service Bulletin" related to the AC Defect on May 29, 2015. (*See id.* at ¶252, Pg. ID 1076);

- GM experienced "ongoing high sales of replacement [parts]" for the air conditioning system which "should have alerted GM that its [air conditioning systems] were defective." (*Id.* at ¶259, Pg. ID 1079); and

- Many owners of the Class Vehicles "complained directly to GM dealerships about the [air conditioning system] failures" and "some instances of these direct-to-GM complaints were posted [] online on GM's own website forums, and responded to by GM customer service." (*Id.* at ¶261, Pg. ID 1079-80.)

When taken together and accepted as true for the purposes of GM's motion to dismiss, these allegations (and others in the First Amended Complaint) plausibly establish GM's knowledge of the AC Defect.[15] *See, e.g., Phillips v. Ford Motor Co.*, 2015 WL 4111448, at **9-10 (N.D. Cal. July 7, 2015) (denying automaker's motion to dismiss fraudulent omission claim and concluding that allegations of knowledge that "include[d] internal testing … dated customer complaints, and dated [technical service bulletins were] sufficient to plausibly allege that [defendant automaker] had knowledge of [the alleged defect]"); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 957-58 (N.D. Cal. 2014) (same); *Afzal v. BMW N. Am., LLC*, 2017 WL 3207232, at *6 (D.N.J. July 27, 2017) (denying motion to dismiss fraud claim and holding that "[w]hile any of [the] sources [of knowledge plaintiffs identified]

---

[15] The Court acknowledges that GM issued the technical service bulletins described above after many of the Plaintiffs purchased their vehicles. But that does not change the Court's analysis. "It is reasonable to infer" that automakers have knowledge of potential defects *before* they issue technical service bulletins because "presumably, the [bulletins are] proceeded by an accretion of knowledge." *In re MyFord Touch Litigation*, 46 F. Supp. 3d 936, 958 (N.D. Cal. 2014). When taken together with Plaintiffs' other plausible allegations of knowledge, the issuance of the technical service bulletins here further supports the conclusion that Plaintiffs plausibly allege that GM had knowledge of the AC Defect before Plaintiffs purchased their vehicles.

may be insufficient on [their] own, the [c]ourt finds that the totality of these allegations – construed in [p]laintiffs' favor – is sufficient to impute knowledge to BMW [of the alleged defect]").

### 3

GM next argues that the Court should dismiss Plaintiffs' fraud claims under Alabama, Arizona, California, Georgia, and Tennessee law because GM "had no duty to disclose the alleged defects." (Mot. to Dismiss, ECF #35 at Pg. ID 1723.) GM insists that in each of these states, a duty to disclose "arises [only] where a confidential [or fiduciary] relationship exists between the parties or where particular circumstances mandate disclosure," and GM says Plaintiffs do not plausibly allege either of those requirements here. (*Id.*) The Court disagrees.

The Court begins with the Plaintiffs who bring fraud claims under Alabama, Florida, and Georgia law because the laws in those states are similar. Under Alabama law, courts "look to several factors in determining whether the particular circumstances of a case require[] disclosure: (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 407 (S.D.N.Y. 2017). "One of the 'other relevant circumstances' is whether a defendant has made any 'affirmatively false statements.'" *Id.* Under Georgia law,

"the obligation to communicate may arise … from the particular circumstances of the case.  The particular circumstances of the case may give rise to an obligation to communicate where there is a concealment of intrinsic qualities of the article which the other party by exercise of ordinary prudence and caution could not discover." *Amin v. Mercedes-Benz, LLC*, 301 F. Supp. 3d 1277, 1296 (N.D. Ga. 2018).  Finally, "[i]n buyer-seller relationships, Florida courts have found that a duty to disclose may arise from a seller's exclusive knowledge of a material fact." *Majdpour*, 2015 WL 1270958, at *13; *see also Ramel v. Chasebrook Constr. Co.*, 135 So. 2d 876, 882 (Fla. Dist. Ct. App. 1962) (holding that, under Florida law, the "[n]ondisclosure of a material fact may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact").

Here, Plaintiffs plausibly allege facts that could support a duty to disclose under Alabama, Florida, and Georgia law.  Plaintiffs plausibly allege that (1) GM knew of the AC Defect before Plaintiffs purchased their vehicles, (2) GM "willfully failed to disclose the [AC] Defect" and "misrepresented the [air conditioning] systems in the Class Vehicles as functional"[16]; (3) these facts were "material" to Plaintiffs, and (4) Plaintiffs "were not able to reasonably discover the AC [] Defect"

---

[16] Plaintiffs also plausibly allege that GM "intentionally concealed the hazardous situations with [the] Class Vehicles through their deceptive marketing campaign that [GM] designed to hide serious problems from [Plaintiffs]." (Am. Compl. at ¶427(b), ECF #24 at Pg. ID 1158).

on their own and "had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the AC [] Defect caused their [Air Conditioning] Systems to [fail]." (Am. Compl. at ¶¶ 306-307, 394-95, 429, ECF #24 at Pg. ID 1124, 1150-51, 1158.)  Plaintiffs further allege that GM made repeated statements about the Class Vehicles' "functioning [Air Conditioning] System," the Class Vehicles' "safety features," and "the supposed quality, safety, and comfort of the Class Vehicles" through GM's "long-term, national, multimedia marketing campaign," statements by GM's sales representatives, and representations included on Class Vehicle window stickers. (*Id.* at ¶¶ 70-71, 81, 187, 296, ECF #24 at Pg. ID 1031, 1033, 1056, 1117.)

Courts applying the laws of Florida, Alabama, and Georgia have repeatedly concluded that allegations like these are sufficient to support a duty to disclose. *See*, *e.g.*, *Majdipour*, 2015 WL 1270958, at *13 (holding that plaintiff plausibly alleged that auto manufacturer "had superior knowledge of the alleged defect" which could "establish a duty to disclose" under Florida law); *Amin*, 301 F. Supp. 3d at 1296 (declining to dismiss fraud claim under Georgia law where plaintiffs plausibly alleged that "Mercedes concealed an intrinsic quality of the Class Vehicles, that [p]laintiffs and consumers generally could not have discovered in the exercise of reasonable care"); *In re Takata Airbag Prods. Liability Litig.*, 193 F. Supp. 3d 1324, 1337 (S.D. Fla. 2016) (applying Alabama law and holding that "[a]t this motion to

dismiss stage, because [p]laintiffs have alleged that Mazda made [] incomplete statements [about the safety of its vehicles], the [c]ourt finds that Plaintiffs have sufficiently alleged Mazda had a duty to disclose additional facts about the safety of its vehicles").

Plaintiffs also plausibly allege a duty to disclose under California and Tennessee law. Under California law, manufactures have a duty to disclose "safety issue[s]." *McCabe*, 948 F. Supp. 3d at 1371 (applying California law). The same is true under Tennessee law. *See Bearden v. Honeywell Intern. Inc.*, 720 F. Supp. 2d 932, 940 (M.D. Tenn. 2010) (internal quotation marks omitted) (applying Tennessee law, refusing to dismiss "plaintiffs' fraudulent concealment claim simply because the parties were not in a fiduciary relationship," and holding that a seller "must disclose any condition or defect that it knows or should know about that renders the product defective or dangerous, and it must disclose basic, material information if it knows that the buyer is about to act without knowledge of the information and is without reasonable means to acquire the information itself").

In this case, Plaintiffs plausibly allege that the AC Defect is a "safety issue," and therefore GM had a duty to disclose it. Plaintiffs specifically allege that the defect "creates a safety risk for Plaintiffs …. because [the failure of the air conditioning system] subjects the occupants of the [Class] Vehicles to unsafely high temperatures and can lead to decreased visibility due to fogging of the windows and

an inability to use the [air conditioning s]ystem to de-fog the windows." (Am. Compl. at ¶11, ECF #24 at Pg. ID 1015.) And, as noted above, Plaintiffs also specifically identify complaints consumers made to the National Highway Traffic Safety Administration and GM regarding the safety risk posted by the AC Defect. (*See id.* at ¶240, Pg. ID 1070-72.) In one such complaint, a driver told the National Highway Traffic Safety Administration that the inability to de-fog his windows due to the air conditioning system defect left him "[u]nable to see a thing" requiring him to "pull over[] on the freeway." (*Id.* at Pg. ID 1071.) Another consumer complained about "serious breathing issues in hot weather" due to the lack of functioning air conditioning. (*Id.* at Pg. ID 1070.) Put simply, Plaintiffs plausibly allege that the AC Defect is a safety issue that required disclosure by GM.

GM responds that the AC Defect "simply do[es] not rise to the level of a serious safety issue." (GM Reply Br., ECF #46 at Pg. ID 2528.) But for all of the reasons stated above, the Court concludes that Plaintiffs do plausibly allege that the failure of their air conditioning systems is a safety issue. GM also argues that it "could not disclose an issue of which it was not aware." (*Id.*) But, as explained above, Plaintiffs plausibly allege GM's knowledge of the air AC Defect. For all of these reasons, Plaintiffs plausibly allege that GM had a duty to disclose the AC Defect under California and Tennessee law.

Finally, "Arizona does not require a duty to disclose to support a claim for fraudulent concealment." *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 237 (S.D.N.Y. 2015). GM is therefore not entitled to dismissal of Plaintiffs' fraud claim under Arizona law on the basis that Plaintiffs fail to plausibly allege a duty to disclose.

## 4

GM next argues that the Court should dismiss Plaintiffs' fraud claims under Arizona, California, Florida, and Tennessee law because those claims are barred by the economic loss doctrine. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1724-25.) The Court declines to dismiss the fraud claims based on the economic loss doctrine at this time.

Whether the economic loss doctrine bars Plaintiffs' fraud claims is an especially complex issue with seemingly persuasive authority on both sides and with potentially different applications of the doctrine under the laws of different states. Given the page limits imposed on the motion-to-dismiss briefing, neither party was able to fully develop their arguments concerning the applicability of the doctrine to Plaintiffs' claims.

The Court concludes that, given the complexity of the economic-loss-doctrine issues in this case, the soundest course of action is to defer decision on application of the doctrine until the summary judgment stage of these proceedings. At that time,

if necessary, the Court will grant the parties additional page extensions in order to fully brief this issue on a state-by-state basis.

Deferring a decision on GM's economic-loss-doctrine arguments should not meaningfully change the scope of proceedings moving forward. GM has not moved to dismiss all of Plaintiffs' common-law fraud claims under the doctrine. Thus, even if the Court agreed with GM that the doctrine barred some of the fraud claims here, others would remain, and discovery to support Plaintiffs' fraud theory would proceed. Likewise, Plaintiffs have asserted fraud-like statutory claims under various state laws, and, for the reasons explained below, the Court is permitting Plaintiffs to proceed with several of those claims. For this reason, too, even if the Court dismissed some of Plaintiffs' common-law fraud claims under the economic loss doctrine, discovery into GM's allegedly fraudulent conduct would proceed. Simply put, postponing a decision on GM's economic-loss-doctrine arguments until full briefing at the summary judgment stage will not substantially enlarge or impact the scope of discovery or the course of proceedings, and that fact further convinces the Court to delay decision on the economic-loss-doctrine questions.

For all of these reasons, the Court declines, at this time, to dismiss Plaintiffs' fraud claims under Arizona, California, Florida, and Tennessee law based on the economic loss doctrine.

Finally, GM argues that the Court should dismiss Plaintiffs' fraud claims "to the extent they rely on alleged advertisements." (Mot. to Dismiss, ECF #35 at Pg. ID 1725.)  GM insists that because Plaintiffs "fail to allege the advertisements they supposedly viewed with specificity or particularity," Plaintiffs cannot plausibly allege that they relied on these advertisements. (*Id.* at Pg. ID 1725-26.)  The Court disagrees.

In Plaintiffs' briefing and at the hearing on GM's motion to dismiss, Plaintiffs made clear that their fraud claims are not based on affirmative misrepresentations made in GM's advertisements.  Instead, Plaintiffs explain that their fraud claims are premised on "GM's failure to *disclose* the AC Defect." (Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1934; emphasis in original.)  And Plaintiffs' failure-to-disclose allegations are much like those found sufficient to state a viable fraud claim in *Beck, supra*.

In *Beck,* the plaintiff alleged that the defendant automaker had "fail[ed] to disclose [a] defective rotary shifter system" in his vehicle. *See Beck*, 273 F. Supp. 3d at 750.  The automaker moved to dismiss the fraud claim on multiple grounds, including that the plaintiff had failed to plead the elements of fraud with particularity. *See id.* at 751.  The court rejected that argument.  It first noted that, "[w]hen it comes to … fraud by omission or fraudulent concealment, a plaintiff faces

a slightly more relaxed pleading burden; the claim can succeed without the same level of specificity required by a normal fraud claim." *Id.* (internal quotation marks omitted). The court then concluded that the plaintiff had met his pleading burden:

> Beck has adequately pleaded the "who" (FCA), the "what" (knowing about, yet failing to disclose, the alleged rotary shifter system defect), the "when" (from the time the vehicles were first placed on the market in 2012 to the present day), the "where" (the various channels through which FCA sold the class vehicles, including the dealership in Carlsbad, California, where Beck purchased his vehicle), and the "how" (if Beck and the class members had known of the alleged defect, they would have not purchased or leased the class vehicles, or they would have paid less for them). Thus, Beck has satisfied the pleading requirements for Rule 9(b).

*Id.* at 751-52.

Likewise here, Plaintiffs plausibly allege the "who" (GM), the "what" (knowing about, yet failing to disclose, the alleged air conditioning system defect), the "when" (from the time the vehicles were first placed on the market to the present day), the "where" (various advertisements, window stickers on Class Vehicles, and discussions with GM dealers who did not disclose the defect), and the "how" (if Plaintiffs had known of the alleged defect, they would not have purchased or leased the Class Vehicles, or they would have paid less for them). Thus, like the plaintiff in *Beck*, Plaintiffs satisfied their pleading burden, including the burden to plead reliance. *See also Bryde v. Gen. Motors, LLC*, 2016 WL 6804584, at *12 (N.D. Cal. Nov. 17, 2016) (rejecting argument that "plaintiffs fail[ed] to sufficiently plead a

fraudulent omission claim because plaintiffs [did] not allege that they viewed and relied on specific GM advertising" and holding that plaintiffs had satisfied burden to plead reliance where plaintiffs "alleged that they interacted with a GM dealer sales representative" and the sales representative did not disclose alleged defect).

Finally, the United States District Court for the Northern District of California's recent decision in *In re General Motors LLC CP4 Fuel Pump Litigation*, *supra*, further confirms that Plaintiffs' allegations are sufficient even though they did not identify specific advertisements. In that case, GM moved to dismiss the plaintiffs' fraud claims on the basis that the plaintiffs had failed to plead fraud with the required particularity in part because they did not identify the specific advertisements on which they allegedly relied. The Court disagreed. It held that where a plaintiff alleges fraudulent omissions, as opposed to affirmative misrepresentations, "the relevant questions [] are whether [p]laintiffs have adequately alleged (1) that GM had knowledge of the defect, and (2) that defect was material." *Id.* at *4. Here, for all of the reasons explained above, Plaintiffs plausibly allege that GM "had knowledge" of the AC Defect and the AC Defect "was material." *Id.* Plaintiffs therefore satisfy the pleading requirements of their fraud claims.

For all of the reasons stated above, the Court **DENIES** GM's motion to dismiss Plaintiffs' fraudulent concealment claims (Counts 6, 8, 15, 17, 23, and 40).

**F**

GM moves to dismiss many of Plaintiffs' state-law consumer-protection-act claims on several grounds. The Court will address each of GM's arguments separately below.

**1**

GM first argues that all of Plaintiffs' state-law consumer-protection-act claims fail because "Plaintiffs cannot advance claims under the state consumer protection statutes unless they sufficiently allege that a defendant was aware of a defect at the time of sale." (Mot. to Dismiss, ECF #35 at Pg. ID 1728; internal quotation marks omitted.) And GM says that Plaintiffs do not sufficiently allege that GM knew about the AC Defect prior to the purchase of Plaintiffs' vehicles. (*See id.*) For all of the reasons explained in Section IV(E)(2) above, the Court concludes that Plaintiffs do sufficiently allege that GM had knowledge of the AC Defect before Plaintiffs purchased their vehicles. The Court therefore **DENIES** GM's motion to dismiss the state-law consumer-protection-act claims on this ground.

**2**

In Count 27 of the First Amended Complaint, Plaintiff Corey Steketee asserts that GM violated the Michigan Consumer Protection Act Mich. Comp. Laws § 445.903, *et seq.*, (the "MCPA") when it "engaged in unfair, unconscionable, or deceptive methods, acts or practices." (Am. Compl. at ¶730, ECF #24 at Pg. ID

1222.)  GM moves to dismiss Steketee's MCPA claim on two grounds.   GM first argues that the Court should dismiss Steketee's MCPA claim because one of the elements of that claim is reliance, and Steketee fails to plausibly allege "that [he] relied on [] allegedly fraudulent statements or omissions" by GM. (Mot. to Dismiss, ECF #35 at Pg. ID 1728.)  The Court disagrees.

For all of the reasons that the Court rejected GM's reliance-based argument in Section IV(E)(5) above, the Court concludes that Steketee's reliance allegations are sufficient at this stage of the proceedings.  For example, Steketee specifically alleges that he viewed and relied upon the window sticker of his vehicle prior to purchasing it, that the window sticker touted the vehicle's air conditioning system without disclosing the AC Defect, and that the functioning air conditioning system was central to his purchasing decision (*See* Compl. at ¶200, ECF #24 at Pg. ID 1059.) The Court therefore rejects GM's argument that, as a matter of law, Steketee does not plausibly allege reliance.

GM next argues that the Court should dismiss Steketee's MCPA claim because "vehicle sales are highly regulated activities that are exempt from" the MCPA. (Mot. to Dismiss, ECF #35 at Pg. ID 1730-31.)  At this time, the Court declines to dismiss Steketee's MCPA claim on the basis that vehicle sales are exempt from the MCPA.

GM relies on a section of the MCPA exempting from the Act's reach any "transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." (Mot. to Dismiss, ECF #35 at Pg. ID 1730 (quoting Mich. Comp. Laws § 445.904(1)(a)).) In the motion to dismiss, GM cites cases in which courts have held that this exemption bars claims similar to Steketee's MCPA claim here. *See, e.g.*, *Feliciano v. Gen. Motors LLC*, 2016 WL 9344120, at \*\* 12-13 (S.D.N.Y. Mar. 31, 2016). And this Court has found at least one recent decision by another Judge on this court doing the same. *See Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772 (E.D. Mich. 2019). Furthermore, Plaintiffs have not cited any cases refusing to apply the exemption under circumstances like those here.

However, the Court is not yet prepared to join the courts that have barred similar MCPA claims based on this exemption. An analysis of whether claims are barred by the exemption requires the identification and careful consideration of the specific statute that purports to authorize the transaction at issue. For example, in the leading Michigan Supreme Court case analyzing the exemption, *Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514 (Mich. 2007), the Michigan Supreme Court focused very carefully on the particular statutory language that allegedly authorized the transaction at issue. *See id.* at 520-21. Here, GM has not yet identified a specific statutory provision that purports to authorize the transactions at issue here.

In the absence of such a detailed statutory analysis, the Court declines to hold, at this time, that the exemption bars Steketee's MCPA claim. The Court will revisit this issue on summary judgment. At that time, GM should direct the Court to the specific statutory language that it relies upon to bar Steketee's claim.[17]

For all of these reasons, the Court declines to dismiss Steketee's MCPA claim on the basis that GM's vehicle sales are exempt from the MCPA. The Court will reconsider this line of argument, on a more developed record and on full briefing, at the summary judgment stage of these proceedings. The Court therefore **DENIES** GM's motion to dismiss Steketee's MCPA claim (Count 27).

### 3

In Count 5 of the First Amended Complaint, Plaintiff Rodney Martin asserts that GM violated the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5, (the "ADTPA") when it sold Class Vehicles with the AC Defect. (*See* Am. Compl. at ¶392, ECF #24 at Pg. ID 1150.) In Count 6, Martin brings a claim of common-law fraudulent concealment. (*See id.* at ¶¶ 404-14, Pg. ID 1153-55.) GM moves to

---

[17] At the hearing on the motion to dismiss, GM's counsel argued, apparently for the first time, that the exemption under the MCPA applies here because the sales of vehicles are regulated by the Michigan Vehicle Code. (*See* 6/25/2019 Hr'g Tr., ECF #55 at Pg. ID 2696.) But that argument was not raised in GM's briefing, and Steketee has not had a sufficient opportunity to respond to it. Moreover, GM did not identify a specific statutory provision of the Michigan Vehicle Code that purportedly authorizes the sales at issue here.

dismiss Martin's ADTPA claim on the ground that the ADTPA "does not allow" Martin to bring "both" a common-law fraud claim and an ADTPA claim simultaneously. (Mot. to Dismiss, ECF #35 at Pg. ID 1732.) GM relies on the "savings clause" of the ADTPA which provides that "the civil remedies provided herein and the civil remedies available at common law, by statute or otherwise, for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment are mutually exclusive." Ala. Code. § 8-19-15(a).

The "savings clause" of the ADTPA does not bar Martin's ADTPA claim as a matter of law. The "savings clause" refers to exclusive *remedies*, not causes of action or theories of liability. Therefore, while the "savings clause" may prohibit Martin from *recovering* on both his fraud and ADTPA claims, the "savings clause" does not bar Martin from pursuing the claims as alternatives. *See*, *e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d at 405 (allowing Alabama plaintiff to plead both fraud and ADTPA claims because, among other reasons, the ADTPA "does not specify *when* in the proceedings the plaintiff must … elect one or the other remedy"). Moreover, GM's counsel candidly acknowledged at the hearing on the motion to dismiss that Martin should be allowed to at least plead both claims as alternatives. (*See* 6/25/2019 Hr'g Tr., ECF #55 at Pg. ID 2706.) Accordingly, the Court **DENIES** GM's motion to dismiss Martin's ADTPA claim (Count 5).

**4**

In Counts 21 and 22 of the First Amended Complaint, Plaintiff Leslie Griffin asserts two state statutory claims. In Count 21, Griffin alleges that GM's failure to disclose the AC Defect violated the George Fair Business Practices Act, Ga. Code § 10-1-390 *et seq.*, (the ""GFBPA"). (*See* Am. Compl. at ¶¶ 627-49, ECF #24 at Pg. ID 1199-1204.) In Count 22, Griffin seeks injunctive relief under the Georgia Uniform Deceptive Trade Practices Act, Ga. Code § 10-1-370 *et seq.*, (the "GUDTPA"), based upon GM's alleged failure to disclose the AC Defect. (*See id.* at ¶¶ 650-69, Pg. ID 1204-09.) GM moves to dismiss both of these claims.

**a**

GM first argues that the Court should dismiss Griffin's GFBPA claim because Griffin failed to provide GM pre-suit notice in compliance with the GFBPA. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1733-34.) The Court agrees.

Under the GFBPA, a plaintiff must make a "written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered … [a]t least 30 days prior to the filing of any [GFBPA] action.'" Ga. Code § 10-1-399(b). "The failure to provide such notice is fatal to a GFBPA claim." *Burns v. Halsted Fin. Servs., LLC*, 2016 WL 5417218, at *4 (N.D. Ga. Sept. 14, 2016).

Griffin did not provide timely written notice to GM under the GFPBA.  Griffin asserts that she provided written notice to GM on June 29, 2018. (*See* Am. Compl. at ¶647, ECF #24 at Pg. ID 1203.)  She then filed this action three days later – on July 2, 2018. *See Marin v. Gen. Motors Co.*, E.D. Mich. Case No. 18-cv-12066 at Dkt. #1 (E.D. Mich. July 2, 2018).  Griffin therefore did not comply with the GFBPA's 30-day notice requirement.

Griffin counters that her notice should be deemed timely because it was given more than thirty days before the filling of the First Amended Complaint (which was filed on August 14, 2018). (*See* Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1941.)  Griffin insists that the Court should measure the thirty-day notice period from the date of the filing of the First Amended Complaint because that is now the operative pleading in this action. (*See id.*)  But the GFBPA clearly provides that notice must be provided thirty days before the filing of an "*action*." Ga. Code § 10-1-399(b) (emphasis added). Thus, contrary to Griffin's argument, notice is not measured with reference to amended pleadings.  Because Griffin failed to provide written notice of her claim thirty days before filing her action, she may not pursue her claim under the GFPBA.[18]  Accordingly, the Court **DISMISSES** Griffin's GFBPA claim (Count 21).

---

[18] The Court acknowledges that another Judge on this court held that notice was timely under the GFPBA where it was given within thirty days of the filing of an amended pleading. *See Persad v. Ford Motor Co.*, 2018 WL 3428690, at *7 (E.D. Mich. July 16, 2018).  But it does not appear that the parties in *Persad* directed the court to the GFBPA's use of the word "action."  And the court did not appear to

**b**

GM next argues that the Court should dismiss Griffin's claim for injunctive relief under the GUDTPA. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1735.) GM argues that the GUDTPA only provides injunctive relief for future, ongoing violations, and Griffin does not allege wrongs that can be remedied through an injunction. (*See id.*) GM insists that Griffin "has had her vehicle repaired, and she does not allege any post-repair issues, even after GM requested Plaintiffs to include any such allegations when amending their complaint." (*Id.* (citing Am. Compl. at ¶181, ECF #24 at Pg. ID 1055).) The Court disagrees with GM and concludes that Griffin pleads a viable GUDTPA claim.

Griffin makes several allegations that, if proven, may establish "ongoing harm" and may entitle her to injunctive relief under the GUDTPA. For example, Griffin alleges that she "may continue to experience failure of [her] Class Vehicle[']s [air conditioning s]ystem[] for which there is no effective fix and for which [she] must have to pay out of pocket [to repair]." (Am. Compl. at ¶666, ECF #24 at Pg. ID 1208.) In addition, at the hearing on the motion to dismiss, Griffin's counsel

---

focus on the use of that word. The Court concludes that *Persad* did not address the basis of the Court's conclusion here that the notice was not timely given under the plain language of the GFBPA.

directed the Court to the following additional claims of ongoing harm in the Complaint (*See* 6/25/2019 Hr'g Tr., ECF #55 at Pg. ID 2700):

- "Even when consumers do receive replacement parts under warranty, GM replaces the parts with equally defective replacement parts, leaving the AC System susceptible to repeated failure. As a result, GM's warranty service does not actually remedy the AC System Defect and causes its warranty to fail of its essential purpose." (Am. Compl. at ¶8, ECF #24 at Pg. ID 1014-15.)

- "The AC System Defect inhibits Plaintiffs and Class Members' expected, comfortable, and safe use of their Vehicles, and requires Class Members to go months without functioning AC Systems while waiting for replacement parts, and to pay for equally defective replacement parts that themselves are susceptible to failure." (*Id.* at ¶10, Pg. ID 1015.)

- "GM's violations present a continuing risk to plaintiffs and to the general public. GM's unlawful acts and practices complained of herein affect the public interest." (*Id.* at ¶667, Pg. ID 1208.)

Taken as a whole, Griffin's allegations state a plausible claim for injunctive relief under the GUDTPA. Indeed, "the existence of an alleged defect, coupled with failed attempts at repairs, or 'band aid' fixes only, along with representations made after each repair that the vehicles are free from the defect, is sufficient to establish likely future harm resulting from similar unsatisfactory efforts by the defendant to skirt liability for the problem without an effective fix." *In re: FCA US LLC Monostable Electronic Gearshift Litig.*, 355 F. Supp. 3d 582, 597 (E.D. Mich. 2018) (denying defendant's motion to dismiss GUDTPA claim); *see also Amin*, 301 F. Supp. 3d at

1294-95 (denying defendant's motion to dismiss GUDTPA claim and holding that plaintiff had plausibly alleged "both ongoing and future harm"). GM's motion to dismiss Griffin's GUDTPA claim (Count 22) is therefore **DENIED**.

**5**

In Counts 24 and 26 of the First Amended Complaint, Plaintiff Richie Ainsworth asserts two statutory claims under Louisiana law. First, in Count 24, Ainsworth alleges that "[b]y failing to disclose that the [AC] Defect was not safe, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer … [GM] engaged in deceptive business practices in violation" of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Stat. § 51:1401 *et seq*. (the "LUTPA"). (Am. Compl. at ¶693, ECF #24 at Pg. ID 1214-15.) Second, in Count 26, Ainsworth claims that GM violated the Louisiana Products Liability Act, La. Stat. § 8:2800.51 *et seq*. (the "LPLA"). (*See id.* at ¶¶ 713-25, Pg. ID 1219-22.) More specifically, Ainsworth says that the Class Vehicles were "unreasonably dangerous" under the LPLA due to (1) their "construction and/or composition," (2) their "design," (3) an "[in]adequate warning about the Class Vehicles and its AC Defect," and (4) the fact that they "do not conform to an express warranty of the manufacturer." (*Id.* at ¶ 715, ECF #24 at Pg. ID 1219-20.) GM moves to dismiss both of Ainsworth's claims under Louisiana law.

**a**

GM first argues that the Court should dismiss Ainsworth's LUTPA claim (Count 24) because it is barred by the LPLA. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1735.) In support of this argument, GM directs the Court to La. Stat. § 9:2800.52. That statute provides that the LPLA "establishes the *exclusive theories of liability* for manufacturers for damage caused by their products." La. Stat. § 9:2800.52 (emphasis added). GM maintains that this statutory exclusion applies in this case because GM manufactured the product Ainsworth alleges is defective. (*See id.*)

The Court agrees that Ainsworth's LUPTA claim fails because the LPLA provides the exclusive theory of liability for the wrongs Ainsworth alleges. Therefore, Ainsworth must proceed, if at all, under the LPLA. This is the same conclusion that the court reached in *In re Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *29 (S.D.N.Y. July 15, 2016). In *In re General Motors*, GM moved to dismiss a plaintiff's LUPTA claims on the basis that because GM manufactured the vehicles at issue, plaintiff's LUPTA claim was barred by the LPLA. The district court agreed. It held that because the damages at issue in that case "were directly tied to the products manufactured by [GM] … the only method of recovery under Louisiana is through the LPLA." *Id.* For all of the same reasons, Ainsworth is limited to pursuing claims, if at all, under the LPLA.

Ainsworth counters that he may plead his LUPTA and LPLA claims as alternatives to one another. (*See* Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1943.) This plain language of the LPLA forecloses this argument. The LPLA provides that it establishes the exclusive *theory of liability*; the LPLA does not merely create an exclusive *remedy*.[19] Because the LPLA creates the sole available theory of liability, the Court declines to permit Ainsworth to pursue any alternative theory.

For all of these reasons, the Court **DISMISSES** Ainsworth's LUTPA claim (Count 24).[20]

### b

GM argues that the Court should dismiss Ainsworth's LPLA claim (Count 26) for two reasons – because it is time-barred and because its allegations fall short of an LPLA violation. (*See* Mot to Dismiss., ECF #35 at Pg. ID 1737-39.) The Court disagrees on both grounds.

The Court is not persuaded that Ainsworth's LPLA claim is time-barred. GM asserts that the LPLA has a one-year statute of limitations "that runs from the date

---

[19] In this respect, the LUPTA stands in stark contrast to the ADTPA, which – as described above in Section IV(F)(3) – creates an exclusive *remedy*. Thus, while it is appropriate to allow alternative pleading under the ADTPA, it is not under the LUPTA.

[20] GM also argues that the Court should dismiss Ainsworth's LUTPA claim because it is time-barred. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1736-37.) The Court need not address this argument because it is granting GM's motion to dismiss this claim on the basis that LPLA is the exclusive theory of recovery.

of sale or from the day the buyer discovers the defect." (*Id.* at Pg. ID 1737). GM then says that this "period began to run in January 2017, when the [air conditioning] in Ainsworth's vehicle allegedly failed." (*Id.*) And GM asserts that Ainsworth did not file this action until March 8, 2018, "more than a year later." (*Id.*) But Ainsworth plausibly alleges that he did not "discover the [AC D]efect" in January 2017. (Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1944.) Ainsworth says that when his air conditioning system first failed in January 2017, he thought that it was a one-time problem with his car and thought that GM fixed the problem. (*See id.*) He insists that he did not discover that his air conditioning system was defective until December 2017 when his air conditioning failed for a second time. (*See id*; citing Am. Compl. at ¶¶ 94, 97.) It strikes the Court as plausible that Ainsworth did not discover the AC Defect until his air conditioning system failed the second time. Thus, the Court declines to dismiss Ainsworth's LPLA claim as time-barred.[21]

The Court also concludes that Ainsworth plausibly alleges a violation of the LPLA. To state a viable LPLA claim, Ainsworth must plead that the AC Defect made his vehicle "unreasonably dangerous in one of the four ways provided in the statute." *Becnel v. Mercedes-Benz USA, LLC*, 2014 WL 1918468, at *7 (E.D. La. May 13, 2014). A product may be unreasonably dangerous under the LPLA based

---

[21] GM may explore Ainsworth's knowledge of the AC Defect during discovery and may, if appropriate, raise its statute of limitations arguments again on a full record at the summary judgment phase of this action.

upon (1) its "construction or composition"; (2) its "design"; (3) an "inadequate warning"; or (4) its "nonconformity to express warranty." La. Rev. Stat. Ann. §§ 9:2800.55-58.

Ainsworth plausibly alleges (at least) a failure to warn under the LPLA. As Ainsworth points out, GM's Limited Warranty includes only a general warning that the Class Vehicle as a whole may not be defect-free. But the LPLA requires a manufacturer to provide a warning about specific *characteristics* of a product that may cause unreasonable danger:

> A product is unreasonably dangerous because an adequate warning about the product has not been provided if, at the time the product left its manufacturer's control, the product possessed a *characteristic* that may cause damage and the manufacturer failed to use reasonable care to provide an adequate *warning of such characteristic* and its danger to users and handlers of the product.

La. Rev. Stat. § 9:2800.57 (emphasis added). The general warning in the Limited Warranty that GM's vehicles may not be "defect-free" did not advise Ainsworth the air conditioning system, in particular, may be defective and may render his vehicle unsafe (in the ways described above). Thus, the Court **DENIES** GM's motion to dismiss Ainsworth's LPLA claim (Count 26).

**6**

Plaintiff James Won purchased three Class vehicles in New York and one Class Vehicle in New Jersey. In the First Amended Complaint, he alleges violations

of both New Jersey and New York law. In Count 30, Won asserts that GM violated the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8:1, *et seq.* (the "NJCFA"). (*See* Am. Compl. at ¶¶ 768-88, ECF #24 at Pg. ID 1233-38.) Won claims that "GM engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA …, and did so with the intent that Class members rely on their acts, concealment, suppression or omission." (*Id.* at ¶772, ECF #24 at Pg. ID 1234.) In Counts 33 and 34 of the First Amended Complaint, Won claims that GM violated New York General Business Law ("NYGBL") §§ 349, 350. (Compl. at ¶¶ 809-37, ECF #24 at Pg. ID 1242-48.) NYGBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in furnishing of any service in this state." NYGBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade, or commerce or in furnishing or any service in this state." GM moves to dismiss each of these claims. The Court will address them separately below.

### a

GM first argues that the Court should dismiss Won's NJCFA claim because he is also pursuing a claim under the NYGBL. (*See* Mot. to Dismiss, ECF #35 at Pg. ID 1740.) GM insists that "Won cannot recover double damages for the same injury." (*Id.*) But Won is not attempting to seek the same damages twice. He bought three vehicles in New York and one vehicle in New Jersey, and he seeks separate

damages arising out of each purchase. Won is therefore entitled to bring claims under both the NJCFA and the NYGBL because they arise out of the separate purchase of different vehicles.

<strong>b</strong>

GM next argues that the Court should dismiss Won's NJCFA claim (Count 30) because "an NJFCA claim cannot proceed based on an alleged defect that manifests *after* the warranty expires," and Won "has not alleged that any alleged [defect] appeared within the warranty period." (*Id.* at Pg. ID 1740-41; emphasis added.) The Court agrees.

"The NJCFA authorizes '[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act' to bring a private action." *Chiarelli*, 2015 WL 5686507, at *14 (quoting N.J. Stat. Ann. § 56:8–19). "Accordingly, '[t]o state a *prima facie* case under the [NJCFA], a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss.'" *Id.* (quoting *Mickens v. Ford Motor Co.,* 900 F. Supp. 2d 427, 436 (D.N.J. 2012)).

"A plaintiff cannot demonstrate an 'ascertainable loss' where the allegedly defective component outperforms its warranty period." *Id.* at *16. New Jersey

56

courts have rejected NJCFA claims by plaintiffs whose products outlasted their warranties because "recognizing a viable [NJ]CFA claim [under those] circumstances [] would essentially compel manufacturers and sellers to warrant their products and component parts beyond that to which the parties expressly agreed." *Perkins v. DaimlerChrysler Corp.*, 890 A.2d 997, 1005 (N.J. Super. Ct. App. Div. 2006). Here, Won does not allege that the vehicle he purchased in New Jersey failed within the warranty period. He therefore fails to state a claim under the NJCFA.

Won responds that the Court should not dismiss his NJFCA claim because he "alleges the [air conditioning s]ystems in three of his Class Vehicles failed twice within three years of purchase, with the remaining vehicle failing once within five years." (*See* Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1946.) But, the First Amended Complaint does not allege that the Class Vehicle that Won purchased in New Jersey, in particular, failed within the warranty period. (*See* Compl. at ¶¶ 99-118, ECF #24 at Pg. ID 1037-41.) Won asserts that three of his four Class Vehicles failed twice within the first three years, but, despite being offered the opportunity to amend his allegations (*see infra* at Section V), he does not allege that the sole vehicle he purchased in New Jersey was among them.

Won further argues that "[e]ven if the [AC] Defect did not manifest within the Warranty periods, GM's reliance on the warranty defense fails because it conflates the warranty defense with NJCFA's element of ascertainable loss." (Resp. to Mot.

to Dismiss, ECF #43 at Pg. ID 1946.) In support, Won relies on *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 502-03 (D.N.J. 2009). In *Maniscalco*, a district court declined to follow *Perkins* and allowed a plaintiff to proceed with an NJCFA claim even though a product failed outside of its warranty. But *Maniscalco* is distinguishable. The plaintiffs in *Maniscalco* alleged that "the defendant *knew* that its specific product contained a defect that would cause it to fail before that product's expected useful life" and intentionally limited the warranty period to avoid paying for repairs. *Id.* (emphasis added). Unlike in *Maniscalco*, Won does not allege here that GM intentionally set the duration of his warranty to avoid having to repair his air conditioning systems. The Court therefore follows *Perkins*, and the numerous cases applying *Perkins*, and concludes that Won cannot state a viable NJCFA claim. *See, e.g.*, *Chiarelli*, 2015 WL 5686507, at **14-17 (applying *Perkins* and dismissing a NJFCA claim in a case alleging that a defect in Nissan vehicles manifested after warranty expired); *Davidson v. Apple, Inc.*, 2017 WL 3149305 (N.D. Cal. Jul. 25, 2017) (applying *Perkins* and dismissing a NJFCA claim in a case alleging that a defect in Apple products manifested after warranty expired); *Noble v. Porsche Cars N. Am., Inc.*, 694 F. Supp. 2d 333 (D.N.J. 2010) (applying *Perkins* and dismissing a NJFCA claim in a case alleging that a defect in Porsche cars manifested after warranty expired). Accordingly, the Court **DISMISSES** Won's NJCFA claim (Count 30).

**c**

GM next maintains that the Court should dismiss Won's NYGBL claims on the basis that "[u]nder New York law, a promise to repair consumer goods, accompanied by a disclaimer that the product may contain defects, acts as a warning that the product at issue may fail, and 'undermine[s] any claim under [GBL] § 349 of a materially misleading or deceptive omission' of a product defect." (Mot. to Dismiss, ECF #35 at Pg. ID 1741.)  GM's primary authority for this argument is *Against Gravity Apparel, Inc. v. Quarterdeck Corp.*, 699 N.Y.S.2d 368, 369 (N.Y. App. Div. 1999).  In *Against Gravity*, a plaintiff accused a software maker of violating the NYGBL when the software company allegedly concealed from plaintiff that its software was not "Y2K complaint."  The New York state court disagreed.  It held that the software maker did not violate the NYGBL because the software had a 90-day warranty and the warranty "expressly 'did not warrant that the operation of the Software will be uninterrupted or error free.'" *Id.*

The Court concludes that *Against Gravity* does not control here for at least two reasons.  First, the opinion in *Against Gravity* is just two paragraphs long and, "due to its length[, it] provides little analysis." *In re OnStar*, 600 F. Supp. 2d at 870 (rejecting defendant's reliance on *Against Gravity*).  Second, *Advanced Gravity* "does not address the holding of [*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 745 (N.Y. 1995)], where … New York's

highest court established the possibility of a § 349 claim based on material omissions when there is a duty to disclose." *Feliciano v. Gen. Motors LLC*, 2016 WL 9344120, at *10 (S.D.N.Y. Mar. 31, 2016). Here, for the reasons explained above, Plaintiffs plausibly allege that GM omitted material facts and that GM had a duty to disclose. Thus, Won may be able to prevail on his NYGBL claims under *Oswego* and *Feliciano* even though GM included in its warranty that its vehicles may not be "defect-free" and promised to make repairs under the warranty. Accordingly, the Court **DENIES** GM's motion to dismiss Won's NYGBL claims (Counts 33 and 34).

**7**

Finally, in Count 7 of the First Amended Complaint, Plaintiff Kenneth Gay alleges that GM violated Arizona's Consumer Fraud Act, AZ Rev. Stat. 44-1521, *et seq.* GM moves to dismiss this claim because Gay fails to "plausibly plead that [he] relied on the allegedly fraudulent statements or omissions" by GM. (Mot. to Dismiss, ECF #35 at Pg. ID 1728-29.) The Court disagrees. Gay specifically alleges that

- "Prior to purchasing the Class Vehicle, Plaintiff Gay test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with GM sales representatives concerning the vehicle's features. Neither [GM] nor [its] agents, dealers, or other representatives informed Plaintiff Gay of the [air conditioning system d]efect's existence at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff Gay relied on [GM's] misrepresentations and omissions in deciding to purchase his vehicle." (*Id.* at ¶34, Pg. ID 1022-23); and

- "In addition to touting many of the Class Vehicle's safety features, the vehicle's window sticker also state that the vehicle was equipped with an [air conditioning s]ystem, the functionality of which was important to Plaintiff Gay in the hot temperatures of Arizona.  The [air conditioning s]ystem was central to Plaintiff Gay's purchasing decision, and he relied on [GM's] representations regarding its functionality in deciding to purchase his vehicle." (*Id.* at ¶35, Pg. ID 1023.)

As explained above in Section IV(E)(5), the Court concludes that Gay plausibly alleges the required reliance element of his claim under the Arizona Consumer Fraud Act.  Accordingly, the Court **DENIES** GM's motion to dismiss Gay's Arizona Consumer Fraud Act claim (Count 7).

## V

At the conclusion of Plaintiffs' response to GM's motion to dismiss, Plaintiffs "respectfully request[ed] leave to replead" any of Plaintiffs' claims that the Court concluded were deficiently pleaded. (Resp. to Mot. to Dismiss, ECF #43 at Pg. ID 1948.) While leave to amend should be "freely give[n] *when justice so requires,*" Fed. Rule Civ. Proc. 15(a)(2) (emphasis added), justice does not require that Plaintiffs be permitted to file a Second Amended Consolidated Master Class Action Complaint.  A careful review of the history of this action shows why.

On April 11, 2018, the Court entered its initial scheduling order in this action. (*See* Scheduling Order, ECF #14.)  In the scheduling order, the Court set forth a procedure for Plaintiffs to file a Consolidated Master Class Action Complaint and

for GM to file a motion to dismiss. More specifically, the Court ordered Plaintiffs to file a Master Complaint by no later than May 4, 2018. (*See* Master Compl., ECF #18.) It then required GM to deliver a substantive "meet and confer" letter to Plaintiffs in which GM would "identif[y] deficiencies in [the] Master Complaint that would be raised in a motion to dismiss." (Scheduling Order, ECF #14 at Pg. ID 303.) The Court then permitted Plaintiffs to file a First Amended Consolidated Master Complaint that sought to address the deficiencies raised in GM's letter. (*See id.*)

This procedure allowed Plaintiffs a full opportunity to allege any and all facts in a First Amended Consolidated Master Class Action Complaint that supported Plaintiffs' claims and that could address GM's bases for dismissal. The Court did not want to undertake an exhaustive analysis of Plaintiffs' claims until it had given Plaintiffs that opportunity. Nor did the Court want the parties to spend time and resources on motion practice until Plaintiffs had the chance to review GM's arguments in support of GM's motion to dismiss and to augment their claims with additional factual allegations if necessary. The parties and the Court have now spent significant time and resources related to the facts and claims in the First Amended Complaint, and it would not be just to require the parties and the Court to repeat this process. The Court therefore declines to grant Plaintiffs leave to amend. *See Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 272-73 (6th Cir. 2018) (affirming denial of request for leave under same circumstances).

## VI

For all of the reasons stated above, GM's motion to dismiss (ECF #35) is

**GRANTED IN PART AND DENIED IN PART** as follows:

- The Court **GRANTS** the motion to dismiss with respect to Counts 1 (for all plaintiffs except for Carl Williams), 4, 11-14 (with respect to Clarence Larry's claims only), 18, 19, 20, 21, 24, 25, 28, 29, 30, 31, 32, 35, 37, 38, and 42. Those claims are **DISMISSED**;

- The Court **DENIES** the motion to dismiss in all other respects; and

- The Court **DENIES** Plaintiffs leave to file a Second Amended Consolidated Master Class Action Complaint.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 5, 2019

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 5, 2019, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764